```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION

UNITED STATES OF AMERICA,     )    Case No. 3:21-cr-00435-N-4
                              )
         Plaintiff,           )
                              )    Dallas, Texas
V.                            )    March 3, 2022
                              )    9:30 a.m.
IJEOMA OKORO,                 )
                              )    REPORT OF VIOLATION OF
         Defendant.           )    CONDITIONS OF PRETRIAL
                              )    RELEASE [128]
_____)


                      TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE IRMA CARRILLO RAMIREZ,
                  UNITED STATES MAGISTRATE JUDGE.

APPEARANCES:

For the Plaintiff:          Mary Walters
                            UNITED STATES ATTORNEY'S OFFICE
                            1100 Commerce Street, Suite 300
                            Dallas, TX  75242-1699
                            (214) 659-8600

For the Defendant:          Phillip W. Hayes
                            LAW OFFICE OF PHILLIP HAYES
                            3300 Oak Lawn Avenue, Suite 600
                            Dallas, TX  75219
                            (214) 774-0488

Recorded by:                Marie Gonzales
                            UNITED STATES DISTRICT COURT
                            1100 Commerce Street, Room 1452
                            Dallas, TX  75242-1003
                            (214) 753-2167

Transcribed by:             Kathy Rehling
                            311 Paradise Cove
                            Shady Shores, TX  76208
                            (972) 786-3063




           Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.
```

<table>
1 |     <u>DALLAS, TEXAS - MARCH 3, 2022 - 9:37 A.M.</u>
</table>

1            <u>DALLAS, TEXAS - MARCH 3, 2022 - 9:37 A.M.</u>

2            THE CLERK:  All rise.

3            THE COURT:  Good morning.  Please be seated.  All

4    right.  We are here in the matter of United States versus

5    Ijeoma Okoro, Case 3:21-cr-435-N.  For purposes of our

6    proceeding, we're going to remain at counsel table to better

7    maintain social distancing.  The microphones are on the

8    tables, and the closer you are to them the better the

9    recording is.  So I'm going to ask you to remain seated,

10   although it's customary in federal court to stand.

11        All right.  Ms. Okoro, did you get a copy of the report of

12   violation of conditions of pretrial release?

13            THE DEFENDANT:  Yes, ma'am, I did.

14            THE COURT:  Have you had a chance to read it?

15            THE DEFENDANT:  Yes, ma'am, I did.

16            THE COURT:  And do you understand what the

17   allegations are in this report?

18            THE DEFENDANT:  Yes, ma'am, I do.

19            THE COURT:  Do you understand that you have the right

20   to a hearing for the Court to decide if your conditions of

21   release should be revoked?

22            THE DEFENDANT:  Yes, ma'am, I do.

23            THE COURT:  And Mr. Phillips, how would Ms. Okoro

24   like to proceed on that issue?

25            MR. HAYES:  Pardon, Your Honor?

Poton - Direct                                3

1            THE COURT:  How would she like to proceed?

2            MR. HAYES:  We could proceed on the issue, Judge.

3    She does not deny the allegations.  She's got some

4    explanations for the Court and certainly would ask the Court

5    to not revoke her supervision at this time.

6            THE COURT:  Okay.

7            MR. HAYES:  Prepared to go forward today.

8            THE COURT:  All right.  And are we prepared to go

9    forward at this time?

10            MR. HAYES:  Certainly.

11            THE COURT:  All right.  You may call your first

12    witness.

13            MS. WALTERS:  Yes.  Thank you, Your Honor.  Mary

14    Walters for the Government.  And Mary Walters calls Wayne

15    Poton.

16            THE COURT:  All right.

17        (The witness is sworn.)

18            THE COURT:  Please be seated.

19            THE WITNESS:  Thank you.

20            THE COURT:  And please speak up into that mic for me

21    and for the record.

22              WAYNE POTON, GOVERNMENT'S WITNESS, SWORN

23                        DIRECT EXAMINATION

24    BY MS. WALTERS:

25    Q    Sir, could you please state your name?

Poton - Direct                          4

1    A    It's Wayne Poton.

2    Q    And what is your position?

3    A    I'm a United States Probation Officer here in the

4    Northern District of Texas.

5    Q    And are you responsible for supervising Ms. Okoro, the

6    Defendant, in the Northern District of Texas?

7    A    She's currently supervised in the Eastern District, so

8    she's supervised by Officer Rogan in the Eastern District,

9    and she's assigned to Probation Tech Martin here in Dallas,

10   and I am the one overseeing this violation.

11   Q    And have you had an opportunity to speak with Officer

12   Rogan regarding the alleged violations?

13   A    Yes, I have.

14   Q    And have you also had an opportunity to review any

15   materials from, I believe, Mr. Bruno Perez, who also

16   communicated with respect to this matter?

17   A    I've spoken to -- with him, but not reviewed --

18   Q    Okay.

19   A    -- if he had any documentation.

20   Q    All right.  Do you recognize the individual named as

21   Ijeoma Okoro in the courtroom today?

22   A    Yes.

23   Q    Could you identify her by where she is seated and an

24   article of clothing she is wearing?

25   A    She is currently seated at the defense table with a

1    colored mask, multicolored mask.

2    Q    Okay.

3         MS. WALTERS:  Let the record reflect the witness has

4    identified the Defendant.

5         THE COURT:  The record will so reflect.

6    BY MS. WALTERS:

7    Q    Now, sir, in speaking with or communicating with Mr.

8    Rogan in the Eastern District of Texas, did he make you aware

9    of potential violations Ms. Okoro committed, violations of

10   her conditions of bond?

11   A    Yes, he did.

12   Q    Could you identify what conditions those were that she is

13   alleged to have violated?

14   A    It was regarding the Defendant must participate in the

15   following location monitoring program, which was home

16   incarceration, and which was modified to include work.

17   Q    And how did she violate those conditions?

18   A    She failed to follow the --

19   Q    That condition?

20   A    She failed to follow the provided schedule.

21   Q    And can you give the specific dates and times she failed

22   to follow it?

23   A    Yes.  The first one would be January 26, 2022.  She was

24   provided a location monitoring window, let's see, I believe

25   to go to -- let's see.

Poton - Direct                                6

1   Q    Is it January 26th or perhaps December 22nd?

2   A    Yes.  December 22nd, Ms. Okoro was approved to go to CVS

3   for a COVID test.  She was provided a window and failed to

4   enter as directed.

5   Q    And when you say failed to enter, could you describe for

6   the Court what that means?

7   A    Say, if she's given a window from 12:20 p.m. to 2:00, she

8   needs to enter at 2:00 p.m. or around 1:59 p.m.  If anything

9   after that, it's a violation.

10  Q    And enter her home residence, correct?

11  A    Correct.

12  Q    And what kind of monitoring is she on?

13  A    She's currently on a radio frequency monitor.

14  Q    Does that tell you where she is at all times?

15  A    No, it does not.

16  Q    Could you explain what that is for the Court?

17  A    So, the radio frequency is basically there's a base unit

18  and the ankle monitor.  The ankle monitor emits a frequency

19  that we cannot hear, a radio frequency.  And depending on its

20  communication with the beacon, it determines if you've left

21  the residence.

22  Q    Okay.

23  A    And then when you come back in, it's able to listen to

24  the radio frequency and say the Defendant's back in the

25  house.

Poton - Direct                         7

1    Q    So it will identify when the Defendant leaves the house

2    or enters the house.  Correct?  But it cannot identify where

3    the Defendant is once the Defendant has left the house?

4    A    No.

5    Q    Okay.  Now, so it indicated she had reported 23 minutes

6    late from CVS on December 22nd; is that correct?

7    A    Yes.

8    Q    And did she notify her supervising Pretrial Services

9    officer that she was going to be late?

10   A    She did not.

11   Q    Did she provide any explanation subsequently as to why

12   she was late?

13   A    She had noted that she went to the wrong CVS.

14   Q    Okay.  But still did not call the Pretrial Services

15   Officer Rogan?

16   A    No, she did not.  And further, he requested verification

17   that she went to get a COVID test and she did not provide

18   that verification.

19   Q    Did she provide a reason that she refused to provide the

20   proof of the COVID test?

21   A    In speaking with her regarding the violation, she noted

22   that it was against HIPAA law and that she did not need to

23   provide it.

24   Q    And is this -- is verifying what a defendant says they

25   are doing with respect to medical appointments something that

Poton - Direct                    8

1    Probation typically asks for?

2    A    Yes.  For every window, we should be requesting

3    verification.

4    Q    And so you're not asking for the substance of whether the

5    test was positive or negative; you're just asking for did she

6    take the test?

7    A    It would be some form of verification.

8    Q    Some form of verification?  Even an appointment notation

9    at CVS?

10   A    Yes, that would work with an appointment card.

11   Q    Okay.  But she did not provide any of that?

12   A    She did not, to my record.

13   Q    Has she violated this condition regarding home

14   incarceration on other dates and times?

15   A    Yes.  On January 7th, she was provided a location

16   monitoring window to go visit an attorney, John Helms, to see

17   about her federal case.

18   Q    Uh-huh.

19   A    And she was provided a window from 8:00 a.m. to -- it

20   says 11:00 a.m. but it was actually 11:30 a.m.  And she

21   entered at 11:55 a.m.

22   Q    So that's approximately 25 minutes late?

23   A    Yes.

24   Q    And did she provide -- did she notify Officer Rogan that

25   she was going to be late?

Poton - Direct                    9

1    A    She did not.

2    Q    Did she notify him afterwards with an explanation as to

3    why she was late?

4    A    I believe she had mentioned that the office visit got out

5    around 10:30.

6    Q    I'm sorry?

7    A    Let's see.  She noted that she didn't leave the office

8    until 10:30 a.m. and the commute to her residence was an

9    hour.

10   Q    And did she provide that while she was running late, or

11   only in response to a request by the Pretrial Services

12   officer?

13   A    Upon the request.

14   Q    Okay.  Is there any verification of that explanation?

15   A    Um, it's not on here, but I believe -- I think Officer

16   Rogan spoke with Attorney Helms and --

17   Q    And --

18   A    -- confirmed that.

19   Q    Okay.  And so it's -- the concern isn't that she is lying

20   about leaving his office at 10:30; the concern is the failure

21   to report?

22   A    Yes.  The failure to be proactive.

23   Q    Now, the third alleged violation is what?

24   A    It's on January 21st, Ms. Okoro was provided a window for

25   a job interview at OSK Logistics from 4:00 p.m. to 9:00 p.m.,

Poton - Direct                          10

1  and she failed to enter her residence at 9:00 p.m.  However,

2  she did contact Officer Rogan at 9:23 p.m., after the window

3  had closed, indicating that she was leaving and would be home

4  around 10:30.  And she ended up entering the home at 10:50

5  p.m.

6  Q    Okay.  So she was an hour and 50 minutes late in this

7  case, but did contact the Pretrial Services officer?

8  A    Yes.  After the window had closed.

9  Q    After the window had closed?  Is -- has Pretrial Services

10 made any attempts to verify the existence of this job

11 interview?

12 A    My verification, I reviewed just Google.  I looked for

13 the job.  I found an address --

14 Q    Uh-huh.

15 A    -- for the employer of -- on Dowdy Ferry Road.  And the

16 address for the interview was a different residence, or a

17 different address, which was 3035 Belvedere Road in

18 Lancaster, which, when searching on Google, it appeared to be

19 a field with a house to the right and a possible trailer.

20 So, --

21 Q    Let's step back a second.  What information did Ms. Okoro

22 give Pretrial Services about the interview before it

23 occurred?  Like, what was the name of the company she was

24 going to interview with?

25 A    Yes.  It was OSK Logistics, and I believe she noted to

Poton - Direct                          11

1    Officer Rogan that that company is ran by her friend, and the

2    person doing the interview would be an acquaintance of her

3    and acquaintance of the friend, Mr. Victor.

4    Q   And so, Victor, you've only got one name?  You don't know

5    if it's his first name or last name?

6    A   Just one name.

7    Q   Okay.  And the address where the interview was to take

8    place according to Ms. Okoro was what?

9    A   3035 Belvedere Road, Lancaster, Texas 75134.

10   Q   And is that the address you Googled?

11   A   I believe that's -- yes, I Googled it.

12   Q   And so is that the address that had a -- was an empty

13   field with the house to the right and possibly a trailer to

14   the left?

15   A   Correct.

16   Q   But the house was not on the address, right?

17   A   No.  The Google would just go to the field with a truck

18   in it.

19   Q   Okay.  Now, did you -- then did you look up an address

20   for OSK Logistic?

21   A   Yes.  And the address is the 2714 Dowdy Ferry Road,

22   Dallas, Texas 75217.

23   Q   Okay.  Do you know anything, based on your research,

24   about how big the company is or how long it's been in

25   business, number of employees, anything like that?

Poton - Direct                    12

1  A    I don't have too much information, but based on this it

2  shows a total of two trucks, tractors owned, two.  There's

3  not much information on it.

4  Q    Okay.  Now, do -- did the fact that she has arrived after

5  the window for which she was allowed to be out of her house,

6  does her -- do her late arrivals give you any concern about

7  your ability or Eastern District of Texas's ability to

8  supervise her on bond?

9  A    Well, it's just a general following the rules.  She's not

10  following the rules.  She was provided guidance on her

11  window, when to return, and she just doesn't follow.  That's

12  the concern.

13  Q    And so it's -- it's an unwillingness to comply with the

14  court order?

15  A    Yes.  She just hasn't been proactive in communicating

16  with her officer.

17  Q    Okay.  Now, is there an ability -- she's on home

18  incarceration right now.  Is there an ability to put a GPS

19  location monitor on her to know where she is?

20  A    There is a possibility for a GPS; however, the Eastern

21  District of Texas does not utilize GPS.  They only use the

22  radio frequency.  So they wouldn't be able to supervise.  One

23  of our officers would have to.  Most likely me.

24  Q    So, is Ms. Okoro already on the most strict conditions of

25  bond, short of detention, that are available?

1    A    Yes.  Right below -- she is right below being detained.

2    Q    Okay.  Is there anything else Probation could do to

3    ensure that she complies with the rules for pretrial release

4    that the Court sets?

5    A    I'm not sure, based on these three violations, I don't

6    believe that she's going to be following the rules, that she

7    can follow the schedule.

8    Q    Okay.  And how do you know that she -- that she was made

9    aware of these rules?

10   A    She was provided a location monitoring program

11   participant agreement.  This took place on September 30th,

12   and it was signed by her and Officer Rogan.  So this explains

13   the process and what's expected.

14   Q    Okay.

15          MS. WALTERS:  I pass the witness.

16          THE COURT:  Mr. Hayes?

17          MR. HAYES:  I just have a few questions for you.

18          THE COURT:  Can you move the microphone a little

19   closer to you?

20          MR. HAYES:  I can put it wherever you want, Judge.

21   Is that --

22          THE COURT:  Thank you.

23          MR. HAYES:  Okay.

24                        CROSS-EXAMINATION

25   BY MR. HAYES:

Poton - Cross                                14

```
 1   Q    Just so I'm clear, she's been on the monitor since
 2   November 17th?  Is that right?
 3   A    Yes.
 4   Q    And as far as I've been told, these are the only three
 5   allegations or only three issues she's had?
 6   A    Correct.
 7   Q    And she leaves regularly?  I mean, she -- matter of fact,
 8   she's been in my office several times.  You wouldn't -- you
 9   understand that, right?
10   A    She's -- excuse me?
11   Q    You understand she leaves regularly and goes places
12   regularly with permission, right?
13   A    Yes.
14   Q    And these are the only three times there's been a hiccup?
15   A    Yes.
16   Q    Matter of fact, the last one was in January.  So all of
17   -- the last third of January, all of February, and the first
18   few days of March, the last five-six weeks, she hasn't had
19   any issues?
20   A    Yes.  And Officer Rogan confirmed that today when I asked
21   him if there was any further LM violations, and he noted no.
22   Q    Oh -- I'm sorry.  I cut you off.
23   A    You're good.
24   Q    So outside of this, I don't know, three week/month-long
25   period, she's been doing everything that's expected of her?
```

Poton - Cross                          15

1    A    Regarding LM, yes.  Officer Rogan noted she was advised

2    on January 6th to provide job search logs, and his only

3    comment was that she had not provided those at this time.

4    Q    Okay.  Now, let's kind of talk about some of these

5    issues.  The first time you say that there was an issue was

6    December 22nd?  She went to the wrong CVS and she was 23

7    minutes late getting home?

8    A    Yes.

9    Q    Okay.  Would that surprise you if it took someone longer

10   than they thought getting a COVID test, or if they went to

11   the wrong CVS?  I mean, things like that happen, right?

12   A    Yes.  Of course.

13   Q    And 23 minutes late, I mean, she got home and she was

14   there the rest of the day, right?

15   A    I don't know if she was out the rest of the day, but yes,

16   we can assume.

17   Q    Well, there's no indication that she left without

18   permission any other time that day?

19   A    True.

20   Q    And would it surprise you if she actually has text

21   messages on her phone where she did send paperwork to the

22   officer in regard to the COVID test?

23   A    It would surprise me because I was not provided that

24   information, so --

25   Q    I know you weren't provided it, but you weren't the

Poton - Cross                                16

1    officer who was communicating with her, right?  This is kind

2    of second and third-hand information.

3    A    She advised me that she did not provide that information

4    to him.  She --

5    Q    She advised you?

6    A    -- may have after -- yes.  She may have after the fact,

7    but during the time she noted she did not provide him any

8    information.

9    Q    Okay.  I agree maybe not initially, but you don't know if

10   she eventually sent it to him or not?

11   A    I don't.

12   Q    Okay.  But if she did and it confirmed she had a COVID

13   test that day, that would certainly show that she wasn't

14   lying about that?

15   A    Of course.

16   Q    Okay.  The second time she was late, when she went to see

17   a lawyer, John Helms.  You -- you -- someone called and

18   verified that she left around 10:30?

19   A    Yes.  Officer Rogan did.

20   Q    And you don't know if that's 10:40 or 10:20, but

21   somewhere around 10:30?

22   A    Uh-huh.  10:30.

23   Q    I can tell you that whenever the officer called me twice

24   to ask me, the first time he asked me what time she left I

25   didn't know so I estimated.

Poton - Cross                          17

1    A    Okay.

2    Q    I said around something because I didn't know I was going

3    to get a phone call and I was going to have to give specific

4    numbers.

5    A    Uh-huh.

6    Q    Do you think Mr. Helms might have been like that, too?

7    A    Possibly.

8    Q    And if you're talking to a lawyer, you may lose track of

9    time, but, regardless, Mr. Helms confirmed that it would have

10   taken her an hour to get home from his office.  Right?

11   A    Yes.

12   Q    I mean, she was at the office trying to deal with this

13   very case, right?

14   A    Yes.

15   Q    And she was 25 minutes late getting home?

16   A    Yes.

17   Q    So, and at this point, from December 17th to January 7th,

18   she's -- she's 48 minutes late for two months, three months?

19   A    Yes.

20   Q    Every other time, she's been there on time.  She has

21   permission to walk her son to the bus stop a couple times a

22   week.  She never has a problem with that, right?

23   A    I've heard of no issues on that.

24   Q    The last one is this job interview.  You went and took a

25   Google map picture.  Do you have any idea how old that

Poton - Cross                                18

1    picture is?

2    A    I don't.

3    Q    Would it surprise you if there's currently a temporary

4    facility set up there?  That's a trucker depot.  Do you

5    understand?

6    A    Uh-huh.

7    Q    And trucks go into places and drop off loads and pick up

8    loads, and -- and either warehouses or field-type areas.  You

9    can't really do that at a crowded -- in downtown?

10   A    Uh-huh.

11   Q    Agree?

12   A    Agree.

13   Q    And OSK appears to be a trucking business.  It was

14   started in 2020.

15   A    Okay.

16   Q    I mean, based on the documents that you've provided, I

17   mean, it looks like it was started maybe in -- is that 2020?

18   A    It says mileage year 2020.

19   Q    Okay.  Doesn't appear to be something that was just

20   created to give her some kind of cover, right?

21   A    Sure.

22   Q    And she told -- she actually talked to the probation

23   officer about the job and said she couldn't take that job

24   based on the weird hours.  Do you know about that?

25   A    No.

Poton - Cross                          19

1  Q   Would it surprise you --

2          THE COURT:  Officer Poton, I'm sorry, I'm having

3  trouble hearing you.

4          THE WITNESS:  Oh, sorry.  No.

5  BY MR. HAYES:

6  Q   Is there any notes about the conversation they had about

7  that?

8  A   No.

9  Q   It turns out the job would have been for when trucks got

10 in, and you don't leave until the last truck gets in, so

11 that's 10:00, 11:00, 12:00, that's when you go home.

12         MS. WALTERS:  Objection.  Is there a question?

13         THE COURT:  Mr. Hayes?

14 BY MR. HAYES:

15 Q   Well, are you aware that that's what the job would have

16 been?

17 A   No.  You're telling me now.

18 Q   Did anyone ask what Victor's last name was?

19 A   No.

20 Q   Okay.  I mean, she -- I asked, and you know what, she not

21 only -- she gave me his last name, she gave me his phone

22 number.  His last name is Kolawole.

23         MS. WALTERS:  Again, is there a question?

24         MR. HAYES:  Yeah.

25 BY MR. HAYES:

Poton - Cross                                        20

1    Q    Are you aware that Victor's last name is Kolawole, K-O-L-

2    A-W-O-L-E?

3    A    No.

4    Q    So instead of calling the guy who owned the company, you

5    just took a Google picture and said she must be lying about

6    it?

7    A    I didn't infer that she was lying about it.  I just took

8    a Google -- I just screenshotted the Google.

9    Q    Okay.  Would it surprise you that I actually spoke with

10   Victor and he confirms he has a trucking business?

11   A    Yes, now I'm aware that you spoke with him.

12   Q    And she was late that night and she called to let him

13   know she was -- she called 23 minutes after she was supposed

14   to be home.  And ever since then, she's been on time.

15   A    Correct.

16   Q    Since it's been brought to her attention, she has curbed

17   this behavior and has dealt with the issue at hand.

18            MS. WALTERS:  Objection.  No question, just

19   testimony from the lawyer.

20            MR. HAYES:  I thought if I raised my inflection at

21   the end you would figure out that was a question.  So I'll

22   ask it differently.

23   BY MR. HAYES:

24   Q    You would agree, wouldn't you, that since this has been

25   brought to her attention, she hasn't had an issue.  Right?

1    A    Yes.  I would agree.

2    Q    And she seems to be in compliance with the court orders

3    since it's been brought to her attention that 23 minutes is

4    quite serious to be late?

5    A    Yes.

6    Q    And if people are able to fix the behavior that has you

7    concerned, that's got to give you a little bit of pause to

8    think that it needs to be stricter, right?

9    A    Can you say again?

10   Q    Sure.  She's doing everything currently that you would

11   want her to do.

12   A    Yes.

13   Q    And as long as she continues like that, then she's a good

14   candidate to stay on supervision.  Agreed?

15   A    Not sure if that, like -- can you ask that question

16   again?

17   Q    Sure I can.  If someone's doing what you asked them to

18   do, they communicate with you, even if they've had a problem

19   in the past, if someone's doing everything that you want them

20   to do, that's a good candidate for supervision?

21   A    Well, I think it showed that she's learned that she needs

22   to show up on time.

23   Q    Okay.  I agree with you.  I think she's learned and she's

24   done that.

25   A    Yes.

Poton - Cross                                    22

1  Q    All right.

2            MR. HAYES:  Nothing further, Your Honor.

3            THE COURT:  Anything else, Ms. Walters?

4            MS. WALTERS:  No, Your Honor.

5            THE COURT:  All right.  You may step down, Officer

6  Poton.

7            THE WITNESS:  Thank you.

8       (The witness steps down.)

9            THE COURT:  Anything else from the Government?

10           MS. WALTERS:  No, Your Honor.

11           THE COURT:  All right.  Mr. Haynes?

12           MR. HAYES:  Your Honor, I would call Ms. Okoro just

13  for the purposes of the allegations, if the Court would

14  allow.

15           THE COURT:  I'm happy to hear a proffer, but if you

16  put her on the stand the Government's going to be entitled to

17  cross-examine.

18           MR. HAYES:  All right.  Well, if you would allow me

19  to proffer, Judge, I would tell you that I've talked to Ms.

20  Okoro in my office a number of times.  Every time that's

21  happened, it's followed up with a phone call from the

22  officer.  The very first time, I can tell you I wasn't

23  expecting it so I told him she probably left between 10:30

24  and 11:00.  Or I don't remember what time it was, but I gave

25  him a range.  My guess is Mr. Helms did the same thing.

1    I've been dealing with federal cases like this for a

2    long, long time, and I've never had an officer call and

3    verify that before, so I just wasn't expecting it.

4    I only mention that because, yes, she was 25 minutes late

5    getting home, but it was verified that she was seeing an

6    attorney, and Mr. Helms is certainly is a qualified attorney

7    and he knows what he's doing.

8    I would point out that she was 23 minutes late, but if

9    she had her phone in here I could show the state or show him

10   -- obviously, she can't bring it in -- but she's got evidence

11   that she did send him the proof she got a COVID test and she

12   was 23 minutes late.  I verified the job interview.  I mean,

13   it's -- it was a real job that she decided she couldn't take

14   it because the hours could be anywhere from 10:00 to

15   midnight.  It's whenever the last truck gets in.  So she

16   couldn't take the job.

17   I think the most -- so I would -- that's what she would

18   tell you, Judge, that she's tried everything she can do.  She

19   has permission to walk her son to the bus stop three times a

20   week.  She doesn't ever mess it up.  She's got permission to

21   pick him up from the bus stop a few times as well.  She

22   doesn't miss that up.  And she's been, I know, coming to see

23   me and doing other things that she's had permission for, and

24   she, since all of this, since these three issues, she's done

25   everything the Court would ask.  And we just want the Court

1    to be aware that's what she would tell you, is that she

2    admits that there were some problems, three problems, and

3    she's -- she's past it.

4        That sounded more like an argument, but that's my

5    proffer, Judge.

6            THE COURT:  Any proof, any evidence of this company

7    on this lot?

8            MR. HAYES:  I didn't know that they were going to

9    insinuate that it wasn't a real lot until today, so I didn't

10   bring Victor down here, but I can -- I can tell you that I've

11   met with him in my office.  He's got a trucking company.  It

12   has two trucks.  And they do daily runs.  And whenever the

13   second truck gets in, the person who's the dispatcher checks

14   it in and goes home.  And that's the job that would have been

15   there.  And she -- it could be where she -- the job's over at

16   9:00, 10:00, 11:00, and she knew she couldn't make that job

17   work.  I think it was four hours at the end of the day.  It

18   wasn't a great job, but it was somebody she knew was trying

19   to give it to her.

20       Had I known that they were going to insinuate this, I

21   guess I could have brought Victor in here, because he's been

22   pretty helpful in the past.

23       I think it's pretty telling that no one even bothered to

24   ask his last name or get his phone number.  They could have

25   verified anything through him if they'd really wanted to.  I

1   did.  I just didn't know that that was going to be called

2   into question.  I thought it was just a timing issue.

3        THE COURT:  Anything else you would like for the

4   Court to consider in terms of evidence before we hear

5   argument?

6      (Pause.)

7        MR. HAYES:  I think I'd indicated, if you want her

8   to go get her phone from the Marshal, she can show you where

9   she sent him proof of the COVID test.  I don't know if that's

10  in -- if the Court thinks that's in dispute or not.  But she

11  -- she can't -- if the Court wants to see it, we can provide

12  that.

13       THE COURT:  Did she ever provide the -- well, the

14  only thing I heard was that it contains evidence that she

15  provided proof of the COVID test.  Did she ever provide --

16  was there -- is there also approved of the job search logs?

17  You didn't mention that.

18       THE DEFENDANT:  The job search logs, I -- like

19  emailing --

20       THE COURT:  You may want to talk to your attorney.

21  And I can't understand you because you're too far away from

22  the mic.

23      (Pause.)

24       MR. HAYES:  Your Honor, if she were called to

25  testify, she would say that she looks for jobs every day, but

1    she does online IT stuff, and she -- she applies for jobs

2    online.  She doesn't have to leave the house to do that.  She

3    would if she got an interview.  But she applies every day for

4    jobs, but just because she's a single mom and has no other

5    income.  She wants to work.

6              THE COURT:  Okay.  So there's no logs, in other

7    words?  That was my question, was there -- you offered to go

8    get the phone from the court security officers to show that

9    she ultimately provided proof of her COVID test.  So my

10   question was, was there any other evidence beyond that on the

11   phone that you wanted --

12             MR. HAYES:  Oh, I --

13             THE COURT:  -- to show me?

14        (Pause.)

15             MR. HAYES:  There's no evidence on the phone about

16   job logs, but I can tell you this is the first I've heard

17   about that as well, --

18             THE COURT:  Okay.

19             MR. HAYES:  -- or, today.  I think he'd said that

20   was kind of an afterthought.  So --

21             THE COURT:  Okay.

22             MR. HAYES:  -- I think she could provide that today

23   or tomorrow if that's something -- if he just wanted her to

24   write down all the jobs that she had been applying for.

25        She's got emails, but I guess she has -- or email

1    confirmations, but I guess she hasn't given them to him.  But

2    he hadn't indicated, last time I talked to him, he hadn't

3    indicated there were any deficiencies in that area.

4            THE COURT:  Okay.

5            MR. HAYES:  And he certainly didn't allege it on the

6    violation motion or we would have dealt with that as well.

7    We just dealt with the issues that we were aware of.

8            THE COURT:  Okay.  Well, let's hear argument, then,

9    if there's nothing else evidence-wise.

10            MR. HAYES:  No, ma'am.

11            MS. WALTERS:  Your Honor, the issue here is

12   suitability for supervision.  We don't believe there's any

13   doubt that she did violate the conditions of bond, and ask

14   that you find that she violated the conditions of bond.  The

15   question is what can the Court do now that would ensure she

16   doesn't violate further when there are no more strict

17   conditions than the Court has already imposed.  Home

18   incarceration on bond is a very serious condition, and as

19   Pretrial Services Officer Poton testified, there is nothing

20   more the Court can impose beyond detention, I mean, other

21   than detention, in this situation.

22        And the concern the Government has is that she's had two

23   prior hearings related to bond.  The Government moved to

24   detain her, and there were hearings on September 29, 2021 and

25   then a second hearing November 17, 2021.  And in both of

1   those situations, the Court released her on bond and

2   admonished her at the end of each hearing about her need to

3   comply and that a failure would not be as a result of a

4   misunderstanding, but an intent not to comply.

5       This is very clear, because the Court did that in open

6   court that's on a transcript, and then here Ms. Okoro has

7   failed to comply.  And while it is a shame that she has

8   failed to comply, there's nothing more that I can identify

9   that the Court can do to ensure her compliance.  Recent

10  compliance or an attempt at a corrective measure after the

11  probation violation report comes out does not mean that she

12  complied in the past or that she's going to continue to

13  comply.

14      The problem is she doesn't follow the rules.  And when

15  she's asked to explain why she doesn't follow the rules, she

16  pushes back.

17      So, for example, refusing to provide the COVID test

18  initially or proof that she had an appointment at CVS due to

19  HIPAA is something that's really a resistance to supervision.

20  It's -- the Government doesn't care at all what the result of

21  the COVID test is.  And in fact, it could have been an

22  appointment for a totally different thing at the CVS.  It's

23  the appointment and the ability to verified.

24      The Government isn't alleging that she didn't have --

25  that Victor is not a real person.  In fact, another Pretrial

1   Services officer did speak with him.  But the issue is her

2   unwillingness to play by the rules.  And the rules aren't

3   hard.  The rules relate to phone calls.  And if she is

4   willing to use the phone when it benefits her, but doesn't

5   feel like she needs to follow the rules when she doesn't want

6   to, that's a problem.

7        So, for these reasons, we believe that the Court should

8   revoke the conditions of bond.  And I've thought about this

9   significantly, because she does have concerns and she does

10  have a child, which was the basis for the reopened detention

11  hearing.  But none of these violations relates to childcare

12  responsibilities, and none of them relate to something that's

13  difficult to do.  They're reporting.

14       So, for those reasons, the Government believes that the

15  violations should be found and she should be revoked and

16  detained pending trial.

17            THE COURT:  Mr. Hayes?

18            MR. HAYES:  Obviously, Judge, we would ask you to

19  not revoke her or detain her.

20       I think Ms. Walters did bring up a good point.  She is a

21  single mom and has a child at home.  And, yeah, none of these

22  are related to childcare, because she's never late.  She gets

23  him to school on time, gets him to the bus on time, and she

24  gets back home on time.

25       She's been on supervision for almost four months.  She's

1    had three issues.  And she's got an officer who is very
2    diligent in checking everywhere she goes.
3        I can tell you that from firsthand experience, that every
4    time she's ever left my office I get a phone call from him
5    within about an hour or two.  So, with a diligent officer,
6    this is it.  She's got three issues.  She was 23 minutes late
7    one time, 25 minutes late one time, after talking to a lawyer
8    an hour away.  And then the job interview issue, she was
9    late.  And she did call, but she called 23 minutes late to
10   let them know what was going on.
11       Since this was brought to her attention, she has not had
12   any issues in the last six weeks.  I think that Ms. Walters
13   downplays that when she says someone who has learned to
14   comply or someone who has recently started to comply, there's
15   no guarantee they're going to continue.  I think that's the
16   exact opposite.  That's the whole purpose of the criminal
17   system, is you -- you give a sanction and see whether or not
18   that pulls someone back in line.  Part of what we do down
19   here, or part of what the Court does, is you give an
20   appropriate punishment, but one that's not too harsh.  You
21   want to give one that fixes the problem but not one that goes
22   overboard.
23       In this situation, her problem was three times out of a
24   hundred, I mean, or more.  And I'm not downplaying that,
25   because it is serious.  But at the same time, that means

1  there's some 97 or several hundred times that she did exactly

2  what she's supposed to do.  And in the last six weeks, she's

3  done exactly what was asked of her.  She's not been a minute

4  late that I'm aware of.  And she has shown that she's taken

5  this serious, and she has shown that she's conformed her

6  behavior to do exactly what the supervision officer wants her

7  to do.

8      And I can tell you, I know the Court gave her the chance

9  because she is a single mom, but she's in the same boat and

10  she's doing everything she can to find a job, take care of

11  him, and then deal with this case.  And we're trying to deal

12  with this case, too.

13      I can tell you from firsthand knowledge that she is

14  currently looking for a job every day, because she's running

15  out of money.  And it has nothing to do with -- the most

16  important thing is she wants to be able to take care of her

17  son, and she is looking every day, but it's difficult to find

18  a job in the computer industry whenever you have a case

19  pending.  But she's looking.

20      We would ask you to give her credit for the six weeks

21  that she's been doing everything right and allow her to

22  continue to do everything right.

23      I think that this case has recently gotten continued.

24  That wasn't her call.  She didn't want it continued.  She'd

25  like to get the case resolved also.  But at the same time,

it's been continued, and now it's further out, and there is
more discovery, and we'll continue to go through that.  It's
a lot easier for me to be able to go through it with her in
my office as opposed to have to go visit her two hours away
or wherever she may be.  That's a selfish reason, but just so
the Court knows.  There's -- appears to be extensive
discovery in this case.

    We would ask the Court to certainly admonish Ms. Okoro
today.  I think that she's gotten the big picture.  I think
she's kind of figured out that even 23 minutes late is
significant.  Because it is.  And we would ask you to allow
her to continue under the supervision that she's on based on
her current ability to follow those rules and based on other
of the facts that we're talked here today, Judge.

            THE COURT:  All right.  Ms. Okoro, based on the
admission and the testimony, I do find clear and convincing
evidence that you violated your conditions of release.  So
the test becomes whether I find that there are no conditions
I can set that will assure your appearance in court or the
safety of the community, or whether you're unlikely to abide
by any condition or combination of conditions of release.

    First of all, your attorney has argued on your behalf
very zealously and put the very best possible spin on it.
But at the end of the day, you and I had a conversation when
I released you on conditions, and I told you very

1   specifically that you were either going to follow my order

2   setting conditions or you weren't, and that if you weren't it

3   was going to be very difficult for you to convince me that I

4   shouldn't revoke you.  I was very clear about what would

5   happen if you violated the conditions.

6        Whether or not you chose to believe me, that's up to you,

7   but I very much told you right up front I expected you to

8   follow the conditions, and any violation, no matter how

9   technical, will still be a violation of a federal court

10  order, which I have here today.

11       I am troubled by the attempt to put everything on the

12  officers.  When you're talking to your officer, you're

13  talking to me.  The officers understand the conditions that

14  I've set.  They understand that I want to be notified of

15  every violation and that I want it reported because of what I

16  told you I would do if you violated the conditions.  So the

17  officer is doing exactly what I asked him to.

18       And these officers do a hard job.  They put their lives

19  on the line to supervise people, to keep the community safe

20  and to keep you safe.  They're not doing this to make your

21  life miserable.  They've got lots of people to supervise.  So

22  when they have to go chase you down, that's time away --

23  that's not time they should be having to spend chasing you

24  down, because these are your conditions and it's your

25  responsibility to comply with those conditions.  But it also

1  takes away from time that they need to spend with other

2  people as well.

3      So, yes, this is -- this started out about being

4  untimely, but it's far beyond that because it was a choice

5  not to do what you were supposed to do.  The officer

6  contacted you on the COVID test and you told him you wouldn't

7  provide it.  I know that you have now, but I had testimony

8  from Officer Poton that he talked to you and you told him you

9  weren't going to provide it because of HIPAA.

10     You were -- the officer had to call -- and that was the

11  first time it was brought to your attention, hey, you were

12  late, you didn't call me.  And two weeks later, you did it

13  again.  You were late, and he's the one who had to call.

14     I understand you've got to go to your lawyer.  I

15  understand things happen.  I've had people call their officer

16  from the side of the road when they had a flat tire.  This

17  doesn't indicate to me that you were concerned.  And in fact,

18  yes, you been compliant the last six weeks, but I issued the

19  summons six weeks ago.

20     So what it looks like to me from here is an officer who

21  told you, hey, you didn't call me, you're not cooperative;

22  two weeks later, you don't call him again, he's got to go

23  find out where were you.

24     Your attorney obviously had a very easy time finding out

25  who Victor was, what his last name was, what his address, but

 1    that's your attorney.  I would expect that you'd be more

 2    cooperative with your attorney than with anyone else, but

 3    that was your supervising officer, and that's the person that

 4    you also needed to be cooperative with.

 5        I understand this seems harsh.  It is harsh.  But at the

 6    end of the day, when I set the conditions, I told you exactly

 7    what would happen if you didn't follow them.  And doing what

 8    I said I would is not unduly harsh.  I made clear to you that

 9    this was serious and whether or not you would comply was up

10    to you.

11        So I've got three violations here.  Three.  And they

12    stopped after I issued the summons.  I can't find that you're

13    going to do what I'm telling you to do, when I've already

14    told you what I was going to do.  So I am revoking your

15    conditions of pretrial release.  I'm going to ask Mr. Hayes

16    to walk you up to the Marshals Office, where you will --

17    well, Officer Poton.  Mr. Hayes can go.  But Officer Poton is

18    going to walk you up to the Marshals Office, where you'll

19    surrender for revocation of your conditions of supervised

20    release.  Mr. Hayes will talk to you about what your options

21    are before today.  I have violations.  I told you what would

22    happen if you violated.  So here we are.  I'm sorry that this

23    is where you find yourself, but it  is.

24                MR. HAYES:  Your Honor?

25                THE DEFENDANT:  Can I speak?

1          THE COURT:  You might want to talk to your attorney

2   before speaking.  And you're not going to change my mind.

3      (Pause.)

4          MR. HAYES:  Could we bring you the phone, Judge?

5   Would that matter, if she sent the COVID test --

6          THE COURT:  She -- I understand that she's not --

7   and I'm accepting that she provided the COVID test after, but

8   I still have the testimony of the officer that when he spoke

9   to her about verification she told him no.

10          MR. HAYES:  I think -- I think she's indicated that

11  she provided that when asked.  And if you were to look at her

12  phone, you might -- it might be able to show what day it was,

13  if it was on that day or how far it was after.

14          THE COURT:  If she provided it to her officer,

15  Officer Rogan, the day that he asked, then she wouldn't have

16  told Officer Poton, who talked to her after that, that she

17  didn't and wasn't going to.

18          THE DEFENDANT:  I didn't.

19          THE COURT:  So that's -- that's the issue I'm

20  seeing.  December 22nd, lack of cooperation, confirmed by the

21  second officer who testified today.  Two weeks later, you had

22  another late, the same kind of violation.  Officer had

23  already talked to her.  And then a third.

24      You know, ultimately, her -- following her conditions is

25  up to her.  I understand it's hard.  I understand things

1   happen.  But when she's already been told you need to call me

2   in advance or when it's happening, and she continues to do

3   it,  --

4           MR. HAYES:  Your Honor, --

5           THE COURT:  -- that's an indication here.  So, I've

6   got another -- I've got a 10:30 docket downstairs.  So that's

7   the ruling of the Court.

8           MR. HAYES:  Sure.

9           THE COURT:  You'll be able to talk to her about her

10  options.

11          MR. HAYES:  We will.  Judge, can -- would the Court

12  be amenable to letting her turn herself in on Monday?  She's

13  got a -- got an eight year old who's going to be home from

14  school in about six hours and no one to get him at the bus

15  stop.

16          THE COURT:  She knew where she was coming today.

17  She knew what she was coming here for.  She knew what the

18  possible consequences were.  And Mr. Hayes, it's important to

19  me to treat everybody the same.

20          MR. HAYES:  Well, I agree, Judge.  I wouldn't expect

21  you to treat someone different.

22          THE COURT:  And to do that would be allow her to --

23  be to treat her differently from other people in her same

24  situation.

25          MR. HAYES:  Would the Court consider a motion to

1    reconsider and --

2            THE COURT:  I will consider whatever motion you

3    choose to file, but at this time that's the decision of the

4    Court.

5            MR. HAYES:  Understood, Your Honor.

6            THE COURT:  Good luck to you, Ms. Okoro.

7            THE CLERK:  All rise.

8        (Proceedings concluded at 10:20 a.m.)

9                            --oOo--

10

11

12

13

14

15

16

17

18

19                        CERTIFICATE

20        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                        **03/13/2022**

23   _____    _____

24   Kathy Rehling, CETD-444                        Date
     Certified Electronic Court Transcriber

25

INDEX

PROCEEDINGS                                                    2

WITNESSES

Government's Witnesses          Direct Cross Redirect Recross

    Wayne Poton                      3      13

EXHIBITS

-none-

RULINGS                                                      32

END OF PROCEEDINGS                                           38

INDEX                                                        39