IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA

v.                                          NO. 3:21-CR-435-N

IJEOMA OKORO (04)

**GOVERNMENT'S NOTICE OF INTENT TO OFFER
EVIDENCE PURSUANT TO RULE 404(B)**


LEIGHA SIMONTON
UNITED STATES ATTORNEY

*Mary Walters*
_____

Mary Walters
Assistant United States Attorney
Texas State Bar No. 24003138
1100 Commerce Street, Third Floor
Dallas, Texas  75242-1699
Telephone:  214-659-8600
Facsimile:  214-659-8803
Email:  mary.walters@usdoj.gov

## Table of Contents

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES........................................................................................ iii

FACTUAL BACKGROUND ........................................................................................ 2

ARGUMENT.................................................................................................................. 4

        A.     Okoro's false tax returns are intrinsic evidence of the
               conspiracies to commit wire fraud and money-laundering ............... 4

        B.     Evidence that the conspiracies to commit wire fraud and
               money-laundering continued through September 2017 is
               intrinsic to the charged crimes ........................................................... 9

        C.     Okoro's receipt of a wire from short-term rental reservation
               victims on March 5, 2018, is relevant to her knowledge of and
               intent to participate in the conspiracy to commit wire fraud .......... 12

        D.     Okoro's receipt of a wire from that included $117,020 from a
               business email compromise victim on February 25, 2019, is
               relevant to her knowledge and intent to participate in the
               conspiracies to commit wire fraud and money-laundering ............. 13

CERTIFICATE OF SERVICE ......................................................................... 16

## Table of Authorities

**Cases**                                                                 **Page(s)**

*Huddleston v. United States*, 485 U.S. 681 (1988)............................................6, 15, 17, 19

*United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) ................................................7, 9

*United States v. Cockrell*, 587 F.3d 674 (5th Cir. 2009)................................................7, 8

*United States v. Crawley*, 533 F.3d 349 (5th Cir. 2008) ...............................................4, 12

*United States v. Girod*, 646 F.3d 304 (5th Cir. 2011) .................................................12, 13

*United States v. Gurrola*, 898 F.3d 524 (5th Cir. 2018).................................................4, 12

*United States v. Jones*, 833 F. Appx. 528 (5th Cir. 2020).................................................13

*United States v. Kinchen*, 729 F.3d 466 (5th Cir. 2013) .......................................7, 8, 9, 15

*United States v. Rice,* 607 F.3d 133 (5th Cir. 2010)..........................................................5

*United States v. Rojas*, 812 F.3d 382 (5th Cir. 2016)..........................................................8

*United States v. Sangs*, 163 F.3d 1355 (5th Cir. 1998) ....................................................13

*United States v. Watkins*, 591 F.3d 780 (5th Cir. 2009)....................................................13

## Rules and Other Authorities

Fed. R. Evid. 404(b) ...................................................................................passim

## GOVERNMENT'S NOTICE OF INTENT TO OFFER
## <u>EVIDENCE PURSUANT TO RULE 404(B)</u>

Pursuant to Federal Rule of Evidence 404(b), the United States respectfully notifies the defendant that it intends to offer evidence at trial of other crimes, wrongs, or acts, to prove her motive, intent, plan, knowledge, and absence of mistake or accident in its case-in-chief.  That evidence consists of the following:

1. Ijeoma Okoro's tax returns for tax years 2017, 2018, and 2019, tcertificate of non-existence of records, and the IRP, which did not reflect the romance funds or other scam funds.[1]

2. The continuation of the conspiracies to commit wire fraud and money-laundering through on or about September 2017.

3. On or about March 5, 2018, victims DZ and KZ wired $4,400 to Okoro to rent an apartment in New York City for June to July 2018 in what turned out to be a short-term rental scam.

4. On or about February 25, 2019, Okoro received $140,000 via wire transfer that included $117,020 from business email compromise victim Miller Truck Lines.

Evidence of Okoro's tax returns and the continuance of the conspiracies through on or about September 2017 (items #1 and #2) are intrinsic to the charged offenses, rendering this notice superfluous.  However, in an abundance of caution, this notice addresses both in the event that either is later determined to be extrinsic.

## FACTUAL BACKGROUND

Ijeoma Okoro is charged with one count of conspiracy to commit wire fraud and

---

[1] The tax returns for David Animashaun and Oluwalobamise Moses will also be offered into evidence as exhibits, authenticated by an IRS witness, and discussed by Animashaun and Moses.  Because this evidence implicates Animashaun and Moses rather than Ijeoma Okoro, Rule 404(b) does not apply to it.

one count of conspiracy to commit money-laundering.  (Dkt. 205.)  The artifice and scheme to defraud charged in the indictment is a romance scam.  The coconspirators assumed fake personas on dating websites, gained the confidence of unsuspecting victims, then lured the victims into wiring money to or making cash deposits into accounts belonging to Okoro, unwitting third parties, and coconspirators.  After receiving the victims' funds, Okoro and her coconspirators quickly moved the money out of the receiving accounts.  Moving the money quickly, often in increments of more than $10,000, was a key step in hiding the money from victims and laundering it so to wash away its illegitimacy.

The superseding indictment charged that the conspiracies began at least as early as January 23, 2017, and continued "through at least July 11, 2017, the exact dates being unknown."  (Dkt. 205 at p.1.)  Evidence showed that the conspiracy to commit wire fraud via romance scams and the conspiracy to launder that money continued through on or about September 28, 2017.  Multiple additional romance scheme victims who were victimized between July and September 2017 have been identified .  These individuals sent money to Okoro directly and indirectly.  The victims have been identified through bank records, reports made to law enforcement, and witness interviews.

Another step in hiding the funds was not reporting them on tax returns. Animashaun, Moses, and Okoro filed tax returns for 2017, but none reported the illegally-obtained funds on their tax returns.  Okoro herself received romance scam funds into three different business bank accounts titled "IJ Global Link."  Okoro identified IJ Global Link as her company on the Schedule C attached to her tax return, but in 2017 the

business description was "exotic entertainment." The victims' funds were not reported. In 2018, Okoro described the business of ]IJ Global Link as "native clo6thing," and again victims' funds were not mentioned. In 2019 and 2020, Okoro described the business of IJ Global Link as "consulting," and again victims' funds do not appear. Not reporting the illegally-obtained funds on tax returns makes it harder for IRS to identify who had control of the money or where the money was, another key step in laundering it.

In addition to receiving funds from victims of romance scams, Okoro received funds from victims of other schemes. First, Okoro received money from victims of a short-term rental scam. Victim DZ responded to an online advertisement to rent an apartment in New York City for approximately 5 weeks in 2018. After DZ negotiated the terms of a contract and signed it, on March 5, 2018, KZ wired $4,400 as directed to a BB&T acct. ending in 3604 in the name of IJ Global Link. Okoro was the sole signatory on the account. Later, the Zamiski's realized the rental contract was a scam.

Second, Okoro received money that was in large part funded by a business email compromise scam. The CFO of Miller Truck Lines had received emails from the CEO telling her to wire money for a new truck he had bought. On December 19, 2018, and December 26, 2018, the CFO wired a total of $117,020 to a Capital One account ending in #0100. That account belonged to Xclusives Weaves, and its sole signatory was Martha Beah. On February 25, 2019, Xclusive Weaves and Braids wired $140,000 to Okoro's IJ Global Link Capital One acct. ending in #2558. Later, Miller Truck Lines realized their email had been compromised.

## ARGUMENT

**A.    Okoro's false tax returns are intrinsic evidence of the conspiracies to commit wire fraud and money-laundering.**

Evidence of crimes, wrongs, and other bad acts is generally admissible if "intrinsic" to the crimes charged.  "Intrinsic" evidence does not implicate Federal Rule of Evidence 404(b).  *See United States v. Crawley*, 533 F.3d 349, 353–54 (5th Cir. 2008). Evidence is intrinsic "if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime of the trial."  *United States v. Gurrola*, 898 F.3d 524, 536 (5th Cir. 2018) (citations omitted).  "Intrinsic evidence is admissible to complete the story of the crime by providing the immediate context of events in time and place, and to evaluate all of the circumstances under which the defendant acted."  *United States v. Rice*, 607 F.3d 133, 141 (5th Cir. 2010).

*Gurrola* and *Rice* apply here.  Okoro's tax returns, on which she failed to report or underreported receipt of romance scam and other scam funds, is inextricably intertwined with the evidence regarding the charged offenses of conspiracy to commit wire fraud and conspiracy to commit money-laundering.  Okoro received hundreds of thousands of dollars into her bank accounts based on her participation in a conspiracy to commit wire fraud.  Those sums could not be explained by legitimate employment.  Getting the money out of her accounts was the critical first step to launder it.  But it was not the only step.  It was just as critical that the money not be reported to the IRS.  Otherwise, if Okoro

declared the romance scam money as income, she would have to identify its source, which she could not truthfully do without revealing her crime, which would lead to a return being scrutinized by IRS. If IRS did not even know about the funds, there was a lower likelihood of detection and greater likelihood of success for the conspiracy to commit wire fraud and money-laundering. Presentation of Okoro's underreporting or failing to report income on her taxes is necessary to complete the story of crime, to provide immediate context of events in time and place, and allows the fact-finder to evaluate the circumstances under which Okoro acted. The evidence is therefore intrinsic and does not implicate Rule 404(b).

Even if the Court were to determine that the Okoro's tax returns were extrinsic to the charged offense, that evidence would still be admissible under Fed. R. Evid. 404(b) as proof of intent, knowledge, absence of mistake, and lack of accident. Federal Rule of Evidence 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character," but may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Supreme Court reasoned that "[e]xtrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988).

The Fifth Circuit "applies a two-pronged analysis for the admissibility of evidence under Rule 404(b). First the evidence of 'other crimes, wrongs or acts' must be relevant

to an issue other than the defendant's character." *United States v. Cockrell*, 587 F.3d 674, 678 (5th Cir. 2009) (citing *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978)).  "The standard for relevancy under *Beechum's* first prong is identical to that found in Rule 401 of the Federal Rules of Evidence: whether the evidence has 'any tendency to make a fact more or less probable than it would be without the evidence' and 'the fact is of consequence in determining the action.'" *United States v. Kinchen*, 729 F.3d 466, 472 (5th Cir. 2013) (quoting Fed. R. Evid. 401).  "An extrinsic act is relevant to an issue other than the defendant's character if it is offered to prove one of the elements listed in Rule 404(b): 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, or lack of accident.'"  *Kinchen*, 729 F.3d at 472; Fed. R. Evid. 404(b); *see also United States v. Rojas*, 812 F.3d 382, 405 (5th Cir. 2016) ("intent is a permitted use of extrinsic evidence under 404(b)(2)").

Second, "the evidence must possess probative value that is not substantially outweighed by its undue prejudice" under Rule 403.  *Kinchen*, 729 F.3d at 471.  "The inquiry 'calls for a commonsense assessment of all the circumstances surrounding the extrinsic offense.'"  *Id.* (quoting *Beechum*, 582 at 914).  As "[the Fifth Circuit] stated in *Beechum*, 'the judge must consider the danger of *undue* prejudice' and the 'test is whether the probative value of the evidence is *substantially* outweighed by its *unfair* prejudice.'"  *Cockrell*, 587 F.3d at 679 (quoting *Beechum*, 582 F.2d at 915) (emphasis in original).

As such, Rule 403 "would seem to require exclusion only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be

excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *Beechum*, 582 F.2d at 915 n.20.  The Fifth Circuit considers "several factors in determining whether the prejudicial effect of the extrinsic evidence substantially outweighs its probative value: (1) the government's need for the extrinsic evidence, (2) the similarity between the extrinsic and charged offenses, (3) the amount of time separating the two offenses, and (4) the court's limiting instructions." *Kinchen*, 729 F.3d at 473.

Here, the government anticipates that Okoro's defense will include an argument that she did not know that the source of the funds was illegal, did not join any conspiracy, and therefore could not have the criminal intent necessary to be convicted.  Okoro's false tax returns from 2017 to 2019 are evidence to the contrary.  Okoro's false tax returns show that she knew the money was illegally obtained and therefore did not want to connect herself to it by declaring it as income on her tax return.  Rather, she did not declare the scam income.  Furthermore, the nature of Okoro's tax returns for 2018 and 2019 did not change.  Okoro continued to underreport or not report income from scams on her returns.  Thus, Okoro's returns demonstrate knowledge of the illegal nature of her income, an absence of mistake as to the source of the funds, and an intent and plan to conspire with others to join the conspiracy to obtain the funds and to launder them.

Okoro's filing of false tax returns for 2017, 2018, and 2019, meets both of the Fifth Circuit's prongs for admissibility under Federal Rule of Evidence 404(b).  First, the tax returns are relevant to an issue other than Okoro's character, namely intent, plan, knowledge, and absence of mistake.  Second, the probative value of the tax returns is not

substantially outweighed by their potential to create unfair prejudice.  The probative

value of the evidence is measured by its tendency to make the existence of Okoro's

knowledge, intent, and absence of mistake more probable than it would be without the

evidence.  The probative value is significant because the primary means of ascertaining

Okoro's mental state is by drawing inferences from her conduct.  Evidence that Okoro

did not report or underreported income from romance and other scams is observable

conduct implying that she acted intentionally and knowingly, not by mistake or accident,

when she received, retained, and laundered the victim funds.  Okoro cannot establish that

the probative value is substantially outweighed by unfair prejudice.  The government has

a significant need for the evidence because mental state is difficult to observe.  Hiding the

money from the IRS is extremely similar to hiding it from the victims by removing from

accounts where it was deposited and a step in the effort to launder the money.  Little time

passed between the conspiracy to commit wire fraud, conspiracy to commit money

launder, and the filing of the tax returns.  If such evidence is determined to be

extrinsic, the government respectfully requests that the Court rule it admissible.

> **B.**     **Evidence that the conspiracies to commit wire fraud and money-laundering continued through September 2017 is intrinsic to the charged crimes.**

Evidence of crimes, wrongs, and other bad acts is generally admissible if

"intrinsic" to the crimes charged.  "Intrinsic" evidence does not implicate Federal Rule of

Evidence 404(b).  *See United States v. Crawley*, 533 F.3d 349, 353–54 (5th Cir. 2008).

Evidence is intrinsic "if it is an uncharged offense which arose out of the same

transaction or series of transactions as the charged offense, if it was inextricably

intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime of the trial." *United States v. Gurrola*, 898 F.3d 524, 536 (5th Cir. 2018) (citations omitted).

Furthermore, an indictment's description of the duration of the conspiracy is not an essential element of the crime charged. *United States v. Girod*, 646 F.3d 304, 316 (5th Cir. 2011) (stating that "[i]n this Circuit, an allegation as to the time of the offense is not an essential element of the offense charged in the indictment and, within reasonable limits, proof of any date before the return of the indictment and within the statute of limitations is sufficient" (citations omitted)). The Fifth Circuit has held that evidence of the charged crime may occur both before and after the period charged in the indictment. *See id.* (holding that conduct occurring four months before the charged crime was intrinsic evidence); s*ee United States v. Jones*, 833 F. Appx. 528, 539 (5th Cir. 2020) (holding that evidence that occurred four days after the period alleged in the indictment was proof of the crime charged); *United States v. Watkins*, 591 F.3d 780, 785 (5th Cir. 2009) (affirming district court's decision that evidence of conduct drug runs occurring several months before indicted conspiracy was intrinsic to charged conspiracy); *United States v. Sangs*, 163 F.3d 1355, *1 (5th Cir. 1998) (holding the district court did not abuse its discretion by concluding that conduct occurring six months before the conduct that resulted in the indictment was intrinsic to the charged crime).

Here, the romance and money-laundering schemes charged in the indictment continued until on or about September 2017, approximately two and one-half months longer than the indictment alleged. The evidence that the conspiracy continued through

September 2017 meets the requirements of *Gurrola*.  First, the additional instances of

romance scams that unfolded after July 11, 2017, and up through September 2017, are

those precisely described in paragraphs one, two, and three of the indictment; the scams

involved at least three of the named codefendants as recipients of victim funds, including

Okoro; and the scams resulted in Okoro engaging in additional monetary transactions

exceeding $10,000.  Second, the conduct occurring from July to September is

inextricably intertwined with the prior conduct and necessary to complete the story

because the last identifiable and confirmed transactions involving this group of

coconspirators in this romance scheme occur in September 2017.  Not allowing evidence

after July 11, 2017, would end the evidence of the conspiracy before it actually ended.

For example, one participant in the conspiracy to commit wire fraud is expected to testify

that the both the romance scheme was executed several times, some of which occurred in

August and September 2017.  Bank records as well as victim testimony confirm the

pattern and the time frame.  Thus the evidence that post-dates July 11, 2017, is evidence

of the crime charged and necessary to show its conclusion.  Finally, the duration of the

conspiracy remains reasonably near the time period alleged in the indictment, within the

statute of limitations, and before the indictment was returned.  Therefore, the proposed

additional evidence is intrinsic and does not implicate Rule 404(b).

    Even if the Court were to determine that the conduct post-dating July 11, 2017,

were not intrinsic, that evidence would still be admissible under Fed. R. Evid. 404(b) as

proof of intent, knowledge, absence of mistake, and lack of accident.  The Supreme Court

reasoned that "[e]xtrinsic acts evidence may be critical to the establishment of the truth as

to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988). The evidence need only "possess probative value that is not substantially outweighed by its undue prejudice" under Rule 403. *Kinchen*, 729 F.3d at 471.

Evidence that Okoro continued to receive victim funds and continued to engage in monetary transactions of more than $10,000 with those victim funds demonstrates that she acted not by mistake, but with knowledge and intent to join and to continue in the conspiracy to commit wire fraud and the conspiracy to commit money-laundering. This evidence is critical to establishing the truth as to Okoro's state of mind, which is generally only observable from her conduct. Finally, this probative value of the evidence is not substantially outweighed by unfair prejudice to the defendant. The conduct is exactly what is charged in the indictment and necessary to prove the crime of conspiracy to commit wire fraud and conspiracy to commit money-laundering beyond a reasonable doubt. The conduct merely extends the conspiracy for two and one-half months beyond that charged in the indictment and is thus extremely close in time to is. There is no risk the jury will convict Okoro for conduct different than that charged in the indictment. For the foregoing reasons, if the Court determines that the romance fraud and money-laundering that occurred in the two and one-half months immediately following the alleged indictment period is extrinsic evidence, the government asks that it be admitted pursuant to Rule 404(b).

**C.    Okoro's receipt of a wire from short-term rental reservation victims on March 5, 2018, is relevant to her knowledge of and intent to participate in the conspiracy to commit wire fraud.**

Okoro's anticipated defense that she lacked knowledge that she had received illegally-obtained funds, didn't join any conspiracy, and therefore lacked the criminal intent necessary to be convicted is undercut by her continuing to receive funds from other online wire fraud schemes.  On March 5, 2018, KZ wired $4,400 to IJ Global Link to pay for a short-term rental apartment in New York City.  Okoro's receipt of a wire transfer from a different kind of wire fraud scheme, commonly called an "Airbnb scheme," shows she knows what she is doing, is not mistaken about her actions, and intends to conspire with others to defraud unsuspecting victims.  Again, this uncharged crime is a wire fraud relevant to Okoro's intent, plan, knowledge, and absence of mistake.  Fed. R. Evid. 404(b).  The Supreme Court reasoned that "[e]xtrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct."  *Huddleston v. United States*, 485 U.S. 681, 685 (1988).

Okoro's receipt and retention of a payment for an Airbnb scheme both of the Fifth Circuit's prongs for admissibility under Federal Rule of Evidence 404(b).  First, the wire payment is relevant to an issue other than Okoro's character, namely intent, plan, knowledge, and absence of mistake.  Second, the probative value of the reservation scheme is not substantially outweighed by their potential to create unfair prejudice.  The probative value is significant because the primary means of ascertaining Okoro's mental state is by drawing inferences from her conduct.  Evidence that Okoro received money

from an Airbnb scam is observable conduct implying that she acted intentionally and knowingly, not by mistake or accident, when she received, retained, and laundered romance victim funds.  Okoro cannot establish that the probative value is substantially outweighed by unfair prejudice.  The government has a significant need for the evidence because mental state is difficult to observe.  The Airbnb scheme is extremely similar to a romance fraud as they are both internet-based wire frauds; the difference is the means of luring in their victims.  The short-term rental scam happened in March 2018, shortly after the last confirmed romance victim was scammed but before some of the unconfirmed romance victims were scammed.  If such evidence is determined to be extrinsic, the government respectfully requests that the Court rule it admissible.

> **D.    Okoro's receipt of a wire from that included $117,020 from a business email compromise victim on February 25, 2019, is relevant to her knowledge and intent to participate in the conspiracies to commit wire fraud and money-laundering.**

The government also anticipates that Okoro will blame her involvement in the conspiracies to commit wire fraud and money-laundering on her then-boyfriend, now codefendant David Animashaun.  Okoro's continuing fraudulent conduct that occurred after she and Animashaun stopped seeing each other undercuts that argument.  On February 25, 2019, an IJ Global Link bank account received a wire for $140,000 from Xclusive Weaves and Braids.  The bulk of that money consisted of $117,020 that Xclusive Weaves and Braids had received in two separate wire transfers from Miller Truck Lines.  Miller Truck Lines was the victim of a business email compromise ("BEC") scam.  Okoro did not return the money.

Okoro's receipt of a wire transfer from a third kind of wire fraud scheme shows she knows what she is doing, is not mistaken about her actions, and intends to conspire with others to defraud unsuspecting victims. Again, this uncharged crime is a wire fraud relevant to Okoro's intent, plan, knowledge, and absence of mistake. Fed. R. Evid. 404(b). The Supreme Court reasoned that "[e]xtrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988).

Okoro's receipt of funds generated by a BEC scheme meets both of the Fifth Circuit's prongs for admissibility under Federal Rule of Evidence 404(b). First, the BEC money is relevant to an issue other than Okoro's character, namely intent, plan, knowledge, and absence of mistake. Second, the probative value of the $140,000 wire is not substantially outweighed by their potential to create unfair prejudice. The probative value is significant because the primary means of ascertaining Okoro's mental state is by drawing inferences from her conduct. Evidence that Okoro received money from a BEC scam is observable conduct implying that she acted intentionally and knowingly, not by mistake or accident, when she received, retained, and laundered romance victim funds. Okoro cannot establish that the probative value is substantially outweighed by unfair prejudice. The government has a significant need for the evidence because mental state is difficult to observe. The BEC fraud is extremely similar to a romance fraud as they are both internet-based wire frauds in which the imposter pretends to be someone he is not. Finally, the BEC wire occurred in 2019, after Okoro was no longer connected to

Animashaun, which confirms that Okoro makes her own decisions with knowledge and intent and without mistake, just as she did when participating in the romance fraud. If such evidence is determined to be extrinsic, the government respectfully requests that the Court rule it admissible.

<u>CERTIFICATE OF SERVICE</u>

I certify that on November 6, 2023, I filed a true and correct copy of the foregoing Government's Exhibit List with the Clerk of Court using the electronic case filing system, which will then send a notification of electronic filing to the following Trey Bunch, attorney for the defendant.

Mary Walters
Assistant U.S. Attorney