1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF TEXAS

3                DALLAS DIVISION

4
    UNITED STATES OF AMERICA,           )  3:21-cr-435-N
5                PLAINTIFF,             )
                                        )
6    vs.                               )  DALLAS, TEXAS
                                        )
7    IJEOMA OKORO,                     )
                DEFENDANT.             )  December 4, 2023
8

9

10        **TRANSCRIPT OF IJEOMA OKORO TRIAL TESTIMONY**

11         **BEFORE THE HONORABLE DAVID C. GODBEY**

12            **UNITED STATES DISTRICT JUDGE**

13
A P P E A R A N C E S:
14

15
FOR THE PLAINTIFF:        **MS. MARY F. WALTERS**
16                         **MS. ELYSE J. LYONS**
                           **MS. JENNA DANELLE RUDOFF**
17                         UNITED STATES ATTORNEY'S OFFICE
                           NORTHERN DISTRICT OF TEXAS
18                         1100 Commerce Street
                           Third Floor
19                         Dallas, Texas 75242
                           mary.walters@usdoj.gov
20                         elyse.lyons@usdoj.gov
                           jenna.rudoff@usdoj.gov
21                         (214) 659-8664

22

23

24

25

```
 1   FOR THE DEFENDANT:          MR. DOYLE RAYMOND BUNCH, III
                                BURLESON, PATE & GIBSON, LLP
 2                              900 Jackson Street, Suite 330
                                Dallas, Texas 75202
 3                              tbunch@bp-g.com
                                (214) 871-7543
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19   COURT REPORTER:            MR. JEFF L. FOSTER, RMR, CRR
                                United States Court Reporter
20                              1100 Commerce St., Room 1504
                                Dallas, Texas 75242
21                              jeff_foster@txnd.uscourts.gov
                                (214) 753-2349
22

23

24        Proceedings reported by mechanical stenography and

25   transcript produced by computer.
```

```
 1              IJEOMA OKORO TESTIMONY -- December 4, 2023

 2                      P R O C E E D I N G S

 3              MR. BUNCH:  Defense calls Ijeoma Okoro.

 4              THE COURT:  Would you raise your right hand, please?

 5              (The witness was duly sworn.)

 6              THE COURT:  Defendant pay proceed.

 7              MR. BUNCH:  Thank you, Your Honor.

 8                           DIRECT EXAMINATION

 9    BY MR. BUNCH:

10    Q.   Good morning, Ms. Okoro.

11    A.   Good morning, Mr. Bunch.

12    Q.   Please introduce yourself to the jury.

13    A.   My name is Ijeoma Okoro.

14    Q.   Let's start at the beginning.  Where were you born?

15    A.   I was born in Lagos, Nigeria.

16    Q.   Okay.  And how was growing up there?

17    A.   It was good.  I went to high school in Lagos, Nigeria and

18    then I came to the U.S. in 2005, I believe.  I graduated high

19    school here in the U.S., --

20    Q.   Okay.

21    A.   -- but Nigeria was good.

22    Q.   How old would you have been in 2005?

23    A.   15.

24    Q.   So 15 years old.  Did you come here on your own?

25    A.   Yes.  I was actually an accompanying minor with the airline,
```

1  yes.

2  Q.   Okay.  And who did you stay with once you -- once you came

3  to the United States?

4  A.   My mom was here, so I stayed with my mom when I got here.

5  Q.   Okay.  So your mother was already here.

6  A.   Correct.

7  Q.   And where was she living?

8  A.   Los Angeles.

9  Q.   Okay.  So you came here at 15 and moved to Los Angeles.

10  A.   Correct.

11  Q.   And completed high school there in Los Angeles?

12  A.   Actually --

13  Q.   Started high school there in Los Angeles and then completed

14  high school here in Texas.

15  A.   I actually completed high school in Arizona, but I graduated

16  college in California.

17  Q.   Okay.  So after high school you went to college.  Where did

18  you go to college?

19  A.   Cal-State Bakersfield.

20  Q.   Okay.  Is that near where your mother lives?

21  A.   It's an hour and a half away from L.A.

22  Q.   Okay.  And what did you major in?

23  A.   Public administration.

24  Q.   Public administration?

25  A.   That is correct.

1  Q.    Okay.  And did you earn a degree?

2  A.    Yes, I got a B.A. in 2014 in public administration.

3  Q.    Okay.  And so then in 2014 after you finished with -- with

4  your college education, with your Bachelor's degree, where did

5  you -- did you stay in California?

6  A.    I did.  I stayed in California for a little bit and I

7  relocated to Dallas in about 2015.  I got into ITT Tech's RN

8  program, so I came to Dallas.

9  Q.    Okay.  So you -- you had applied and gotten in for a --

10  A.    A registered nurse, correct.

11  Q.    Okay.  Now, before you moved here had you ever met David

12  Animashaun, Mr. Moses, any of the folks that have been talked

13  about here?

14  A.    No, I did not.

15  Q.    When you -- when you came to the United States, did

16  you -- did you end up -- did you come here on, what, a student

17  visa?

18  A.    I came here on a visitor's visa.

19  Q.    I'm sorry?

20  A.    A visitor's visa.

21  Q.    And what is that?

22  A.    You come into the United States to visit.  It's a visitor's

23  Visa.

24  Q.    And your mother was here, correct?

25  A.    That is correct.

```
1   Q.   Eventually did you get a green card?

2   A.   Yes, I did in 2013.

3   Q.   Okay.  So you're here legally.

4   A.   That is correct.

5   Q.   And after you moved here did you -- you said you came here

6   to attend school to Dallas?

7   A.   That is correct, yes.

8   Q.   Did you have any family in the area?

9   A.   Yes, my aunt actually lives in Dallas, so I when I came here

10  I moved in with my aunt.

11  Q.   Okay.  Do you also have cousins here?

12  A.   Yes, I have a lot of cousins in Dallas as well.

13  Q.   Okay.  So your mother wasn't here, but you had plenty of

14  family nearby when you came to the Dallas area?

15  A.   That is correct, yes.

16  Q.   And attended ITT?

17  A.   ITT Tech, yes.

18  Q.   And did you work?

19  A.   Yes, I was working full-time and also going to the program

20  as well.

21  Q.   Okay.  Starting sort of when you moved here what kind of

22  jobs were you working?

23  A.   I worked at Pearl Technology as a sales consultant.

24  Q.   Okay.  And how long did that last?

25  A.   About a year, I think.  Yeah, about a year.
```

1    Q.    Okay.  So you worked at Pearl Technology for about a year,

2    and then what did you do?

3    A.    And ITT Tech shut down and I got a job at a temp agency.

4    Because when ITT Tech shut down the state of Texas decided to

5    help all the students continue their education, so I got enrolled

6    into a community college, but at that point in the program I

7    couldn't continue working full-time and going to school at the

8    same time, so I had to drop the program and just work.

9    Q.    Okay.  So the community college program, was that to further

10   your -- was that to get some requirements for your nursing --

11   A.    Yes.  To complete the registered nursing program, yes.

12   Q.    Okay.  Have you had several jobs?

13   A.    Yes, I've had plenty of jobs.  Prior to the year when the

14   school shut down, ITT Tech, I was just working for different temp

15   agencies, whatever job that they have available for me they'll

16   let me know, and then I'll go to the job.  So it's usually a

17   month, two months.  It pretty much depends on the need of the

18   client.

19   Q.    Let me ask you a little bit -- and we may circle back to

20   some of that -- the job stuff, but let me ask you a little bit

21   about your personal life.

22   A.    Sure.

23   Q.    Do you have any children?

24   A.    Yes, I have a now ten-year-old son and his name is Isaac.

25   Q.    Okay.  No daughter?

1   A.    I do not have a daughter.

2   Q.    So only one male child.

3   A.    I just have one male child.  That is correct.

4   Q.    Let's go back a minute to jobs.  Back in late 2016, what

5   were you doing?

6   A.    I believe I was still working at Pearl Technology then,

7   yeah.

8   Q.    And did you -- eventually you lost that job?

9   A.    That is correct.

10  Q.    And how did you lose that job?

11  A.    As a sales consultant you have to like meet a quota and

12  because I was going to school full-time and working full time I

13  wasn't able to meet the quota of sales.

14  Q.    So after that you -- were you working some odd jobs?

15  A.    Yes, I was working pretty odd jobs with the temp agencies.

16  Q.    Okay.  Did you also have any side businesses you were doing?

17  A.    Yes, I like -- as an immigrant, I mean, I work hard at

18  whatever opportunity that's available as far as a job.  I'll do

19  it.  Whatever I can -- that can make me money.  If I sell this

20  coat and it will make me money I'll sell it to you.  So I was

21  pretty much odd things as well.

22  Q.    Have you -- do you attend church?

23  A.    Yes.

24  Q.    And when did that start for you?

25  A.    I grew up in church.  I was born a believer, so I have been

1  going to church my whole life.

2  Q.    Okay.  And what -- what religion?

3  A.    I am a Christian.

4  Q.    In about 2016 where were you attending church?

5  A.    The Redeemed Christian Church of God in Plano, Texas.

6  Q.    Okay.  And are you -- are you earnest in your religious

7  beliefs?

8  A.    I firmly believe in Jesus Christ, yes.

9  Q.    Okay.  And do you attempt -- do you try to live your life

10  under the principles of your religion?

11  A.    I do.

12  Q.    More recently after your relationship with David Animashaun,

13  did you switch churches?

14  A.    I did, because it was kind of awkward after the whole

15  situation, because he ended up marrying somebody else and not

16  marrying me like he told me he was going to.  So I still visit

17  the church, but I ended up going to a different church because it

18  was kind of embarrassing.

19  Q.    Okay.  So when and where, if you recall, did you meet David

20  Animashaun?

21  A.    I met David at a church, it's called Winner's Chapel.  It's

22  where he called he went for a gig.  And after the program

23  I noticed him, because he played the guitar in my church so it's

24  right there in front of the church, so I introduced myself to

25  him.  I said, "Hey, you go to Redeemed, right?"  He said, "Yeah."

1  I said, "I see you, you play the guitar," and then we exchange

2  numbers after that conversation.

3  Q.   And what -- what happened from there?  Did you hear from

4  Mr. Animashaun after that?

5  A.   Yes, I heard from him the very next day and then we went out

6  to the movies.  He asked me what I like to do and I said movies,

7  so we went to go watch a movie, and then he asked me to be his

8  girlfriend, and in about a week he had asked me to marry him.  I

9  thought that was really awkward.  And then I had told him that if

10 you want a green card I can't help you, because I'm not even a

11 citizen yet.

12          And then I didn't hear from him for about a month and

13 then he -- one month later he texted me and says that he's been

14 really busy and he apologized, because I thought he had ghosted

15 me.  And then I was kind of offended, but he said that he had

16 been really busy and apologized and then we hung out again, and

17 then he reasked me again if I wanted to be his girlfriend and

18 I -- I agreed, because he was really nice.  He was really a sweet

19 guy and I told him about my son.

20          Because usually in Nigeria if you are unmarried with a

21 child it's -- it's -- people frown on that, so I let him know up

22 front about my son.  I introduced him to my son and then he was

23 okay with that.  And he really showed my son love and he showed

24 me love and I agreed to be his girlfriend.

25 Q.   Okay.  So you mentioned that in the very beginning he came

1  on very fast.

2  A.   He did, yes.

3  Q.   A weekend and he was talking about marriage is what you

4  said.

5  A.   That's correct.

6  Q.   And then you informed him -- you felt that was a little

7  quick and you informed him, hey, if this is about your

8  immigration status, I'm not going to be able to help you because

9  I'm -- I'm a green card holder, I'm not a citizen.

10  A.   That is correct.

11  Q.   Do you know Mr. Moses?

12  A.   I do not.

13  Q.   Do you know anybody named George Mike?

14  A.   I do not.

15  Q.   Do you know Frederick Orji?

16  A.   I do not.

17  Q.   Do you know Chukwuemeka Orji?

18  A.   I do not.

19  Q.   Do you know Mr. Musa?

20  A.   I do not.

21  Q.   Do you know -- besides Mr. Animashaun, do you know any of

22  the people in your indictment?

23  A.   I do not.  I have never met them.

24  Q.   In your relationship with David, did -- did he ever engage

25  in any -- did he engage in business transactions?

1    A.    Yes, he has a whole music studio in his house, so I would

2    see people come in and like try to compose like sounds or

3    whatever and then he would tell them how much this is going to

4    cost.  That's pretty much what I saw him doing was his music

5    business.

6    Q.    And was that -- you felt that that was the business he was

7    in; is that correct?

8    A.    Correct.  That's what he told me he does.

9    Q.    Okay.  And you saw things consistent with that, correct?

10   A.    That is correct, he has a studio in his apartment.

11   Q.    Okay.  So did you have any reason to doubt that?

12   A.    No, I did not.

13   Q.    Do you know -- do you have any idea what somebody who

14   produces music makes?

15   A.    I do not.

16   Q.    Do you -- were you under the impression that it could range

17   from zero dollars to infinity dollars?

18   A.    I mean, it could, because, I mean, music producers I know --

19   I don't have a ball (sic) figure of how much they make, but I do

20   know they make money.

21   Q.    When the two of you reconnected after the short period of

22   him not communicating with you after the green card discussion,

23   what -- how did that -- how did your relationship develop from

24   that point?

25   A.    I mean, it just kept going stronger.  He told me he didn't

 1  need me to -- for a green card, because he was already married to

 2  somebody for his green card and he had already completed that

 3  financial transaction, so that's not what he wanted me for.  So

 4  he gave me a little bit of reassurance that that's not the reason

 5  why he wanted to be with me.  But it went really good.  He would

 6  take care of me and take care of my son.

 7  Q.   Why do you say financial transaction?

 8  A.   Because he paid the woman to get married to him for his

 9  papers.

10  Q.   So that was a fake marriage.

11  A.   That is correct.

12  Q.   He was -- he was --

13          MS. WALTERS:  Objection, speculation.

14          THE COURT:  Overruled.

15  Q.   (BY MR. BUNCH)  Was he -- he was also -- he was seeing you.

16  A.   That is correct.

17  Q.   And did he let you know that the marriage was not serious?

18  A.   Yes, he told me it was -- it was fake.  I spoke to the

19  lady --

20          MS. WALTERS:  Objection, hearsay.

21          THE WITNESS:  Yeah.

22          MR. BUNCH:  He's a co-conspirator, Your Honor.

23          (Bench conference out of the hearing of the jury.)

24          THE COURT:  It's a little bit of an odd position for

25  you to take.

1          MS. WALTERS:  I didn't hear what he said.  But it is

2     definitely hearsay, because it's just everything that she's

3     telling him and he testifying.

4          THE COURT:  And he said he's a co-conspirator.

5          MS. RUDOFF:  He said that.

6          MS. WALTERS:  That's what Trey said.  Okay.

7          MS. RUDOFF:  Understanding -- and understanding,

8     Your Honor, the statements aren't in furtherance of the

9     conspiracy.  What she's talking about is completely unrelated and

10    regarding her claim of marriage fraud.

11         THE COURT:  Okay.

12         MR. BUNCH:  Your Honor, I mean, it seems the 404

13    section rules of evidence apply broadly.  The 800 section rules

14    of evidence apply narrowly.  I would -- I would ask for some

15    latitude on this.

16         THE COURT:  Okay.  You've had some so far.  How much

17    more are you going to ask her about what he said to her?

18         MR. BUNCH:  There's -- I think the impressions that he

19    gave her are definitely relevant.  And so directly, probably not

20    a whole lot, but --

21         THE COURT:  Okay.  Let's not ask any more about what he

22    told her.

23         MR. BUNCH:  Okay.

24         THE COURT:  Okay?

25         MR. BUNCH:  Yes, Your Honor.

```
 1              MS. WALTERS:  Because they did have a chance to

 2    cross-examine Mr. Animashaun last week and this didn't come up.

 3              THE COURT:  Okay.  Let's go.

 4              (End of bench conference.)

 5    Q.  (BY MR. BUNCH)  Okay, Ms. Okoro, so we were at the point of

 6    this marriage.

 7    A.   Correct.

 8    Q.   Tell us how just starting from -- from there how the

 9    relationship progressed and things you noticed with regard to

10    Mr. Animashaun's business transactions?

11    A.   The relationship was going really good.  He would always

12    take care of me, whatever it is that I need.  And in early 2017

13    after ITT Tech had shut down I was trying to figure out, you

14    know, what I wanted to do next, like the next career path.  And

15    then he told me that I should start a business.  And I was like I

16    have always wanted to go into business.  You know, I have always

17    wanted to sell clothing.  And then he told me to open up a DBA.

18    I didn't know what a DBA was and he explained it to me.

19              And then we were trying to figure out what name the

20    business would be.  I said Isaac's Clothing, because I like to

21    put his name on everything, and then he said no.

22    Q.   Just to remind --

23              MS. WALTERS:  Objection, hearsay continued.

24              THE COURT:  Okay.  Let's stay away from what he told

25    you.
```

1              THE WITNESS:  Okay.

2    Q.   (BY MR. BUNCH)  So who is Isaac?

3    A.   I'm sorry?

4    Q.   Again, who is Isaac just --

5    A.   Isaac is my son.

6    Q.   Okay.

7    A.   My ten-year-old son, yes.

8    Q.   And you wanted to name the business what?

9    A.   Isaac's Clothing.

10   Q.   Okay.  And did you learn that that did not meet his

11   criteria?

12   A.   No.

13   Q.   Who suggested the name IJ Global Link?

14   A.   David.

15   Q.   And did you -- and did you proceed with that?  Did you open

16   a DBA under the name IJ Global Link?

17   A.   I did.

18   Q.   Did you know how to do that?

19   A.   No.

20   Q.   Okay.  Who taught you how to do that?

21   A.   He texted me the address where to go to and I went and

22   afterwards I called him excited.  And then I wanted to open a

23   Chase business account, because I already had a Chase account at

24   the moment.  And then he told me to open up a Bank of America

25   instead and then I opened up a Bank of America.

```
 1              I went to his apartment in Plano, Texas, excited,
 2   showing him what I had just done.  And then he took a picture
 3   just to commemorate -- you know, took a picture of everything I
 4   had done.  I had created online banking information and he took a
 5   picture and I created the account.
 6   Q.   So what did he take a picture of?
 7   A.   Of the online banking details, the ATM card -- not the ATM
 8   card.  I got a temporary card that day, but he took a picture of
 9   the online banking information and the DBA.  So he had the
10   account number and routing number and all the information in
11   there.
12   Q.   Okay.  So at that point he had your information?
13   A.   That is correct.
14   Q.   Your login information?
15   A.   Yes.
16   Q.   Did -- at some point in March did you notice a large deposit
17   into your account?
18   A.   I did not.  He actually called me and informed me that there
19   was a deposit in the account.  And then I asked what it was --
20              MS. WALTERS:  Objection, Your Honor.  It continues to
21   be the hearsay.
22              THE COURT:  Okay.  Let's have a fresh question.
23   Q.   (BY MR. BUNCH)  You -- so you did not deposit -- this was a
24   wire that came in.
25   A.   Correct.
```

1  Q.   Okay.  And you didn't -- this is -- you don't check your

2  bank statement every day, correct?

3  A.   I do not.

4  Q.   You became aware of this because of David, correct?

5  A.   That is correct.

6  Q.   And the -- what -- what happened after that with the 25,000?

7  A.   I was instructed on what to do and how to withdraw the

8  money.  So I'm trying not to say him at this point, but he

9  instructed me what to do.  He drove me to the bank, --

10  Q.   Okay.

11  A.   -- yeah.

12  Q.   These -- and did you at that time feel that -- well,

13  that's -- that's his money.

14  A.   He told me it was his money.

15       MS. WALTERS:  Objection, if we could -- hearsay.

16       THE COURT:  Sustained.

17  Q.   (BY MR. BUNCH)  Did -- let's -- let's stay away from what he

18  said.

19  A.   Okay.

20  Q.   But you can -- you can look at your bank statement, right?

21  A.   Correct.

22  Q.   And know that -- that money was taken out and that you were

23  there to take it out, correct?

24  A.   Correct.

25  Q.   With David.

```
 1  A.   Correct.
 2  Q.   Okay.  Did he frequently go to the bank with you?
 3  A.   All the time, yes.
 4  Q.   Did you ever allow him -- or maybe not even -- you didn't
 5  even know about it -- to access your account?
 6  A.   He had the login details.
 7  Q.   Did he ever take your ATM card and use it?
 8  A.   Yes.
 9  Q.   And what was -- what was that for?
10  A.   Because he had -- the account belonged him, so he knew the
11  PIN numbers.  If he wanted to use it to make any withdrawals he
12  would do that.
13  Q.   You're the only signer on the account, correct?
14  A.   Correct.
15  Q.   But you -- you're telling us that he -- he had those details
16  and used the account pretty freely?
17  A.   That is correct.
18  Q.   What -- what was he telling you like personally at this time
19  as far as in your relationship?
20  A.   How much he loves me, to withdraw the money.  Just
21  instructed me on what I needed to do.
22  Q.   Okay.  But in the relationship is he -- is he telling you he
23  loves you and those --
24  A.   Yes, how much he loves me and he loves my son and can't wait
25  for us to start a family together.
```

```
 1   Q.   Okay.  And did you ever observe him dealing in other
 2   businesses besides music production?
 3   A.   No.
 4   Q.   Did you ever observe him buying and selling vehicles?
 5   A.   Oh, yes.  Yeah, he -- I watched him actually bid for cars as
 6   well, because he buys and sells vehicles as well, yes.
 7   Q.   And was it your understanding that the cars he was bidding
 8   on were for resale?
 9   A.   That is correct.  He would go on QCAR.  It's a website where
10   people can bid on cars and buy it and resell it.
11   Q.   Okay.  Did he -- you observed this.  Did he ever talk to you
12   about doing that?
13   A.   I pretty much figured it out myself.  He didn't talk me into
14   doing it.  But, like I said, like if I can make money off of
15   it -- he taught me how to do it, so he didn't tell me to do it,
16   but he taught me how to do it, because I wanted to also be able
17   to buy and sell cars and make some type of profit.
18   Q.   Okay.  So you've -- you've been here the whole trial,
19   correct?
20   A.   That is correct.
21   Q.   You've seen the financial statements of money coming in to
22   accounts that you set up.
23   A.   That is correct.
24   Q.   Tell us -- tell the jury what -- what was that about?
25   A.   It was all David.  He put the money in the account -- well,
```

1  he let me know there was money in the account and then he

2  instructed me to --

3          MS. WALTERS:  Hold on.

4          THE WITNESS:  Okay.  I can't.

5  A.  He told me the money was his.  Oh, no.  Okay.  I'm not sure

6  what to say.  But I did know about a George Mike.  I didn't know

7  that it was from a romance scam victim.  I was never -- I never

8  convinced Moses to -- to go into fraud.

9          David never explained the fact that the money -- the

10  funds were from romance scam victims.  I don't believe -- I feel

11  like -- and I have always had this motto that if you take money

12  from someone that fears God, if God fights for that person you

13  cannot stand against God.  So I don't believe in that.  So I was

14  never told about the whole scheme of the matter.

15          I am or was just a victim, because David came to me in

16  the pretext that he was going to get married to me and I believed

17  him and I trusted him.  And when he was done using me and when

18  there was no more accounts to be used he dumped me and married

19  some other girl that came to Dallas from Atlanta and then he left

20  me.

21          And it was such a painful -- I didn't know like I could

22  ever feel that much pain.  I wanted to report the whole situation

23  and then he threatened me and said if I did, that if I go down

24  you go down.  So I just took my L and was hoping karma to catch

25  up with him.  I did not imagine that karma would involve me in

1  the whole ordeal, but I did not know anything about the romance

2  scam victims.  I've never spoken with them.  There's no e-mail or

3  text correspondence between me and them, because I would never

4  put myself in that type of situation.

5  Q.   (BY MR. BUNCH)  All of this money we've seen, the cash taken

6  out of accounts during this trial, did you keep that money?

7  A.   No, I did not.

8  Q.   Who did you give it to?

9  A.   David.

10 Q.   And you brought up Mr. Moses.  And so I want to -- I want to

11 talk about that a little bit.

12 A.   Okay.

13 Q.   Have you ever in your life, to your recollection, met

14 Mr. Moses?

15 A.   I have not.  I would remember him, because he has very

16 distinctive features, but, no, I have never met him.

17 Q.   Okay.  Back to the funds.

18 A.   Okay.

19 Q.   All of these cash withdrawals and counter credits and all of

20 that, did you do that for your own benefit or for David's?

21 A.   It was for David.

22 Q.   And at the time were you in love?

23 A.   I was in love with him.  We were planning on getting

24 married.  He met my whole family.  He met my aunts, my cousins,

25 my mother, and he make them also to believe that this was his

1    intention was to marry me, but that was never his intention.

2    Q.    And so did you feel that this was a man you could have a

3    future with?

4    A.    I did.

5    Q.    Did you like the music that he made?

6    A.    I did.  He plays really good guitar and he also plays the

7    piano as well and he actually taught Isaac how to play the piano

8    too.

9    Q.    Did he -- through this money that was coming into your

10   account, did he -- did he treat you well?  Did he share it with

11   you?

12   A.    He did.  If I needed anything he would take care of me.  If

13   I needed to, let's say, get my nose done he would said, okay, I

14   got you.  Let's go.  If I needed something he would -- he would

15   take care of me to make sure that I was okay to the -- he wasn't

16   extra and he wasn't frugal, it was just like the basic things he

17   would try to take care of.

18   Q.    You -- we saw in evidence -- one thing we saw was some 1099s

19   or W-2s from your taxes.  Do you recall that?

20   A.    I do.

21   Q.    And some of them were for a clothing business.  Is that the

22   clothing business that you referenced?

23   A.    That is correct.

24   Q.    And we also saw on your import records some substantial

25   purchases of clothing.  Were those for your own personal use?

1    A.    No.

2    Q.    What were those for?

3    A.    It was for the business.

4    Q.    Okay.

5    A.    The clothing business.

6    Q.    And so that $11,000 that we saw come in, were those clothes

7    for resale?

8    A.    Correct.

9    Q.    Do you recall approximately when you and Mr. Animashaun

10   stopped seeing each other?

11   A.    When he was done using me.  In 2018 before my 28th birthday.

12   Q.    And what was your -- what is your birthday?

13   A.    June 10, 1990.

14   Q.    Okay.  So maybe in May?

15   A.    Yeah, May.

16   Q.    Okay.  And you heard Mr. Animashaun's testimony that

17   according to him the two of you stopped seeing each other in late

18   2017 or very, very early 2018.  Do you recall hearing that?

19   A.    I did.

20   Q.    Okay.  Is that true?

21   A.    No.

22         MR. BUNCH:  Permission to approach the witness?

23         THE COURT:  Yes.

24   Q.    (BY MR. BUNCH)  Okay.  What is that that's sitting in front

25   of you?

 1  A.    My JP Morgan Chase account statements.

 2  Q.    Okay.  And flipping to the April 2018 statement, --

 3  A.    Okay.

 4  Q.    -- does anything on that document refresh your recollection

 5  as to a payment you might have made to David in April of 2018?

 6  A.    Give me a second.  It was a Zelle payment to David on 4-24.

 7  Q.    Okay.  Were you two together at that time?

 8  A.    Correct.  Yes.

 9  Q.    Okay.  And what kind of figures of money are we talking

10  about here?

11  A.    I had Zelled him on 4-24 -- I had Zelled him $20 and then on

12  5-04 I had Zelled him $500.

13  Q.    Okay.  Do you have any recollection of what that money was

14  for?

15  A.    I don't remember, but what I do know is that sometimes he

16  would tell me he doesn't have money.  And if I have it, because

17  he was my boyfriend I would -- I would send it to him.

18  Q.    Okay.  But you -- I believe you said that you do recall that

19  by the time your birthday rolled around in June you two were not

20  together anymore.

21  A.    That is correct.

22  Q.    So sometime in between this transaction at the end of April

23  and June and your birthday is when the two of you finally split

24  up.

25  A.    Yes, I walked into his apartment and I saw his now wife

```
 1   together with him.
 2   Q.   Okay.  And at that point how did you feel?
 3   A.   I was heartbroken.
 4   Q.   Did you feel like someone you had put so much -- or a
 5   relationship you had put so much into and it's just gone poof?
 6   A.   I did.  I didn't even -- actually never believed that I
 7   could feel so much pain.  Like I have heard people talk about
 8   heartbreaks and it was so painful.  And I'm really proud of
 9   myself, because all I did was walk out and just went back to my
10   apartment and just -- really just think about what I just saw.
11   And it was really painful.  I would never wish that feeling on
12   anybody.
13   Q.   Let's talk a minute about your income tax returns.
14   A.   Okay.
15   Q.   Do you acknowledge that you may have been careless in your
16   income tax returns?
17   A.   No, I don't -- I don't believe that I was careless.
18   Q.   When -- when we're talking about car and truck expenses as
19   business expenses, does that include mileage driving around?
20   A.   It does.
21   Q.   And where were you driving to for business?
22   A.   Driving around Dallas if I'm in the Dallas area.  I'm always
23   going back and forth to L.A., even though I live here.  So I'm
24   driving around L.A.  So pretty much driving around town, yeah.
25   Q.   And that was for what business?
```

1  A.   Clothing.

2  Q.   Okay.  Do you -- we saw an exhibit -- excuse me.  We saw an

3  exhibit showing that -- well, let me back up.

4       Once -- once your relationship with Mr. Animashaun

5  ended, did you still see him around some?

6  A.   Yeah, I was still going to the same church, but, yeah, I

7  would see him.  The Nigerian community is kind of small.  I think

8  I saw him at some concert at one point.  But even though I

9  stopped going to the church, if they have program I would show

10 up, so I'll bump into him then, yeah.

11 Q.   And -- if I could have one moment.

12      Let's -- let's talk about where you were working after

13 the relationship ended.

14 A.   Okay.

15 Q.   Where did you get a job after the relationship ended?

16 A.   In late 2017 I got a job as an EMR consultant.  EMR means

17 electronic medical records.  That's what the hospitals use to, I

18 guess, check in patients.  And most hospitals use Epic or Cerner

19 so I was working as an EMR consultant.

20 Q.   Let's -- let's break that down a little bit.  What is Epic?

21 A.   Epic is the software that whichever hospital -- whoever is

22 able to sell the hospital on the software uses for their

23 patients.  The majority of the hospitals in Dallas I realized

24 they use Epic and that's where you can put in all the information

25 of your patient.

1          The whole point of that EMR system is if they go to a

2     different provider, that provider has access to all their

3     patient's records without calling and having to fax in the

4     information.  It just cuts the time in half and makes the process

5     go faster.

6     Q.   Okay.  And how long did you have that job?

7     A.   I did it for about a year and a half, I believe, or almost

8     two years.

9     Q.   Okay.  And then what happened as far as your work?

10    A.   I got a job at KPMG.  The travel was just a lot and didn't

11    really have time with my son.  And the thing about the contract

12    is that they're usually short lived.  The contract can be

13    anywhere from two weeks, which is like the minimum, to about a

14    month.  So I'm constantly changing employees, like every 30 days

15    I probably have a new contract with a different employee.

16          So I wanted something more -- I wanted more stability.

17    So I got the offer with KPMG as a senior associate in the

18    San Francisco office working from home in Dallas and I took that

19    opportunity.

20    Q.   Okay.  What is KPMG?

21    A.   I don't know what the acronym stands for, but KPMG is one of

22    the Big Four accounting firms in the U.S.

23    Q.   Okay.  So this was -- this was a really good job, right?

24    A.   It was a really good job.

25    Q.   And what were your duties there?

1  A.    As a senior associate what I would do is audit -- I was an

2  external auditor with KPMG.  I would audit whatever clients I am

3  assigned to, usually a minimum of three, maximum to four, a

4  client's accounting.  The main thing as an accountant is to

5  prevent fraud.

6  Q.    Okay.  And did you enjoy that work?

7  A.    I did.

8  Q.    And was that -- was there a learning curve?  Did you feel

9  sort of over your head at first?

10  A.    I did.  It was a lot.  The Big Four is -- it was a great

11  experience.  I wanted that.  I wanted that Big Four on my resume.

12  And with the workload it was a lot.  Auditing four clients all

13  the time was very stressful and it wasn't paying as good as it

14  should.  It was just a great experience.

15  Q.    And while you're working there are you also trying to do

16  side businesses?

17  A.    Yes, even working -- because I worked from home I can work

18  anywhere in the U.S.  So even working with KPMG I still would do

19  an EMR project if I get it.  I would just work nights.  So I'm

20  working KPMG during the daytime and then I would do the EMR

21  consulting job at night.  So whatever consult work that I would

22  get I would still do it and just juggle them all at the same

23  sometime.

24  Q.    Okay.  So this was consulting on the side for what you were

25  doing before you were at KPMG.

1  A.   Correct.

2  Q.   While also having a full-time job at the Big Four accounting

3  firm.

4  A.   That is correct.

5  Q.   You -- the Government introduced some travel records of

6  yours --

7  A.   Okay.

8  Q.   -- for -- for travel.  Can you -- can you tell us what that

9  was about?

10  A.   They misstated in that travel record in the sense that -- so

11  a flight from -- because I lived in L.A. before I came here --

12  from Los Angeles to Lagos, there's no direct flight to Lagos.

13  You always -- depending on the airline there's always a layover.

14  So if I'm going with Virgin, I'm laying over in London.  It does

15  not mean I went into London, I'm just laying over in London.  And

16  then from London I will get to my destination, which is Lagos.

17        So depending on the airline I would lay over in

18  whatever country the airline is at, so they're counting that as

19  multiple trips versus one trip.

20        So since I have been here the first trip I made was in

21  2013 after I had my son to Nigeria.  That was one trip.  And

22  then, I believe, in 2015 I had gone to Istanbul, Turkey to donate

23  my eggs to a family member that was not able to have a child.  So

24  I went there to donate my eggs, so that's the second trip.

25        And then the third trip was in -- I went to Dubai -- I

 1 | want to say I went to Dubai in 2016.  I believe I went to Dubai

 2 | in 2014 as well.  So that's a fifth trip.

 3 |         And then the sixth trip is when I went to Lagos in

 4 | 2021.  I believe I went twice that year.  So every layover I

 5 | noticed that they were counting the layover as an additional

 6 | travel, but it wasn't the case.

 7 | Q.    Okay.  So -- and Lagos is the town that you're from in

 8 | Nigeria?

 9 | A.    That's where -- the capitol of the city (sic), but I'm not

10 | from Lagos.  I'm actually from Ebonyi State, but not from Lagos.

11 | Q.    But your travel into Lagos was to visit family members?

12 | A.    That is correct.

13 | Q.    At some point did you encounter an entity named Xclusive

14 | Weaves & Braids?

15 | A.    I met a guy called Valentine and that was the business that

16 | he was doing, Xclusive Weaves & Braids, correct.

17 | Q.    Okay.  And what -- you were -- you were sent some money from

18 | Xclusive Weaves & braids, correct?

19 | A.    That is correct.

20 | Q.    And what was the purpose of that money?

21 | A.    Purchase vehicles.

22 | Q.    For yourself or for --

23 | A.    For Xclusive Weaves & Braids.

24 | Q.    Okay.  So at the request of someone else you accepted that

25 | money to, what?  What was the --

```
 1  A.   The money was to purchase the vehicles.  He wanted to send
 2  it to Nigeria and resell it.  And because I have watched David
 3  bid cars and car parts.  And the other major car companies that
 4  people use is called IAA, so I told him that I could help him do
 5  that.  So he sent me the money, which is more than we had talked
 6  about.  And then I helped him purchase the vehicles.
 7  Q.   Okay.  So did you purchase vehicles with that money?
 8  A.   I did.
 9  Q.   How many?
10  A.   About eight.
11  Q.   Okay.  And was there any money left over?
12  A.   So because that was not what we had talked about I sent him
13  the rest of the money, because at one point he started acting
14  violent.  So he wanted me to pretty much withdraw the money and
15  give it to him, which is similar to the situation with David and
16  I thought that was really sketchy and I told him I was not going
17  to do that, because of my experience with David.
18            And I took that picture to let him know, hey, I'm
19  sending your money back.  I have already purchased the cashier's
20  check.  The car has been purchased.  I can't give you that back.
21  But this is the rest of the money.  And that's why there was a
22  picture of that 70K that I took to send to him.
23  Q.   Okay.  So this was a refund from money that you had not
24  spent in purchasing vehicles?
25  A.   That is correct.
```

1    Q.    And did you make money off of that transaction?

2    A.    It was during the time Covid hit, so unfortunately there

3    wasn't any money to make, because no one had money to actually

4    purchase the vehicle after it was shipped in Nigeria.  And I left

5    the communication with him and the person, the shipper, because

6    at one point he was becoming very aggressive towards me and I

7    didn't want to deal with the situation anymore, so I let the

8    person know I was -- I used his license to purchase the vehicle,

9    to handle the situation with him.

10   Q.    Did you find it odd that Xclusive Weaves & Braids was

11   sending you a check to buy vehicles?

12   A.    No, he wanted some to use in Nigeria, but selling cars like

13   exporting cars, Japanese products, you can actually make profit

14   off of it when you send it to, say, Nigeria or any African

15   country.  You can make a profit off of it.  You can buy a car for

16   a thousand dollars and you can sell it for about $4,000.

17   Q.    Okay.  So I believe you stated there were -- you purchased

18   eight cars?

19   A.    Yes.

20   Q.    Okay.  And so eight cars for approximately $70,000, correct?

21   A.    Not $70,000, that was excluding the shipping and clearing,

22   because you have to actually pay to ship the vehicles and you

23   also have to pay to clear the vehicles.

24   Q.    So these aren't -- are these used cars?

25   A.    Correct.

```
 1   Q.   So not high end -- you could spend 70,000 on one brand new
 2   high-end car, correct?
 3   A.   Correct, but they were all used vehicles.
 4   Q.   Any idea if those funds were from an illicit source?
 5   A.   I have no idea where the money came from.  Selling hair --
 6   people make a lot of money selling hair, so it seemed like a
 7   legitimate source of income, because I know how much it costs for
 8   me to buy my wigs, so I didn't -- there was no reason to actually
 9   question where the money came from.
10   Q.   Okay.  Was it your impression that this guy just wanted to
11   get $140,000 and he wanted to turn it into $250,000 or something?
12   A.   Correct.  He wanted to make a profit off of that, yes.
13   Q.   When -- do you recall all the photos of the search of your
14   house?
15   A.   I do.
16   Q.   Let's -- let's talk about that house for a second.  Okay?
17   A.   Okay.
18   Q.   Was that house paid for?
19   A.   No, it's mortgaged.
20   Q.   Okay.  And how much did you have to put down for that house?
21   A.   I believe I put down 12 or $15,000.  I don't recall.  But
22   not up to 20.  I believe it was $15,000.
23   Q.   And you were making monthly payments toward the debt on the
24   house?
25   A.   On the downpayment?
```

```
 1  Q.   No, just towards the mortgage debt on the house.
 2  A.   Oh, yeah, I'm still paying -- I'm still paying towards the
 3  mortgage, yes.
 4  Q.   Okay.  So this wasn't a cash purchase of a house, correct?
 5  A.   Correct.
 6  Q.   Can you tell us what you paid for the house?
 7  A.   When I purchase -- when I closed the house I closed at
 8  $308,000.
 9  Q.   Okay.  And you also obviously owned a car at that time.
10  A.   Correct.
11  Q.   And how much -- how much did you pay for that car?
12  A.   It was -- I don't recall, but I didn't pay it all off.  I
13  paid the majority of it down and I had like a little left on it,
14  but I hadn't finished paying it.
15  Q.   Okay.  So we saw from the photos the inside of your house
16  and we saw a workstation.  Do you remember those photos?
17  A.   I do.
18  Q.   Where is that office area?
19  A.   The downstairs office in my house.
20  Q.   Okay.  And we saw a computer on the ground?
21  A.   Correct.
22  Q.   We saw two laptops open on the desk.
23  A.   Correct.
24  Q.   And then there was another laptop inside the desk.
25  A.   Correct.
```

1  Q.   Tell us what all those computers are.

2  A.   Well, they all were computers and the Government -- it's

3  interesting how they painted that picture.  But I was working for

4  PWC at the time and I had two computers for PWC.  And when you

5  open it, it literally does say PWC.  But I was contracted under

6  MBO Partners, so PWC sent those laptops to me.  And then one of

7  them was from Signet.  My friend was staying with me at the time,

8  so the one in the drawer was my friend's work laptop.

9          Whenever we're done with our contract we have to send

10  those laptops back, so her laptop that was -- that was in the

11  picture that was in the drawer was a laptop that was supposed to

12  be returned back to the employee (sic).  And then I had my own

13  personal laptop.  So I believe that's -- those are all the

14  laptops that they saw.

15  Q.   All right.  What about the one on the floor?

16  A.   It was probably -- probably one of the -- I'm not sure.  I

17  think it was a black laptop.  So it's probably my friend's

18  laptop.  Because I had two HP, one Dell, one personal computer

19  and then my friend's laptop.  So I was trying to figure out what

20  that other laptop was.  So it's either my son's laptop.  That's

21  the only think I can think about.  Because usually I have him

22  sitting down in the office, so I can -- I get to keep an eye of

23  what he's doing, because I work so much and whenever he comes

24  back from school I -- if he's going to be on the computer I like

25  him sitting where I can see what he's doing so he's not accessing

```
 1  things that he's not supposed to access.
 2  Q.   And you -- you mentioned earlier you were actually -- the
 3  entity that hired you was in California.
 4  A.   Correct.
 5  Q.   And you were to work from home.
 6  A.   That is correct.
 7  Q.   This was all during the pandemic.
 8  A.   Correct.  And the majority of KPMG as an associate we worked
 9  from home.  At PWC we worked from home as well.  The majority of
10  I.T. audit jobs all work from home.
11  Q.   But obviously 2017 was -- was pre-pandemic.
12  A.   Correct.
13  Q.   And -- but you were still working from home at that time.
14  A.   That is correct.  2017?
15  Q.   Yes.
16  A.   No, I wasn't working from home in 2017, I was an EMR
17  consultant in 2017.
18  Q.   Okay.  Okay.  But the photos from the search warrant were
19  from 2021?
20  A.   Correct.
21  Q.   The -- I'm showing you Government's 63.  This is a photo of
22  the front of the house you were living in.
23  A.   That is correct.
24  Q.   Is that your car?
25  A.   Yes.
```

1    Q.    What -- and what year model is that, if you recall?

2    A.    It is a 2017 Mercedes C-300.

3    Q.    Okay.  And this was in 2021 when this search occurred.

4    A.    That's correct.

5    Q.    And you didn't buy that car new?

6    A.    No, I did not.

7            MS. WALTERS:  I'm sorry, could you repeat it?  I just

8    couldn't hear.  I didn't hear your question.

9            MR. BUNCH:  I just said you didn't buy that car new.

10           MS. WALTERS:  Okay.

11   Q.    (BY MR. BUNCH)  Okay.  So this is -- is this coming in the

12   door to your house?

13   A.    That's correct.

14   Q.    Okay.  And this -- this staircase leads to what?

15   A.    To the bedrooms upstairs.

16   Q.    Okay.  Downstairs we can see a little bit back here in this

17   area a couch.  Is that the living room?

18   A.    That is the living room, correct.

19   Q.    And then which way do you turn to get to the office from

20   this vantage point?

21   A.    The right.

22   Q.    Okay.  So you turn to the right and you see this office

23   set up, correct?

24   A.    Correct.

25   Q.    And then this is a photo of the other view of the living

1  room.  Agreed?

2  A.    Correct.  Yes.

3  Q.    It's a little messy.

4  A.    Unfortunately.  I have a son.  I'm going to put the blame on

5  him.

6  Q.    When did you move into this house?

7  A.    April of 2021.

8  Q.    And is this your bedroom?

9  A.    Correct.

10 Q.    Unmade bed.

11 A.    I'm going to blame my son.  Yes.

12 Q.    And then off of that master bedroom is your closet, correct?

13 A.    Correct.

14 Q.    Do you remember this photo of the closet?

15 A.    Correct.

16 Q.    Do you have lots of clothes?

17 A.    I mean, not that much, but yes.

18 Q.    Are these extravagant clothes?

19 A.    No.

20 Q.    Are these the clothes that you wear to church and in your

21 personal life and to work and all of that?

22 A.    Some of them, yes, and some of them are the ones for sale.

23 If you can see, I believe that -- it looks like there's a tag --

24 most of the dresses actually still have their tags on them.

25 Q.    Okay.  So you -- you kept your inventory for your clothes

1    business also in this closet?

2    A.    That's correct.

3    Q.    And then page 12 here, this is -- is this a guest room?

4    A.    Correct.

5    Q.    And you mentioned you had a friend staying with you.  Who

6    was that friend?

7    A.    Her name is Cynthia.

8    Q.    Okay.  And was this where she was staying?

9    A.    Yes.

10   Q.    How many bedrooms total did this house have?

11   A.    Three.

12   Q.    The third bedroom on page 14, is that --

13   A.    Isaac's room, yeah.

14   Q.    There's a clue there, --

15   A.    Right.

16   Q.    -- the rug.  But this is his room where he stayed.

17   A.    That's correct.

18   Q.    And on page 15, this is that laptop on the floor.

19   A.    That's correct.

20   Q.    And Isaac you said would often use a computer on the floor

21   near you so you could monitor what he was on.

22   A.    That's correct.

23   Q.    And then those are a bit hard to see, but we can make out at

24   least a keyboard to a laptop here (indicating) and then this

25   other laptop here (indicating).

1  A.    That's correct.

2  Q.    And then on 17 we see this property tag that you referenced

3  previously.

4  A.    That's correct, Signet.

5  Q.    Okay.  And Signet was a client of --

6  A.    That was the job I got after KPMG, so I went from external

7  auditing to internal auditing.

8  Q.    Okay.  And this was property of an entity that you were

9  doing work for.

10  A.    That's correct.

11  Q.    These documents here, specifically this sales contract,

12  sales receipt for a piece of land, tell us about that.

13  A.    I purchased this land, I think, sometime in 2018.  I'm

14  trying to remember.  And then I went home -- I was able to

15  finally get the receipt from the person that I'm -- I purchased

16  it from.

17         The survey on the left -- so Nigeria is kind of weird.

18  So if you buy land you have to still pay the owner of the land,

19  which is a weird scenario.  So even though you've purchase it you

20  still have to make another payment.

21         So that receipt on the left, which looks like is

22  multiple land, is just literally just one land.  It was just the

23  survey of the land.  But this land was purchased in -- excuse me,

24  in I want to say 2018, but I didn't get the receipt until I paid

25  for that survey and I got the physical copy when I went to

1  Nigeria in 2021, I believe.

2  Q.   Okay.  What was this -- and we see that it's 3.9 million

3  naira.

4  A.   Yeah, the purchase of the land was 3.9 million naira, which

5  is about 4,000 U.S. dollars, 5,000 U.S. dollars.

6  Q.   So this was -- was this a big piece of land?

7  A.   No, it was not a big piece of land.

8  Q.   912 square meters, so maybe a quarter acre?

9  A.   Nigeria would call it a one and a half plot, so I don't know

10  what it would be in U.S. terms, but about that.  But it's not

11  big.  It's not even the size of this room, if I'm correct.  It's

12  not a big plot of land, so.

13  Q.   And what was the purpose of purchasing that?

14  A.   Nigeria has the highest real estate in the world.  So this

15  plot of land that I bought in 2018, I believe, in U.S. dollars as

16  of 2021 someone wanted to purchase it for $10,000, so it has

17  doubled -- in the last two years it has doubled.  So if I leave

18  it for another five years it's going to be a lot.  Because the

19  part of town where I bought it, it's Ibeju Lekki, they're trying

20  to build refineries in that area, so a lot of people are moving

21  towards that area and it would be a huge investment in the

22  future.  That's why I purchased it.

23  Q.   So this was an investment purchase --

24  A.   Correct.

25  Q.   -- from the country you're from?

1    A.   Correct.

2    Q.   And in that country you also have a bank account, correct?

3    A.   That is correct.

4    Q.   Okay.  Anything unusual or abnormal about that bank account?

5    A.   No.

6    Q.   And this -- what do we see here?

7    A.   It is the key fob to the bank I was -- I'm banking with.

8    It's call GTB Bank in Lagos, in Nigeria.

9    Q.   Okay.  And anything unusual about having this or using this

10   with banking in Nigeria?

11   A.   No.  Every time you try to login to the account, for

12   security purposes you have to actually put in the key fob to

13   actually login to your account every single time.

14   Q.   So we saw a picture of the guest bedroom a minute ago,

15   correct?

16   A.   Correct.

17   Q.   And then this, here's another picture of the guest bedroom.

18   Significantly messier than the previous picture.

19   A.   Right.

20   Q.   Did you cause that mess?

21   A.   The offices -- I guess that's why my bedroom looks messy

22   actually.  They literally tore the whole house down.  They threw

23   everything that they could to find something and that's what they

24   did.

25   Q.   And this is a photo of your garage.  Agreed?

1    A.    Correct.  Yes.

2    Q.    And we see some boxes in here.  Are these -- are these

3    clothes that you're reselling or what -- what's pictured here?

4    A.    Some of them are clothes.  The two big yellow ones, tubs,

5    they're clothes.  The ones that are closed.  The rest is boxes,

6    because I just moved.  Boxes of things that I hadn't unboxed.

7    The two yellow tubs are clothes that I had not sold.

8    Q.    And this -- this is not the home that you were living in

9    with -- or did you ever live with David Animashaun?

10   A.    No, I did not.  We lived in the same apartment complex, but

11   not living together, no.

12   Q.    Okay.  And you weren't -- you didn't have this house at the

13   time that David was in your life; is that right?

14   A.    I did not, yes.

15   Q.    And where were you living -- what apartment complex were you

16   living in the same apartment complex with David?

17   A.    It's called Gateway Crossing in Plano, Texas.

18   Q.    And did you live there first or did David?

19   A.    David did.

20   Q.    Do you remember when you moved in to that apartment complex?

21   A.    The ending of 2017, I believe sometime in August or

22   September of 2017.

23   Q.    2017 or '16?

24   A.    '17.

25   Q.    Okay.  Where were you living before that?

1    A.    I was living with my aunt in Garland.

2    Q.    Okay.  And did David over go over there?

3    A.    Like he testified we're always together almost every day,

4    so, yes, he was always there and I'm always at his place going

5    back and forth.

6    Q.    Did -- so were you -- did you believe when you opened your

7    IJ Global Link account that David had his own account?

8    A.    I wasn't aware of any account that he had.

9    Q.    Okay.  Is it difficult for sometimes an immigrant to open up

10    a bank account?

11    A.    That is correct.  In L.A. I opened my account with my

12    student I.D.  I was not able to open my account with a passport,

13    because I didn't have a state issued I.D., and the only way the

14    banker was able to open an account for me was with my college

15    issued I.D., so you're not able to open an account.  He said they

16    stopped doing that and I have to -- it has to be a government

17    issued I.D., not a passport.  So I opened my account -- my

18    Wells Fargo college, I think, with my college I.D.

19    Q.    So having had that experience did it surprise you that --

20    when you learned that -- or were under the impression that

21    Mr. Animashaun did not have a bank account?

22    A.    That is correct.  Because I didn't -- I wasn't able to open

23    one until I got into college.  Because when I came here first I

24    was in high school and I wasn't able to open a bank account until

25    I had my college I.D.

1  Q.   Looking back on it now, of course, you have heard during

2  this trial and knew before that where some of the money that was

3  going into your accounts was -- was from.

4  A.   That's correct.

5  Q.   At the time when this was occurring in 2017 and so on, was

6  this -- did you have any idea that these were in any way illegal

7  funds?

8  A.   I had no idea.  David me told me it was his money from his

9  business as a producer doing music.  So, no, I had no idea.

10  Q.   Okay.  Did you ever make any agreement to have fraudulent

11  funds in your account knowingly?

12  A.   No, I did not.

13  Q.   You did in the course of your relationship with David in

14  some ways benefit from his illegal activities, correct?

15  A.   I guess you could say that, but it wasn't a 50/50 split,

16  like they were making it seem like we were splitting the money in

17  half.  That did not occur, no.

18  Q.   Okay.  So from your perspective did you just have sort of a

19  generous boyfriend who had a lot of business going on?

20  A.   Yeah, he was taking care of me.  African men take care of

21  their women and he was just taking care of me because he was my

22  boyfriend, yes.

23  Q.   And you -- did you have any idea at that time that he was

24  using your accounts for these -- these wires?

25  A.   I had no idea.  I would never knowingly, willingly allow him

```
 1   to do such in my account knowing that it could come back and hurt
 2   me and I'll get in trouble.
 3   Q.   This is already in evidence, Government's 67.  Do you recall
 4   this exhibit?
 5   A.   Yes.
 6   Q.   Okay.  And there is -- these are the search records we heard
 7   about in the early part of the presentation of this exhibit.  But
 8   do you recall the spreadsheets we looked at?
 9   A.   I do.
10   Q.   Okay.  So this is, I believe, D or C.  This is D, worksheet
11   D.  Do you recall looking at this one?
12   A.   Yes, I do.
13   Q.   And over -- over here we see several items, sewn clothes
14   $11,000, children's clothes.  Do you recall what this 1443 amount
15   was, three kilograms?
16   A.   Yes, I do.
17   Q.   And what is that?
18   A.   It looks like -- if you scroll to the left it will show
19   where I purchased it from.  It was like an item I purchased from
20   AliExpress in China.
21   Q.   And would that have been something for resale?
22   A.   Correct.
23   Q.   And in these other spreadsheets there's some similar
24   references.  Do you recall that?
25   A.   Yes, I do.
```

```
 1   Q.    So you've never met Mr. Moses?
 2   A.    I have not.
 3   Q.    And he told the jury you had a daughter.  Do you recall
 4   that?
 5   A.    I do.
 6   Q.    Do you recall both David and Mr. Moses testifying that it's
 7   important for them -- for the romance scam to work for them to
 8   make the person they're scamming believe they're in love.
 9   A.    I do.
10   Q.    Did you believe you were in love with Mr. Animashaun?
11   A.    I did.  I believed I was in love with him.
12   Q.    Did David at any point ever indicate to you that you needed
13   to keep -- when you were giving him cash did he say you need --
14   or not did he say.  Did he ever indicate that you needed to keep
15   it below $10,000 or was that an impression you had?
16   A.    No.  If he did -- because he's not charged with money
17   laundering, it's just me, so no.
18   Q.    So Mr. Animashaun is not charged with money laundering, you
19   are.
20   A.    Correct.
21   Q.    Is that because he used your accounts for his money
22   laundering?
23   A.    That is correct.
24   Q.    Did you ever ask David questions about the money coming in?
25   A.    Yes, I did.  At one point a private investigator reached out
```

1  to me and he had me meet him in Garland, Texas.  And he showed me

2  some text messages and pretty much told me I'm being used.  He

3  explained to me and said you're a victim and --

4            MS. WALTERS:  Objection, hearsay.

5            THE COURT:  Sustained.

6  A.   And I reached out to David based off of the conversation I

7  had with the PI that I met in Garland, and then he told me that

8  it would never do anything to harm me.  And that -- that he loves

9  me and he loves Isaac and he would never do anything to harm me.

10 But I did raise some objection and he said it was his money.

11           I wanted to mention that he showed me some of the

12 properties he owned in Nigeria to pretty much tell me that --

13 that he was well to do --

14           MS. WALTERS:  Objection, hearsay, and there's no

15 question pending.

16           THE COURT:  Sustained.

17 Q.   (BY MR. BUNCH)  So at some point did you learn that David

18 had property in Nigeria?

19 A.   Yes, I did.

20 Q.   Okay.  And was that investment property?

21 A.   No.

22 Q.   What was your impression that that was for?

23 A.   Those were houses that he showed me he owned in Nigeria.

24 Q.   This -- so we talked a little bit about the transaction with

25 the $140,000 and the cars and the return of money.  Did you

```
 1  ever -- and you said he became aggressive and you thought
 2  something was amiss.  What did you do because of -- did you take
 3  any action because of that?
 4  A.   I did.  I filed an anonymous FBI report online on him.
 5  Q.   On --
 6  A.   Valentine.
 7  Q.   Okay.  And did you ever hear anything back from that?
 8  A.   I did not.
 9  Q.   Okay.  Did you have to give your name on that?
10  A.   I did.
11  Q.   Okay.  After you made that report did you feel that was the
12  end of it?
13  A.   Yes.
14          THE COURT:  How much more do you have?
15          MR. BUNCH:  A bit, Your Honor.
16          THE COURT:  Okay.  Then let's go ahead and take our
17  lunch break now.  And we'll see you-all back at 1:30, 1:30.
18          COURTROOM SECURITY OFFICER:  All rise for the jury.
19          (Jury not present.)
20          THE COURT:  Anything else we need to take up at this
21  time?
22          MS. WALTERS:  Not from the Government.
23          MR. BUNCH:  I don't believe so, Your Honor.
24          THE COURT:  All right.  We'll see you back in an hour.
25          (Recess taken.)
```

```
 1              COURTROOM SECURITY OFFICER:  All rise.

 2              THE COURT:  Be seated.  Defendant may proceed.

 3              MR. BUNCH:  Thank you, Your Honor.

 4   Q.   (BY MR. BUNCH)  Okay.  Let's -- let's go back to one thing.

 5   Let's go back to when exactly, if you remember, this first week

 6   of -- you know, when you met David and then by the end of the

 7   week he's asking you to marry him.  When was that?

 8   A.   Late November.  Late 2016, so sometime in November.

 9   Q.   Okay.  And you don't know if it was prior to the

10   Thanksgiving holiday or after, but it was somewhere in November.

11   A.   Yeah, late -- late 2016, yes.

12   Q.   It was not October?

13   A.   I don't believe so, because my son's birthday is in October.

14   I believe I met him after his birthday.

15   Q.   So you don't -- it's been, what, seven years, so you

16   don't --

17   A.   I don't recall, yeah.

18   Q.   You don't recall the exact date, but it was in that range

19   for sure?

20   A.   Yes.

21   Q.   Earlier I referred to Mr. Animashaun as a co-conspirator,

22   and he is a co-conspirator to Mr. Moses, Mr. Musa, Mr. Orji --

23   the other Mr. Orji, correct?

24   A.   Correct.

25   Q.   But at any time that you knew David or otherwise, did you
```

1  agree with David, Moses, anyone named in your -- in this case to

2  commit fraud, to accept romance scam money, any of that?

3  A.    I did not.

4  Q.    Now, that you are aware of the source of these funds, that

5  some of them went through your account, how do you feel about

6  that?

7  A.    I feel really awful.  Sitting here and listening to the

8  testimonies of these victims and the men they thought that they

9  were in a relationship with, that they were in love with, that

10  some of them were convinced that they were going to marry whoever

11  that person on the other end of the computer is -- is just -- it

12  hurts.  Especially as a woman and towards the end of my

13  relationship with David knowing that he did the exact same thing

14  to me it really hurts.  And I really feel bad that they had to go

15  through the situation that they went through.

16        I remember one of the victims saying that she had to

17  sell property to give to her supposed lover, another victim had

18  to take a second job after -- J.S.K., I believe she said she took

19  a second job.  Another victim had to come out from retirement.

20  You know, words can't describe the wickedness of these men and I

21  was not a part of it.  I did not convince Moses to defraud

22  innocent women.  David did not explain to me and tell me that

23  these funds were coming from victims of a romance scam.  That was

24  incorrect.  And I feel really bad for the women.

25  Q.    David's -- one -- one question this may raise is, was David

1  living a life-style that was indicative that -- you know, I mean,

2  you saw a lot of money moving through your accounts.  Did you

3  believe it was David's legitimate money?

4  A.    I did.

5  Q.    Okay.  You saw all this money.  Was his life-style

6  consistent with that much money?

7  A.    Yes, his life-style was -- he was living in an upscale

8  apartment in Plano, Texas.  He had really nice clothes and shoes.

9  He showed me a couple of his properties he had back home in

10  Nigeria.  So the life-style that he was depicting, the money that

11  was coming in, it added up and it made sense to me.

12  Q.    Okay.  And so why would a person with this much money not

13  own a house?

14  A.    He just came to the U.S. and you cannot -- you can't

15  purchase a house without like two years for a W-2 to depict how

16  that income was made.  And he didn't have -- as of the time when

17  we started dating he did not have his legal permanent residency.

18  I believe he got it sometime in 2017.

19  Q.    Okay.  So that wasn't even a question to you why he didn't

20  have a house, because he had just arrived in the United States

21  months prior.

22  A.    Based on what he told me, yes.  He told me he just came in.

23  Q.    You -- you saw the evidence of the PTIN?

24  A.    Correct.

25  Q.    And remind us of what that is?

1   A.   It is a code for a tax preparer to prepare taxes.

2   Q.   Okay.  And did you get that certification?

3   A.   It wasn't a certification per se, it was just an application

4   that I did online and if you pass the background test the IRS

5   will actually issue that number.

6   Q.   And is that -- what was the purpose of doing that?

7   A.   I wanted to make another source of side income.  I wear many

8   hats.  If you show me how to do something I'm going to figure it

9   out and I'm going to try to make money out of it.  And my Turbo

10  Tax always does like a yearly promo where it says if you want to

11  prepare taxes come in and we will teach you.

12        My tax preparer that I met that is now a friend, he has

13  his own company and then he told me he can teach me.  He did try

14  to teach me, it was really complicated, and it was just not

15  something I was interested in doing.

16  Q.   Okay.  So when you got that were you thinking tax preparing

17  is a seasonal way to be extra super busy from January to April

18  and make some extra money and then you can -- you can put that

19  down and just do your 9:00 to 5:00 or do -- you know, sell

20  clothes or whatever you're doing the rest of the year?

21  A.   Correct.  It was a seasonal opportunity that I was wanting

22  to partake in.

23  Q.   Now, in the Government's evidence they presented some

24  evidence suggesting that some of the W-2s on your returns -- I

25  believe they're trying to establish or insinuate that they might

1  be fraudulent.

2  A.    That is correct.

3  Q.    Are any of your W-2s fraudulent?

4  A.    No, it's not.

5  Q.    Is there a way to -- how would you or the Government

6  establish that they're legitimate?

7  A.    As an auditor if I wanted to establish it's fraudulent --

8  they all have an EICN number.  All I would have to do is select a

9  random sample of all those W-2s and the Government would have an

10  opportunity to subpoena anybody.  Subpoena that company and ask

11  for that employee record, both current employees and employees

12  that no longer work for those companies, and then it would show

13  that my name is part of an actual current employee or a past

14  employee to actually verify without making speculations.

15  Q.    Okay.  So all these companies that are in your taxes you've

16  done work for.

17  A.    Correct.  Yes.

18  Q.    Having gone through this experience, do you feel that you

19  can relate to the victims that have testified?

20  A.    I'm sorry, can you repeat that question?

21  Q.    Do you feel that you can relate to the victims that have

22  testified?

23  A.    Yes, I'm a victim myself.  David used me and when he was

24  done using me and I couldn't do nothing else for him he moved on

25  and he married somebody else, because he didn't marry me.

```
 1   Q.   Do you feel like you were duped?

 2   A.   Yeah.  He used me.

 3   Q.   A question I've asked many of the victims is looking back --

 4   back at it in retrospect, do you feel like a fool for believing

 5   him like those other victims did?

 6   A.   I feel like a big fool.

 7            MR. BUNCH:  I'll pass the witness.

 8            MS. WALTERS:  I'm trying to be efficient, just trying

 9   to get organized.

10                        CROSS-EXAMINATION

11   BY MS. WALTERS:

12   Q.   Ms. Okoro, you and I have spoken before, haven't we?

13   A.   Yes, we have.

14   Q.   And, in fact, we've met in person before, haven't we?

15   A.   Yes, we have.

16   Q.   You came to the U.S. Attorney's Office in 2022 to meet with

17   me and with Ms. Lyons and Ms. Rudoff, correct?

18   A.   Correct.

19   Q.   And you also met with federal agents that day, correct?

20   A.   Correct.

21   Q.   And on that date Ms. Lyons gave you a presentation that

22   included much of the evidence we've been showing you in trial

23   today, correct?

24   A.   Correct.

25   Q.   We met for more than an hour; is that right?
```

1    A.    Right.

2    Q.    And you had a chance to ask questions that day, didn't you?

3    A.    Yes.

4    Q.    And you were accompanied by your attorney, weren't you?

5    A.    I was.

6    Q.    So you or your attorney could speak to us, right?

7    A.    Correct.

8    Q.    You could tell us we had the evidence wrong, couldn't you?

9    A.    Correct.

10   Q.    You didn't say a word that day, did you?

11   A.    Well --

12   Q.    No, the question --

13   A.    I did not.

14   Q.    You did not?

15   A.    No.

16   Q.    And this is the first we're hearing of this explanation for

17   all of these transactions in your account, correct?

18   A.    Well, I've always given -- correct.

19   Q.    Correct.  You didn't bring it up and you had more than an

20   hour meeting with us.

21   A.    Correct.

22   Q.    And then this summer, summer of 2023, you and I also spoke

23   on the phone a few times, right?

24   A.    Correct.

25   Q.    And you came to the U.S. Attorney's Office to review

1  evidence, right?

2  A.    Right.

3  Q.    And you never gave this explanation that you offered today

4  previously?

5  A.    No.

6  Q.    You also said you reported someone or something to the FBI,

7  right?

8  A.    Right.

9  Q.    Do you have a copy of that report with you?

10  A.    I do not.

11  Q.    You don't know the case number?  You don't know the case

12  number?

13  A.    I do not.

14  Q.    And you've never provided that report to the Government,

15  have you?

16  A.    I wouldn't be able to if I wanted to, so no.

17  Q.    You have never filed a police report with any local agency

18  relating to any of these scams, correct?

19  A.    Correct.

20  Q.    So you're telling the jury today that you've never committed

21  fraud, right?

22  A.    Correct.

23  Q.    And you've never conspired with anyone to commit fraud?

24  A.    Correct.

25  Q.    You've -- you're telling the jury today you haven't engaged

1  in money laundering, right?

2  A.    Correct.

3  Q.    And that you haven't conspired with anyone to commit money

4  laundering?

5  A.    That is correct.

6  Q.    Now, you met David Animashaun in real life, in person.  Not

7  online, in real life.

8  A.    Correct.

9  Q.    You met him at a gig, right?  A music gig?

10 A.    I wouldn't call it that, but correct.

11 Q.    I thought you testified on direct that you met him at a gig

12 where he played music.

13 A.    I said a church conference.  I didn't say gig.

14 Q.    Okay.  And you dated him for more than a year, correct?

15 A.    Correct.

16 Q.    You started -- you started dating sometime in late 2016?

17 A.    Correct.

18 Q.    And then you dated until shortly before your son's birthday

19 in June of 2018, right?

20 A.    My birthday.

21 Q.    Oh, your birthday.  Okay.  Your birthday in 2018.

22 A.    Correct.

23 Q.    You introduced David to your family, right?

24 A.    Correct.

25 Q.    He knew your son?

```
 1   A.   Correct.

 2   Q.   You knew his real name?

 3   A.   Correct.

 4   Q.   And, in fact, you lived near him in 2017 when you moved from

 5   Garland to Plano; is that right?

 6   A.   Correct.

 7   Q.   So he lived in an apartment in Plano, right?

 8   A.   Right.

 9   Q.   You lived in an apartment in Plano; is that right?

10   A.   Correct.

11   Q.   Now, you said on direct that you were always together.  Do

12   you remember that?

13   A.   Yes.

14   Q.   And yet you never met your boyfriend's roommate

15   Oluwalobamise Moses?

16   A.   He never had a roommate in Plano.

17   Q.   The question was you never met --

18   A.   No.

19   Q.   So Oluwalobamise Moses just completely made up that he met

20   you?

21   A.   He did.

22   Q.   And Mr. Animashaun went to Nigeria in 2017, didn't he?

23   A.   He did.

24   Q.   You were still dating him while he was in Nigeria, right?

25   A.   Correct.
```

1  Q.   And so he was in Nigeria and you were back here in the

2  United States, right?

3  A.   Correct.

4  Q.   You wired him money in Nigeria, didn't you?

5  A.   I did.

6  Q.   Let's go to Exhibit 94, please, page 1.  Let's look at the

7  top half of this document, please.

8         Now, this is a signature card for your account at Chase

9  Bank, right?

10 A.   Correct.

11 Q.   So it's got your name on the left-hand side and it's the

12 7577 account on the right-hand side; is that correct?

13 A.   Correct.

14 Q.   And at the bottom half of the document, I believe we see

15 your signature.

16 A.   That's correct.

17 Q.   That is your signature?

18 A.   Yes, ma'am.

19 Q.   And you're the only signer on this account.

20 A.   I am.

21 Q.   Let's go to page 51.  Now, if we could zoom in on the top

22 half just generally so that the jury understands what we're

23 looking at.  This is your account statement for the 7577 account

24 from April 14th to May 11th, 2017, right?

25 A.   Correct.

1    Q.    Now, let's go to the next page and we'll focus on a line on

2    page 52 where there is a May 11th, 2017 outgoing wire.  Do you

3    see that on May 11th, an international wire that's outgoing?

4    A.    I do.

5    Q.    What's the amount of that wire?

6    A.    $13,310.

7    Q.    Who is it to?

8    A.    David Animashaun.

9    Q.    So he's not at the bank in Dallas with you when you send

10   that wire, is he?

11   A.    He's not.  That was an online wire, but, no, he wasn't.

12   Q.    He wasn't at the bank.

13   A.    No.

14   Q.    And that was a transaction -- you have been sitting through

15   trial, haven't you?

16   A.    Correct.

17   Q.    And wires you have to go into the bank to do back in 2017.

18   A.    That's incorrect.

19   Q.    Let's look at the next wire on page 61, please.  Let's go --

20   yes.

21          So on May 25th, do you see that transaction?

22   A.    I do.

23   Q.    And that's a second wire being sent to David Animashaun in

24   Nigeria.

25   A.    That's correct.

1    Q.    What's the amount for?

2    A.    $6,635.

3    Q.    David Animashaun was out of the country, correct?

4    A.    Correct.

5    Q.    Now, he returned in June of 2017, right?

6    A.    Sure.

7    Q.    And you kept dating.  You were still dating him in June of

8    2017?

9    A.    Correct.

10   Q.    You went to the same church at that point.

11   A.    Correct.

12   Q.    And you knew that he played in the church band.

13   A.    Correct.

14   Q.    And he played some gigs on the side, right?

15   A.    I wouldn't call it gigs, but correct.  Sure.

16   Q.    He had music instruments set up at his apartment?

17   A.    Yes, he did.

18   Q.    You said you wouldn't call them gigs.  So you haven't ever

19   seen him play a gig where he might make $25,000, have you?

20   A.    He produces.  I don't consider --

21   Q.    No, the question was you haven't seen him play a gig where

22   he might make $25,000.

23   A.    No.

24   Q.    And he never had you deposit a counterfeit check, did he?

25   A.    Not that I recall.

1  Q.   You never had to sell any property to send to David, did

2  you?

3  A.   No, I did not.

4  Q.   And while you were dating David you never had to stop paying

5  for your kid's activities, for your son Isaac's activities, did

6  you?

7  A.   No, I did got.

8  Q.   You didn't have to take on extra jobs because David was

9  asking you for money, did you?

10  A.   No, I did not.

11  Q.   And you said that he asked you to marry him on direct,

12  right?

13  A.   Correct.

14  Q.   But you knew he was married when you were dating him, didn't

15  you?

16  A.   Initially, no.

17  Q.   But you found out he was married, right?

18  A.   He informed me.

19  Q.   You kept dating him until right before your birthday in

20  June of 2018, right?

21  A.   Correct.

22  Q.   Now, you've got a Bachelor's degree from Cal State

23  Bakersfield.

24  A.   That is correct.

25  Q.   And you emphasize that you wanted to be an entrepreneur.

```
1   A.   Correct.
2   Q.   And you've said you are capable of preparing your own taxes,
3   right?  You got a PTIN.
4   A.   I got a PTIN, but I'm not capable of creating my taxes.
5   I never said that.
6   Q.   You're not capable of creating -- preparing your own taxes.
7   A.   No.
8   Q.   Despite having applied for a PTIN to become a paid tax
9   preparer for other people.
10  A.   You need it to prepare taxes first, so yes.
11  Q.   So you got that.
12  A.   Correct.
13  Q.   Do you think you manage your own finances?
14  A.   Yes.
15  Q.   You worked for a Big Four accounting firm, KPMG, right?
16  A.   Correct.
17  Q.   And yet you repeatedly received money into your bank
18  accounts that involve online scams; isn't that true?
19  A.   Correct.
20  Q.   Your college degree is in public administration; is that
21  right?
22  A.   Correct.
23  Q.   You finished your college degree in 2014.
24  A.   Correct.
25  Q.   So you were working, if I understood, many temporary and
```

1   contract jobs in 2017 in Dallas.  In Dallas and the surrounding

2   areas.

3   A.   Not in the Dallas area, no.

4   Q.   So you weren't living in the Dallas area in 2017?

5   A.   I was.

6   Q.   And you were working other places in 2017, correct?

7   A.   In Dallas and outside Dallas, correct.  Yes.

8         MS. WALTERS:  Let's look at Government Exhibit 66,

9   please, and let's go to page 145.

10   Q.   (BY MS. WALTERS)  Now, in the top half of this document you

11   saw this entered as a Government exhibit previously, right?

12   A.   Correct.

13   Q.   And in the middle of the page in the second quarter of 2017

14   it shows that you worked for PDQ Staffing, right?

15   A.   Correct.

16   Q.   And you made approximately $2,900 the second quarter of

17   2017.

18   A.   Correct.

19   Q.   And then you also worked for Smith Temporaries in the first

20   quarter of 2017; is that right?

21   A.   Correct.

22   Q.   You made $3,762; is that right?

23   A.   Correct.

24   Q.   Finally, we look at -- we're still on page 145 and we're

25   looking for TPUSA, which is the bottom quadrant.  So you worked

1  for TPUSA in the third and fourth quarters of 2017, right?

2  A.    Correct.

3  Q.    And you made about $1,700 total.

4  A.    Correct.

5  Q.    If I did that -- or $1,500.  So let's go to page 66, please.

6  Excuse me, page 146.  And let's look for CJS Solutions, which is

7  going to be in the bottom half.  Now, CJS Solutions is someone

8  you actually worked for in 2017, right?

9  A.    Correct.

10  Q.    And you made $6,378 according to the Texas Workforce

11  Commission.

12  A.    Correct.

13  Q.    And that's the dollar amount CJS reports to Texas as

14  having -- as to what they paid you, right?

15  A.    Right.

16  Q.    Now, let's go to page 147.  You also worked for Vela Point

17  in 2017.  Do you see that?

18  A.    I do.

19  Q.    In the third quarter it appears you made about $2,500?

20  A.    I do.

21  Q.    So you made about $17,000 from employment that's reported on

22  W-2s in 2017.  Wouldn't you agree?

23  A.    There's one more employee that's not listed here.

24  Q.    And who is that?

25  A.    I believe it's called B&G, Bradford & Galt, or something

1    like that.

2    Q.    In 2017?

3    A.    Yes, ma'am.

4    Q.    Now, you also started a business, IJ Global Link, in 2017.

5    A.    Correct.

6    Q.    Now, actually you said that you worked for a company named

7    Bradford & Galt, and that doesn't appear in the Texas Workforce

8    Commission records, does it?  We've gone through three pages of

9    the records and you didn't see it, did you?

10   A.    I don't know how the reporting works, so no.

11   Q.    And you don't remember the Texas Workforce Commission

12   witness testifying how employers with W-2s report to them for

13   purposes of keeping track of wages?

14   A.    I do.  Most of the companies were not in Texas.

15   Q.    I just wanted to make sure you --

16   A.    Yes.

17   Q.    The answer is yes.  So you started a business called

18   IJ Global Link in 2017.

19   A.    Correct.

20   Q.    Let's go to Government's Exhibit 123.  Now, at the top half

21   of this it identifies your company as IJ Global Link, right?

22   A.    Correct.

23   Q.    And it gives the home address of Duck Creek Drive.  That's

24   your apartment, isn't it?

25   A.    It is.

1    Q.    In Garland?

2    A.    Correct.

3    Q.    That's where the business location is going to be?

4    A.    Correct.

5    Q.    And there's no storefront, is there?

6    A.    No.

7    Q.    There's no retail location, is there?

8    A.    No.

9    Q.    And there's no website, is there?

10    A.    No.

11    Q.    Okay.  And at the bottom of this it's got your name and your

12    signature, right?

13    A.    Correct.

14    Q.    And finally in the very bottom it shows the date that you

15    obtained this assumed names record, doesn't it?  It's February

16    13th, 2017?

17    A.    Correct.

18    Q.    And four days later you opened your first business bank

19    account in the name of IJ Global Link.

20    A.    That is correct.

21    Q.    Let's go to Government's Exhibit 6, page 17, please.  Now,

22    is this the bank account signature card that you signed when you

23    opened an account in the name of IJ Global Link?

24    A.    Yes.

25    Q.    So it's the account 4431; is that right?

1    A.    Correct.

2    Q.    And at the bottom it has you as the signatory.

3    A.    That is correct.

4    Q.    Let's turn to page 18.  And at the top half you sign as the

5    owner of this account, right?

6    A.    Correct.

7    Q.    And on page 19 you opened a second account at Bank of

8    America in the business name IJ Global Link as well.

9    A.    A savings account, yes.

10   Q.    In IJ Global Link?

11   A.    Correct.

12   Q.    Okay.  And you sign at the bottom of that signature card,

13   correct?

14   A.    Correct.

15   Q.    You're the only signer.

16   A.    That is correct.

17   Q.    Now, let's go to page 22.  So if we look in the middle of

18   the page, is this -- do you recognize this as a bank account

19   statement for your IJ Global Link account ending in 4431?

20   A.    I do.

21   Q.    And the beginning balance was zero dollars on February 17th,

22   correct?

23   A.    Correct.

24   Q.    And so during the month of February you deposited a hundred

25   dollars into the account and you withdrew a hundred dollars; is

1  that right?

2  A.    Correct.

3  Q.    So the ending balance that -- on February 28th was zero

4  dollars, right?

5  A.    Correct.

6  Q.    So let's go to page 28.  In the middle of the page it

7  summarizes what happened the following month, doesn't it?

8  A.    It does.

9  Q.    And so beginning balance on March 1st you've got zero

10 dollars, right?

11 A.    Right.

12 Q.    And then $142,000 gets deposited into this account in one

13 month, right?

14 A.    Right.

15 Q.    And you withdrew or transferred $132,000 of that, correct?

16 A.    Correct.

17 Q.    So at the end of the month you're left with a little bit

18 over $10,000; is that right?

19 A.    Right.

20 Q.    Now, you testified on direct you were really proud of having

21 opened a business bank account and you went to tell David about

22 it, right?

23 A.    No.

24 Q.    You didn't testify on direct that you were so excited when

25 you opened your business bank account you went to show him the

1  account details and he took a photo?

2  A.   Yes, you just changed the statement.  So, yes, that's what I

3  said.  I showed him what he asked me to do, correct.

4  Q.   And he took a photo of your online bank account, right?

5  A.   Correct.

6  Q.   Now, your online bank screen, the home screen when you login

7  to your account, is that what he took a photo of?

8  A.   No, I set up online banking that day, so he took a picture

9  of the login details to the banking account.

10  Q.   Well, if you set up online banking it doesn't show the

11  password, does it?

12  A.   No, I wrote it on a piece of paper.

13  Q.   So you wrote the password on a piece of paper and gave it to

14  David?

15  A.   It was on the paperwork of -- that gets started in the

16  package they give you, so the login details and password was on

17  the paper, correct.

18  Q.   No -- but you showed David the password, right?

19  A.   I showed him the login details, correct.

20  Q.   Now, he didn't have your PIN, did he?

21  A.   He did.

22  Q.   You gave him your PIN too?

23  A.   I did.

24  Q.   So you've given him your login details and you have given

25  him your PIN number and your password, correct?

```
 1  A.   Correct.
 2  Q.   Now, so he may engage in your -- your theory is he may
 3  engage in transactions on your account because he has all the
 4  ability to login, right?
 5  A.   Right.
 6  Q.   Now, it still wouldn't explain transactions you had to be
 7  present and show an I.D. for at the bank, would it?
 8  A.   It would not.
 9  Q.   Let's go to page 13 of Government's Exhibit 6, please.
10  Let's look at the top half of this document.  So this is -- this
11  is a cashier's check, correct?
12  A.   Correct.
13  Q.   And it's bought by IJ Global Link, correct?
14  A.   Correct.
15  Q.   And it's made payable to IJ Global Link, correct?
16  A.   Correct.
17  Q.   It's for $20,000, right?
18  A.   Right.
19  Q.   On March 27th, 2017.
20  A.   Correct.
21  Q.   You have to pay a fee to get a cashier's check, right?
22  A.   I believe so.
23  Q.   So you had to show I.D. to obtain this cashier's check,
24  right?
25  A.   Right.
```

1  Q.   And you could have just transferred the money between two

2  accounts, couldn't you have?

3  A.   Correct.

4  Q.   Now, let's go back to page 30.  Now, in this -- in the --

5  let's take the top half of this page, yes.

6         Now, we see lots of counter credits in here and wires

7  and a teller transfer; is that correct?

8  A.   Correct.

9  Q.   We don't see any payroll deposits, do we?

10 A.   No, we don't.

11 Q.   No ACHs, no -- no normal paychecks for any of your jobs.

12 A.   No.

13 Q.   Now, the first wire that comes in is March 14th, 2017.  Do

14 you see that?

15 A.   I do.

16 Q.   It's $4,800.

17 A.   Correct.

18 Q.   Do you know Alfred Hooper?

19 A.   I do not.

20 Q.   Did you ask David who Alfred Hooper was?

21 A.   I did not.

22 Q.   You've never spoken to him, have you?

23 A.   No, I haven't.

24 Q.   And you didn't return the money, did you?

25 A.   I gave it to David, so no.

1   Q.   Now, there's a wire later on March 17th for $25,000.

2   A.   That is correct.

3   Q.   And that's from Jill Sobol-Kerst, isn't it?

4   A.   That is correct.

5   Q.   And at the bottom of that wire line it says "expertise

6   maintenance."  Do you see that?

7   A.   I do.

8   Q.   You don't provide maintenance or expertise in maintenance,

9   do you?

10  A.   No.

11  Q.   And neither does David, does he?

12  A.   No.

13  Q.   And you don't know Jill Sobol-Kerst, do you?

14  A.   I do not.

15  Q.   And you didn't return the money, did you?

16  A.   No.

17  Q.   So let's go to the next two wires, March 23rd.  Two payments

18  come in for almost $60,000.  Do you see that?

19  A.   I do.

20  Q.   Okay.  And in the middle of the second line there's language

21  that says "AMH Speekenbrink."  Do you --

22  A.   Yes, I do.

23  Q.   Okay.

24          MS. WALTERS:  That's okay.

25  Q.   (BY MS. WALTERS)  And you don't know anybody named

1   AMH Speekenbrink, do you?

2   A.    No.

3   Q.    And you didn't ask David who Speekenbrink was, did you?

4   A.    No.

5   Q.    Now, the last line says, "Insurance payment on behalf of Amy

6   Peters, first transfer."  Do you see that?

7   A.    I do.

8   Q.    And the second one says "second transfer," right?

9   A.    Right.

10  Q.    You're not licensed by the Texas Department of Insurance to

11  broker insurance, are you, --

12  A.    No.

13  Q.    -- to sell insurance?  You didn't have an insurance

14  business, did you?

15  A.    No.

16  Q.    And neither did David, did he?

17  A.    No.

18  Q.    And you didn't return the money?

19  A.    No.

20  Q.    Then on March 20th let's go to page 9, please, top half.

21  You bought a cashier's check payable to David Animashaun, didn't

22  you?

23  A.    Yes.

24  Q.    March 20th, 2017.  And that's a transaction you have to go

25  into a bank to do, isn't it?

1  A.    Yes.

2  Q.    You have to show I.D., correct?

3  A.    Correct.

4  Q.    And it's from your IJ Global Link account payable to him,

5  right?

6  A.    Right.

7  Q.    Let's go back to page 30, please.  Let's see.  Now, with

8  that cashier's check made payable to David, you testified earlier

9  you didn't know David had any bank accounts, right?

10 A.    That's not what I said.

11 Q.    I thought you said David didn't have any bank accounts.

12 A.    I said that it did not surprise me that he needed me to put

13 the money in my account, because I know that you can't get a bank

14 account without the proper IDs.  Yes, that's what I said.

15 Q.    So, yes, the answer is you thought he didn't have bank

16 accounts.

17 A.    Correct.

18 Q.    But you purchased a cashier's check made payable to him.

19 A.    That was before -- when I opened the account.

20 Q.    The question was -- it's a yes/no question.  You purchased a

21 cashier's check made payable to David.

22 A.    The reason why I -- yes, I did.

23 Q.    So then I would like to direct your attention to page 31,

24 please.  Now, after receiving these wires into your accounts,

25 let's go to the top -- let's take the top transactions from March

1  6th through March 13th, please.

2          Now, that very first transaction, March 6th, 2017, do

3  you see that, Ms. Okoro?

4  A.    Yes, ma'am.

5  Q.    So that's a transfer from 4431 to your savings account 6287

6  at Bank of America, right?

7  A.    Right.

8  Q.    And then that happens March 6th and then on March 7th you

9  transfer more money to 6287, right?  Your savings account?

10 A.    Yes.

11 Q.    And that time you transferred a thousand dollars, didn't

12 you?

13 A.    Money was transferred, yes.

14 Q.    And money was transferred again to 6287 in the dollar amount

15 of $600, right?

16 A.    That was David doing the transfers, but yes.

17 Q.    No, no, the question is money was transferred --

18 A.    Yes.

19 Q.    -- to your savings account in IJ Global Link.

20 A.    Correct.

21 Q.    And so in these first three days $1,900 has been transferred

22 to a savings account you're the sole signatory on, right?

23 A.    Correct.

24 Q.    Then we go down to March 22nd and there's yet another

25 transfer to your 6287 savings account, right?  $1,600?

```
 1  A.   Correct.

 2  Q.   And finally March 31st, $1,500 --

 3  A.   Correct.

 4  Q.   -- sent to your savings account.  Now, during this month you

 5  also spent money from this account.  Let's look at March 31st,

 6  middle of the page.  Exactly, right.  A Time Warner cable bill

 7  gets paid out of there on March 31st, right?

 8  A.   Right.

 9        MS. WALTERS:  Let's go down to transactions that occur

10  below then to March 14th -- let's blow up March 14th through

11  about March 20th, please, if we can do that.  Yes, next page.

12  You're -- thank you for catching me.  It's page 32.

13  Q.   (BY MS. WALTERS)  So at the top we see March 14th there's a

14  transaction on a debit card for 23.24; is that right?

15  A.   Correct.

16  Q.   And that's a restaurant, Kung Pao?

17  A.   Correct.

18  Q.   And then do you see on March 14th a couple of transactions

19  later there's a purchase at Burger King?

20  A.   Correct.

21  Q.   And then there's a purchase below that at Murphy's Wal-Mart

22  in Garland.

23  A.   Correct.

24  Q.   And then there's Murphy's restaurant, March 15th.  Do you

25  see that?
```

1  A.   Correct.

2  Q.   And then March 15th we've got purchases at Wal-Mart, Amazon

3  and Jack in the Box, right?

4  A.   Correct.

5  Q.   We go down to March 20th and there's a check card payment to

6  Sprint in the amount of $117, right?

7  A.   Right.

8  Q.   And March 21st, which is just -- just below what's been

9  highlighted here, we see March 21st, a payment to Poshmark.  It's

10  a clothing retail store?

11  A.   Correct.

12  Q.   And then March 22nd Wal-Mart and March 23rd Braum's, right?

13  A.   Correct.

14  Q.   If we go to the next page we're going to see on March 27th a

15  ticket on Virgin Airlines for $1,200, correct?

16  A.   Correct.

17  Q.   And finally on March 30th, which is just below this, we've

18  got a purchase at Macy's on March 30th in the amount of 135.

19  A.   Correct.

20  Q.   So these are just expenses, right?  So let's go back to page

21  28 and let's focus on the middle of the page where it has that

22  summary.

23       So at the end of March 31st, 2017 you would agree you

24  had $10,000 in this account that you did not have at the

25  beginning of the month.

```
 1   A.   Correct.
 2   Q.   Now, even if Mr. Animashaun is in the music business, you'd
 3   agree that $142,000 in incoming money is a lot of money in one
 4   month, right?
 5   A.   I can't tell, no.
 6   Q.   You have no idea?  You don't think it's a lot of money for a
 7   guy living in an apartment with a roommate as an adult?
 8   A.   He didn't have a roommate when we were together.
 9   Q.   But he testified that he's had roommates here, --
10   A.   Correct.
11   Q.   -- correct?  Afeez Alao, Mr. Moses?
12            So you're spending money wired in by -- from people you
13   don't know, right?
14   A.   Wrong.
15   Q.   This is your account, got a debit card.  Are you saying that
16   you weren't spending the money?
17   A.   David has access to that same debit card.
18   Q.   And so who had the card, then?  Did you share it?
19   A.   David had access to the card and if I needed something he
20   would let me use it.
21   Q.   So you're saying that all of these, even Poshmark, someone
22   else is using the card.
23   A.   No.
24   Q.   So you're still spending money on transactions that you
25   don't have -- you're getting money into an account that you
```

1  opened, right?

2  A.    Correct.

3  Q.    And you're receiving payment for what appear to be business

4  purposes and you're not in that line of business, right?

5  A.    Correct.

6  Q.    And David's not in that line of business either, is he?

7  It's identified on the wires.

8  A.    Correct.

9  Q.    And you're keeping the money from the people who sent it in,

10  right?

11  A.    Wrong.

12  Q.    You never returned any of the money.  I just asked you all

13  of those.  You never returned any of the money from any of these

14  wires.

15  A.    I'm not keeping the money, David is.

16  Q.    No, it's your account.  You know that it's coming into your

17  account, --

18  A.    Correct.

19  Q.    -- right?  And you never contact the bank and say, "No, this

20  money shouldn't be in my account."

21  A.    No.

22  Q.    Now, let's go to your savings account.  Let's go to page 36.

23  And I want to follow-up.  So you knew that you weren't in those

24  lines of business that were identified on the wires, right?

25  A.    Right.

```
1   Q.   And you knew David wasn't in those lines of business that

2   were identified on the wires, right?

3   A.   Correct.

4   Q.   And so just looking on the face of the wires there's no

5   legitimate reason you should have that money, right?

6   A.   Right.

7   Q.   So the balance at the start of March 2017 on page 36 is zero

8   in your -- in the savings account 6287; is that correct?

9   A.   Correct.

10  Q.   And during the month of March 2017 you received $5,000 into

11  this account, correct?

12  A.   Correct.

13  Q.   So this is a savings account and it's based on all those

14  transfers from your 4431 account, right?

15  A.   Correct.

16  Q.   So you've got $5,000 more in a savings account than you did

17  at the beginning of the month.

18  A.   Correct.

19  Q.   Now -- and let's go to page 40.  Now, on page -- let's see.

20  I think it's page 40.  Let's see.  Yes, it's page 40.  Okay, at

21  page 40, middle of the account you've got an account summary here

22  again for account 4431, right?

23  A.   Correct.

24  Q.   And you got approximately -- your account received

25  approximately $31,750 during the month of April 2017, right?
```

1   A.    Correct.

2   Q.    And you withdrew 32,000.  Withdrew or transferred roughly

3   32,000 that same month.

4   A.    Correct.

5   Q.    Yes.  And you're still more than $9,000 ahead in this

6   account, right?

7   A.    Correct.

8   Q.    And this is not an account you use to receive payroll or

9   ACH or paychecks, right?

10  A.    Correct.

11  Q.    Let's go to page 42, please.  So in the top half we see

12  deposits and other credits.  So all of the money coming into this

13  account in April are counter credits, wires and another deposit.

14  No paychecks, right?

15  A.    Yes.

16  Q.    And so on April 3rd you had a counter credit of $20,000 in

17  two different transactions, right?

18  A.    Correct.

19  Q.    You also had a wire on April 3rd.  Do you see that for

20  $5,000?

21  A.    Yes.

22  Q.    Do you see a name on the second line there?

23  A.    Yes.

24  Q.    Bruce Brahmsteadt.  Do you see that?

25  A.    I do.

```
 1   Q.   You don't know Bruce Brahmsteadt, do you?

 2   A.   I don't.

 3   Q.   And you didn't ask David about him, did you?

 4   A.   Again, David has access to that account, so no.

 5   Q.   Didn't ask David.

 6   A.   No.

 7   Q.   And you didn't return Bruce Brahmsteadt's money, did you?

 8   A.   No.

 9   Q.   And, in fact, you withdrew it and spent this money.

10          Let's go down to the lower half of this page.  On April

11   3rd that money is coming in and that money is going out.

12   April 3rd you withdraw $18,000 in cash, right?

13   A.   Correct.

14   Q.   And April 4th it shows another $9,000 in cash being

15   withdrawn from this account, right?

16   A.   Right.

17   Q.   Finally on April 6th you withdraw $4,283, right?

18   A.   Right.

19   Q.   Okay.  And April 3rd you also spend -- or a lot of money is

20   spent out of this account.  It starts at, I believe, Target on

21   April 3rd.

22   A.   Money is spent.  That is correct.

23   Q.   Money is spent.  And looks like there's a Thai restaurant

24   where money is spent on April 3rd, Zenna Thai?

25   A.   That's correct.
```

1    Q.    And money is paid for a car wash, right?

2    A.    Correct.

3    Q.    And then it looks like money is being spent at Wal-Mart

4    again all on April 3rd, right?

5    A.    Correct.

6    Q.    Okay.  And let's go to page 43, please.  Now, at the top of

7    this more expenses are coming in.  You've spent -- $40 is spent

8    with NTTA, right?  That's the toll tag people, right?

9    A.    Correct.

10   Q.    And then there's a second payment to NTTA, correct?

11   A.    Correct.

12   Q.    And then we have Wendy's and Domino's and Amazon.  Do you

13   see all of those?

14   A.    I do.

15   Q.    And down on April 6th we've got another purchase at H&M,

16   right?

17   A.    Correct.

18   Q.    So this is all happening in April.  Let's go to page 48.

19   Now, in the middle of the page this is your statement from

20   May 1st to May 31st, 2017, in 4431, correct?

21   A.    Yes.

22   Q.    And the bank closed your account, didn't it?  The bank

23   closed your account, didn't it?

24   A.    Yes, it did.

25   Q.    And, in fact, it issued you a check, right?

1    A.    Right.

2    Q.    And it issued you a check, I believe, for more than $9,000.

3    Do you see that in the middle of the page, withdrawals and other

4    debits?

5    A.    Yes.

6    Q.    And that check that they issued you was made payable to

7    IJ Global Link, right?

8    A.    Right.

9    Q.    And even before Bank of America closed your account on

10   May 31st, you had three other accounts opened in the name of

11   IJ Global Link, right?

12   A.    Correct.

13   Q.    Let's go to the next page.

14          (Discussion out of the hearing of the reporter.)

15   Q.    (BY MS. WALTERS)  Now, let's focus on the top portion, yes,

16   where it says deposits and other credits.  Do you see where it

17   says May 23rd, force post credit for 5.99?

18   A.    Yes.

19   Q.    And you were here when Bank of America testified, correct,

20   that this account was closed?

21   A.    Correct.  Yes.

22   Q.    And on May 17th, 2017 you got the account closing

23   transaction, that's the check, for $9,208.60?

24   A.    Yes.

25   Q.    And she testified that the account was closed for fraud,

1 correct?

2 A.   She did.

3 Q.   Now, let's go to Government's Exhibit 92, page 23.  Now,

4 here you had opened an account at Wells Fargo, right, in the name

5 of IJ Global Link?

6 A.   Correct, yes.

7 Q.   And this was March 7th, 2017?

8 A.   Yes.

9 Q.   So you opened two accounts.  In the middle of the page, do

10 you see an account ending in 5650?

11 A.   Yes.

12 Q.   That's a checking account?

13 A.   Yes.

14 Q.   And then the one below it that ends in 5342, that's a

15 savings account?

16 A.   Yes.

17 Q.   Also for IJ Global Link, right?

18 A.   Right.

19 Q.   And at the bottom of the page -- or actually on the -- yes,

20 at the bottom of the page where it mentions related customer

21 information, what's your relationship to the account of IJ Global

22 Link?

23 A.   It says on here "sole owner."

24 Q.   Okay.  Let's turn to page 25.  Now, Wells Fargo asks you

25 what your business was, didn't they?

1    A.    Yes.

2    Q.    And on March 7th when you opened this you provided your

3    street address as Duck Creek Drive, Apartment H in Garland,

4    right?

5    A.    Right.

6    Q.    And you're the sole proprietor as well.

7    A.    Correct.

8    Q.    And you describe the annual gross sales, which is just a

9    guideline, but you provide a number of $36,000, correct?

10   A.    Correct.

11   Q.    And that's your e-mail address on the right-hand side, isn't

12   it?

13   A.    Correct.

14   Q.    Now, let's focus on what the sales market is.  It's an

15   international market, correct?

16   A.    Correct.

17   Q.    And the primary country for number one is listed as NG.  Do

18   you see that?

19   A.    I do.

20   Q.    And is NG often an abbreviation for Nigeria?

21   A.    It is.

22   Q.    So then the industry is going to be administrative support,

23   waste management and remediation, right?

24   A.    Right.

25   Q.    Travel arrangements for goods.  So you provided this

1   information to Wells Fargo, right?

2   A.   I don't recall if this was in person or online.  If it's

3   online, then David did it, so I don't recall.

4   Q.   This has all of your information, correct?

5   A.   Correct.

6   Q.   And you actually signed this document three times.  Let's go

7   to page 27.  Is that your signature?

8   A.   It's an E-signature it looks like, but yes.

9   Q.   Are you saying that that's not your signature, that you

10  didn't sign this?

11  A.   I'm not saying that.  I signed it, yes.

12  Q.   Okay.  So you signed it March 7th, 2017 at the top and then

13  you've signed it a second time in the middle of the page and a

14  third time at the bottom of the page, right?

15  A.   Correct.

16  Q.   You're the sole signatory listed on this, correct?

17  A.   Correct.

18  Q.   Now, let's go to page 1 -- and you do the same thing.  This

19  is for the account.  Let's go to page 151, please.  Now, this is

20  an additional document involved in Wells Fargo's opening of your

21  account, right?

22  A.   Correct.

23           MS. WALTERS:  So let's scroll down to where it has

24  the -- yes, exactly right, third-party payment processor.

25  Q.   (BY MS. WALTERS)  So you tell Wells Fargo that you're not

1   going to process credit card payments, right?

2   A.   Correct.

3   Q.   And that in this lower half when it asks money service

4   business, that you are not going -- let's -- let's go to line 3,

5   please.  You tell them you're not going to cash or provide money

6   back from checks, money orders or traveler's checks for

7   companies, right?

8   A.   Correct.

9   Q.   You're not going to be a check casher.

10  A.   Correct.

11  Q.   And page 29 of this document, please.  So we're going to

12  look generally -- this is part of a -- part of a statement for

13  your account that ends in 5650, right?

14  A.   Right.

15  Q.   It's March of 2017?

16  A.   Yes.

17  Q.   When you look at it you don't see any payroll deposits into

18  this account either, do you?

19  A.   No.

20  Q.   This wasn't an account you used for ACH, anything like that.

21  A.   No.

22  Q.   But there are cash deposits and wires into this account.

23  A.   Correct.

24  Q.   So let's look at the transaction on March 20th.  Do you see

25  a transaction on March 20th?

```
 1  A.   I do.

 2  Q.   And that's an incoming wire transfer, isn't it?

 3  A.   It is.

 4  Q.   It's for 4,620?

 5  A.   It is.

 6  Q.   It's from Colleen de Tullio, right?

 7  A.   Correct.

 8  Q.   You don't know Colleen de Tullio, do you?

 9  A.   I do not.

10  Q.   And you didn't return the money, did you?

11  A.   No.

12  Q.   On March 20th -- there also seems to be a purchase made on

13  March 20th at Golden Nails in Garland.  Do you see that for $36?

14  A.   I do.

15  Q.   And also at McDonald's on March 20th, --

16  A.   I do.

17  Q.   -- right?

18  A.   Yes.

19  Q.   And also at a Shell service station?

20  A.   I do.

21  Q.   Let's scroll down to -- let's see.  I think it is March

22  21st.  Let's start -- yes.  Thanks.

23          So March 21st you actually -- or you make a withdrawal

24  in a branch in person, right?

25  A.    Correct.
```

1  Q.   Of 4,230?

2  A.   That is correct.

3  Q.   And then March 22nd there's a purchase of $211.09.  Do you

4  see that?

5  A.   I do.

6  Q.   At Tory Burch?

7  A.   Yes.

8  Q.   That's a women's accessory store, shoe store, clothing, that

9  kind of thing?

10  A.   Uh-huh.  Correct.

11  Q.   Now, let's go down to March 27th.  I believe -- yes.  There

12  appears to be a deposit of $20,000 into this account, right?

13  A.   Right.

14  Q.   And on March 29th, $4,000 is withdrawn in person in a branch

15  store, right?

16  A.   Right.

17  Q.   Now, we've been looking at this.  There are no -- no

18  shipping expenses on this statement, right?  March 2017?

19  A.   That is correct.

20  Q.   No FedEx, no DHL?

21  A.   That is correct.

22  Q.   And the ending -- let's go to page 28, please.  Let's focus

23  on the activity summary.

24        So the beginning balance March 7th was zero, wasn't it?

25  A.   That's correct.

1  Q.   And the ending balance is $16,074.85, right?

2  A.   Right.

3  Q.   So you're more than $16,000 ahead in this account over the

4  month of March, --

5  A.   Correct.

6  Q.   -- right?  Now, April 2017 is similar.  Let's go to page 33.

7  Let's focus on -- yes.  Thank you.  Sometimes I have trouble with

8  my own glasses.

9           April 20 -- you received -- you started out with a

10  little over 16,000 and you got $20,000 worth of deposits into

11  this account 5650 in that one month, right?

12  A.   Right.

13  Q.   And you also withdrew about the same amount of money in this

14  account, correct?

15  A.   Correct.

16  Q.   Okay.  Let's go to page 34, please.  So we see on March --

17  on April 3rd, which is going to be, yes, in the middle of the

18  page -- we see two deposits of $3,000 each, right?

19  A.   Correct.

20  Q.   And then the next day, April 4th, you withdraw $5,400, --

21  A.   Correct.

22  Q.   -- right?  And April 6th you withdraw $15,510, correct?

23  A.   Correct.

24  Q.   You transfer money to Glory Okoro on April 4th; is that

25  correct?

1  A.    Correct.

2  Q.    Is Glory Okoro your mother?

3  A.    She is.

4  Q.    You also receive money from Glory Okoro as well on April

5  17th; is that right?

6  A.    Correct.

7  Q.    And you receive approximately $250 on April 17th?

8  A.    Correct.

9  Q.    And then April 17th you also send money back to your mother

10  in the amount of $250.

11  A.    Correct.

12  Q.    Now, let's look at April 19th where we have two separate

13  deposits into this account.  There's a first one for $8,000 and

14  then a second one for $7,000.  Do you see that?

15  A.    I do.

16  Q.    So there's been $15,000 deposited April 19th, right?

17  A.    Correct.

18  Q.    And the same day you make a withdrawal in person for $924.

19  A.    That is correct.

20  Q.    And those two deposits are made from different locations in

21  California, right?

22  A.    I don't recall.

23  Q.    Okay.  Now, in this whole -- we've gone through deposits and

24  withdrawals in this account.  None of these show shipping company

25  names, correct?

1    A.    Correct.

2    Q.    No shipping companies.

3    A.    Correct.

4    Q.    No DHL, no FedEx, no other kinds of shipping companies.

5    A.    Correct.

6    Q.    Now, on May 8th, 2017 the bank closed this account, didn't

7    it?

8    A.    It did.

9    Q.    Okay.  And so they actually ended up writing you a check

10   when they closed this account, didn't they?

11   A.    Yes.

12   Q.    Let's go -- yeah.  And so you withdrew $15,347.75, right?

13   A.    Correct.

14   Q.    Okay.  But even with these four accounts those weren't all

15   the accounts that were opened in IJ Global Link's name in April

16   and May of 2017, were they?

17   A.    Correct.

18   Q.    Yeah, you had an account at BB&T.  Let's go to page -- to

19   Government's Exhibit 90, page 85.  Now, is this the signature

20   card for your account in the name IJ Global Link at BB&T?

21   A.    Correct.

22   Q.    And it was opened April 28th, 2017, right?

23   A.    Right.

24   Q.    It was -- your address is still listed as Duck Creek Drive

25   in Garland?

```
 1   A.   Correct.
 2   Q.   And at the bottom of the page you sign as the owner of the
 3   account, right?
 4   A.   Correct.
 5   Q.   Are you the sole signatory on it?
 6   A.   Correct.
 7   Q.   No one else has authority.
 8   A.   No.
 9   Q.   Then you open a second account at BB&T a few months later.
10   Let's go to page 86.  So this is a second account at BB&T in the
11   number of 6581, right?
12   A.   Right.
13   Q.   In the name of IJ Global Link.
14   A.   Correct.
15   Q.   And at the bottom of the page you're again the sole signer,
16   right?
17   A.   Right.
18   Q.   So at this point you've got six bank accounts opened during
19   2017 in the name of IJ Global Link, right?
20   A.   Correct.
21   Q.   And you were working temp jobs and contract jobs.
22   A.   Correct.
23   Q.   Okay.  So let's look at what happens in the 3604 account in
24   May 2017.  Let's go to page 3, please.  Yes, let's look at that.
25            So in this account it looks like on May 30th we see a
```

1    purchase at Kung Pao Asia.  We've seen that before, haven't we?

2    A.    Yes.

3    Q.    We've seen expenses at Wal-Mart before in other accounts and

4    you see them again here, right?

5    A.    Right.

6    Q.    And we see your Time Warner bill is being paid on May 31st

7    like we've seen in other accounts, right?

8    A.    Correct.

9    Q.    The last two purchases are at Forever 21 and Macy's, right?

10   A.    Correct.

11   Q.    None of the expenses were for shipping?

12   A.    No.

13   Q.    None of the expenses were for travel arrangements for goods?

14   A.    No.

15   Q.    Okay.  Let's go to page 12, please.  So this is part of a

16   statement for the 3604 account.  Do you see an incoming wire in

17   the lower half on July 27th for $10,000?

18   A.    I do.

19   Q.    Okay.  You don't know who it's from, just -- do you?

20   A.    I do not.

21   Q.    And you didn't ask David, did you?

22   A.    He said -- I did.

23   Q.    Now, you have this $10,000 come in on July 27th and on

24   July 31st you wrote a check, right?

25   A.    Correct.

```
 1   Q.   Let's go to page 81.  Let's look at the top half of this.
 2   Is this a check to cash?
 3   A.   Yes.
 4   Q.   And it's for $6,200, right?
 5   A.   Correct.
 6   Q.   Let's go back to page 18, please.  And let's focus on the
 7   wire and incoming deposit on August 3rd.  Yes, please.  Do you
 8   see an incoming wire transfer August 3rd for $30,967?
 9   A.   I do.
10   Q.   You don't know who it's from, do you?
11   A.   No.
12   Q.   And you don't know a guy named Donald Schupak, do you?
13   A.   I do not.
14   Q.   And you didn't return this money, did you?
15   A.   It was not returned.
16   Q.   And let's go to page 80, please.  Four days later you wrote
17   a check, right?
18   A.   Correct.
19   Q.   For $15,000 to cash.
20   A.   Correct.
21   Q.   Now, let's go back to page 18, please.  There's another
22   check -- another incoming wire on August 11th, $40,000, right?
23   A.   Right.
24   Q.   You don't know who it's from, do you?
25   A.   I do not.
```

```
 1   Q.   And you don't know anybody named Brenda Hill, right?
 2   A.   I don't.
 3   Q.   And the money wasn't returned?
 4   A.   No.
 5   Q.   The money wasn't returned, was it, any of this $40,000?
 6   A.   No.
 7   Q.   Now, let's go to page 76, please, the top half.  Now, four
 8   days later you obtained a check to cash, right?
 9   A.   Correct.
10   Q.   For $14,810, right?
11   A.   Right.
12   Q.   Now, let's go to page 132.  February 14th in the same
13   account 3604 you've got an incoming wire for $8,972, right?
14   A.   Right.
15   Q.   You don't know who this is from, do you?
16   A.   No.
17   Q.   And the money doesn't get returned, does it?
18   A.   No.
19   Q.   In fact, February 16th you wrote a check for $7,500.  Now,
20   let's -- let's go back to -- let's go to page 46, please.  And
21   this is another statement for 3604.  Do you see incoming wires?
22   A.   Yes.
23   Q.   And do you see a wire that's incoming for $44,980?
24   A.   I do.
25   Q.   Do you also see a wire on March 5th for 4,390?
```

```
 1  A.    I do.
 2  Q.    And you don't know who the wire is from that's the 4,390, do
 3  you?
 4  A.    I don't.
 5  Q.    You don't know Kelly Zamiski, do you?
 6  A.    I do not.
 7  Q.    You do not know Dawn Zamiski, do you?
 8  A.    I do not.
 9  Q.    And you were not running -- you didn't have an apartment in
10  New York that you were renting out on Airbnb, did you?
11  A.    No.
12  Q.    You don't know anybody named Hiasent Peters, do you?
13  A.    I don't.
14  Q.    So on May 9th BB&T closed this account too, didn't they?
15  Let's go to page 147, please.  So at the end of April 2018 you've
16  got $23,838.93 in this account, right?
17  A.    Right.
18  Q.    And on May 9th the bank closed your account, correct?
19  A.    Correct.
20  Q.    And they wrote you a check for $23,838.93, right?
21  A.    It appears so.
22  Q.    Let's go to the last bank account we're going to address,
23  Government's Exhibit 89, please, page 1.  Do you recognize this
24  as your Capital One account?
25  A.    I do.
```

1   Q.   And it's in your name, --

2   A.   It is.

3   Q.   -- right?  So it's got the opening account balance on

4   April 28th, 2017 is -- was $20, right?

5   A.   Right.

6   Q.   And nothing much happens in this account during the month of

7   April, it's just $20 and that's it.  The closing balance is 20?

8   A.   Correct.

9   Q.   Okay.  Now, let's go to page 6, please.  Page 6, lower half,

10  there's a lot of activity in September of 2017 in this account,

11  right?

12  A.   Right.

13  Q.   So you deposit -- a check is deposited for $20,000 on

14  September 6th, correct?

15  A.   Correct.

16  Q.   And two days later $15,000 is withdrawn in cash, right?

17  A.   Right.

18  Q.   And we also see expenses here on debit cards, money spent at

19  Chevron, McDonald's, KFC; is that right?

20  A.   Correct.

21  Q.   And, again, Wal-Mart, Burlington?

22  A.   Correct.

23  Q.   Don't see anything here relating to shipping, do you?

24  A.   No.

25  Q.   Nothing relating to clothing?

1   A.    On this statement, no.

2   Q.    Okay.  You --

3   A.    Actually the Burlington store is right there.

4   Q.    You don't -- you don't get paychecks into this account, do

5   you?

6   A.    No.

7   Q.    You don't get ACHs into this account.

8   A.    No.

9   Q.    Let's go to page 16.  So money gets withdrawn and let's

10  focus on where the account sits in June of 20 -- June of 2018.

11  We've skipped a few months ahead.  You've got $3.89 in the

12  account, right?

13  A.    Correct.

14  Q.    But no other activity, nothing happens.

15  A.    Right.

16  Q.    Let's go to page 17.  No activity in the account, right?

17  A.    Right.

18  Q.    Let's go to page 18.  No activity in the account here in

19  August, right, of 2018?

20  A.    Correct.

21  Q.    Let's go to the next page.  No activity in September of 2018

22  either.

23  A.    Correct.

24  Q.    Go to the next page.  No activity in this whole account in

25  October of 2018, --

1    A.    No.

2    Q.    -- right?  Or in November?

3    A.    No.

4    Q.    Not anything in December, right?

5    A.    Right.

6    Q.    No activity in January of the following year, right?

7    January of 2019 we're seeing nothing in this whole account.

8    A.    Right.

9    Q.    Let's go to page 24.  So we see no activity until February

10   25th, 2019, right?

11   A.    Right.

12   Q.    There's an incoming wire for $140,000?

13   A.    Right.

14   Q.    And the next day you wired $56,000 of it out, correct?

15   A.    Correct.

16   Q.    And then let's go to the next page, which shows over the

17   course of three withdrawals -- March 1st you withdraw 13,510 in

18   cash, right?

19   A.    Right.

20   Q.    And then you withdraw of $66,000 in cash on March 1st,

21   right?

22   A.    Right.

23   Q.    And then on March 16th you withdraw 4,000 more dollars in

24   cash, right?

25   A.    Right.

1  Q.   So you've now withdrawn about $83,000 in cash from this one

2  wire, correct?

3  A.   Correct.

4  Q.   And I believe you testified on direct that you know a guy

5  named Valentine is connected to the wire, right?

6  A.   Correct.

7  Q.   Are you aware that he's been indicted for business e-mail

8  compromise involving victims?

9  A.   No.

10  Q.   He's -- you didn't know he's been indicted for conspiracy to

11  commit wire fraud?

12  A.   No.

13  Q.   Wire fraud and aggregated identity theft?

14  A.   No.

15  Q.   And now Valentine is connected, based on your own

16  representation to us, to this wire.

17  A.   Correct.

18  Q.   And he's also connected to Xclusive Weaves.

19  A.   Correct.

20  Q.   You weren't dating David Animashaun at this time period,

21  were you?

22  A.   No, I wasn't.

23  Q.   Now, all of these transactions have been happening in your

24  accounts in 2017 and 2018 that we've been talking about except

25  for this one in 2019, right?

1  A.   Correct.

2  Q.   And each time all of your accounts -- you end up with more

3  money at the end even if the bank closes the account, right?

4  A.   What is left in the account, yes.

5  Q.   It's a check to you.

6        And -- but if we go to Exhibit 68, your 2017 taxes,

7  what we see on line seven of 68 is that your personal income is

8  about $30,500, correct?

9  A.   Correct.

10  Q.   And then if we go to page 17 where we see at the top what

11  you've described any of your business as being is exotic

12  entertainer, correct?

13  A.   Correct.

14  Q.   And below that on your Schedule C you say that -- for your

15  income on line one -- I believe it's line one, yes -- that you

16  only made $1,200 as an exotic entertainer in 2017.

17  A.   Correct.

18  Q.   But we've seen hundreds of thousands of dollars go through

19  your accounts in 2017, haven't we?

20  A.   That doesn't belong to me, but yes.

21  Q.   And you reported a loss in 2017 on your business of $10,218,

22  right?

23  A.   Correct.

24  Q.   At the same time, since we went over the Texas Workforce

25  Commission earlier, we're only seeing legitimate wage income of

1    about $17,000, right?

2    A.    The TWC is incorrect.

3    Q.    So employers are just misreporting their -- the wages

4    they're paying you when they're under an obligation of law to

5    report accurately to the state?

6    A.    Like I said, the EICN number would show the company.  And if

7    the Government had reached out to those companies to actually get

8    the actual W-2 they would have seen that information instead of

9    coming up with speculation that it's incorrect, so yes.

10    Q.    So you were here when Special Agent Keeton testified,

11    correct?

12    A.    Correct.

13    Q.    And the companies also report wage income to the IRS, --

14    A.    Right.

15    Q.    -- right?

16    A.    Correct.

17    Q.    And so the number reported to the IRS for your W-2 was also

18    not what you reported it to be.

19    A.    It's a database called IDRC, if I remember correctly, and he

20    wasn't sure how that works as well.

21    Q.    It was not showing what you have said, was it?

22    A.    No, it did not, because it was incorrect.

23    Q.    So both the State of Texas and the IRS happen to be totally

24    wrong, but you never filed amended tax returns, did you?

25    A.    I never worked in the state of Texas even though I live in

1  the state of Texas.

2  Q.   You have never file amended tax returns to correct such an

3  error for 2017, did you?

4  A.   There was no error in 2017, so, no, I didn't file an amended

5  tax return.

6  Q.   Okay.

7            MS. WALTERS:  Shall I keep going?

8            THE COURT:  How much more do you have?

9            MS. WALTERS:  A lot.

10            THE COURT:  Okay.  Let's go ahead and take our morning

11  break now.  We'll see you-all back at 3:25.

12            COURTROOM SECURITY OFFICER:  All rise for the jury.

13            (Jury not present.)

14            THE COURT:  So how much is a lot?

15            MS. WALTERS:  Let me -- my colleagues are better at

16  time estimates than I have been, if I may.

17            (Discussion out of the hearing of the reporter.)

18            MS. WALTERS:  Your Honor, I believe it would be about

19  45 minutes.

20            THE COURT:  Okay.  And are you contemplating any

21  rebuttal evidence as yet?

22            MS. WALTERS:  We are not as yet.

23            THE COURT:  Okay.  All right.  Let's see you-all back

24  at 3:25.

25            MR. BUNCH:  Your Honor, I do have one very quick issue.

```
 1                THE COURT:  Yes.

 2                MR. BUNCH:  I would argue that the Government has

 3    opened the door to what David said about these transactions when

 4    they asked the witness did you ask David what this wire was

 5    about, did you ask David what this wire was about.  I believe

 6    they have opened the door to what he said to her about what the

 7    wire was about.

 8                THE COURT:  I don't think so.

 9                MS. WALTERS:  Also, they still had the opportunity to

10    cross-examine David Animashaun when he testified here last week

11    for several hours.

12                THE COURT:  Okay.  See you back at 3:25.

13                (Recess taken.)

14                COURTROOM SECURITY OFFICER:  All rise.

15                THE COURT:  Be seated.  The Government may proceed.

16    Q.   (BY MS. WALTERS)  Ms. Okoro, we have been going through bank

17    accounts in detail that were in the name of IJ Global Link,

18    right?

19    A.   Correct.

20    Q.   And you'd agree that we -- in any of the accounts that I've

21    shown you so far we haven't seen any business expenses, right?

22    A.   Some expenses were business, so I would disagree there.

23    Q.   Okay.  Then I would like to direct your attention to

24    Government's Exhibit 68.  And we'll go to page 17 specifically.

25                Now, at the top half in lines A through C this is the
```

1  Schedule C that was attached to your tax return for 2017,

2  correct?

3  A.   Correct.

4  Q.   And in line A this form says that your principal business

5  was exotic entertainment, correct?

6  A.   Correct.

7  Q.   And you have offered no testimony today that you were in

8  exotic entertainment, correct?

9  A.   I didn't talk about it, but --

10 Q.   No, you haven't.  You have talked quite a bit about your

11 employment.  You have not mentioned that, have you?

12 A.   I have not talked about that employment, that part of me,

13 no.

14 Q.   Okay.  And in box C you don't identify IJ Global Link as a

15 company, correct?

16 A.   Correct.

17 Q.   And there's no clothing business mentioned here either.

18 A.   Correct.

19 Q.   Let's go to Government's Exhibit 69, and then page 19,

20 please.

21        Now, in the top three lines A through C this is the

22 Schedule C for your income tax return for 2018, right?

23 A.   Right.

24 Q.   And you identify clothing here, correct?

25 A.   Correct.

1  Q.   But you do not identify IJ Global Link as a business name,

2  right?

3  A.   Right.

4  Q.   And we also don't see in the import/export records any

5  import or export shipments in 2018, do we?

6  A.   Correct.

7  Q.   Let's go to page -- and it's -- and let's go to Government's

8  Exhibit 70, page 24, please.

9       And the top half is -- once, again, this form is the

10 Schedule C indicating profit or loss from your personal business

11 for tax year 2019, right?

12 A.   Right.

13 Q.   And it identifies your principal business in line A as

14 consulting, correct?

15 A.   Correct.

16 Q.   And line C doesn't identify IJ Global Link, does it?

17 A.   It does not.

18 Q.   It never references selling cars, does it?

19 A.   No.

20 Q.   It does not reference shipping cars, does it?

21 A.   No.

22 Q.   Let's go to Government's Exhibit 71, page 17.

23      And the top half again in 2020 this is your profit or

24 loss for business and on line A you identify yourself as being in

25 consulting, right?

1   A.   Correct.

2   Q.   And there is still no business name identified in line C,

3   correct?

4   A.   Correct.

5   Q.   So you never ever told the IRS that IJ Global Link even

6   existed, correct?

7   A.   Correct.

8   Q.   Let's go to -- let's turn now to something more recent.  You

9   bought a house after you dated David Animashaun, correct?

10  A.   Correct.

11  Q.   Let's turn to Government's Exhibit 148.  So you bought a

12  house in March of 2021, right?

13  A.   Correct.

14  Q.   And the title company used was a company called MI Title,

15  right?

16  A.   Correct.

17           MS. WALTERS:  I'm going to move to admit Government's

18  148 on the basis of our 902 notice and stipulation between the

19  parties.

20           (Discussion out of the hearing of the reporter.)

21           MR. BUNCH:  No objection.

22           THE COURT:  It's admitted.

23  Q.   (BY MS. WALTERS)  Let's go to Government's Exhibit 148,

24  page 1, please.  And let's go to the top of the page.

25           Now, this is the closing disclosure that was part of

1  your title package, right?

2  A.    Correct.

3  Q.    And you have a closing date on the left-hand side of

4  March 31st, 2021?

5  A.    Correct.

6  Q.    And the sales price identified is $310,334?

7  A.    Correct.

8  Q.    And the cash needed to close is actually a little bit lower

9  on the page.  I believe it's at the bottom, the bottom line, yes.

10         You see cash to close is $15,860, right?

11  A.    Right.

12  Q.    So you had to provide information regarding your income and

13  your employment to be able to get a loan to close on this house,

14  right?

15  A.    Right.

16  Q.    And it asked for your current employment, didn't it?

17  A.    Correct.

18  Q.    And it asked for prior employment.

19  A.    Correct.

20  Q.    And it asked about your financial assets and your

21  liabilities, right?

22  A.    Right.

23  Q.    Let's go to page 8, please.  The bottom of page 8, that last

24  big block, you identify your employer as KPMG, correct?

25  A.    Correct.

1  Q.   And it identifies what your position is and what your start

2  date is, November of 2019, correct?

3  A.   Correct.

4  Q.   Now, you describe -- at the bottom there's a line that says

5  check if you are the business owner or self-employed.  Do you see

6  that?

7  A.   I do.

8  Q.   And you did not check that box, did you?

9  A.   I did not.

10  Q.   So let's go to the top of page 9.  In the first block, yes,

11  line C, it says, "If applicable complete information for

12  additional employment/self-employment income," correct?

13  A.   Correct.

14  Q.   And you checked the box "does not apply," correct?

15  A.   It appears so, correct.

16  Q.   The second line then asks you to complete information about

17  prior employment and you do, right?

18  A.   Correct.

19  Q.   So you identify Atos I.T. Solutions, correct?

20  A.   Correct.

21  Q.   And you provide an address for Atos I.T. Solutions in

22  Irving, Texas?

23  A.   Correct.

24  Q.   Okay.  And then lower on that page you identify NTT Data, I

25  believe.  And you -- do you see where you've identified NTT Data?

```
 1   A.    I do.

 2   Q.    And it says your position was as an associate, correct?

 3   A.    Correct.

 4   Q.    And you worked there from March to May 2019, correct?

 5   A.    Correct.

 6   Q.    Now, then finally the next block shows information

 7   indicating you were employed by UCLA Medical Center in 2019.

 8   A.    Correct.

 9   Q.    Okay.  And was that employment for approximately two months

10   from February to April 2019?

11   A.    Approximately, yeah.

12   Q.    Now, if we zoom out and go to the next page we -- we don't

13   have any more employment, correct?

14   A.    Correct.

15   Q.    So those three employers were the three that you identified

16   for -- to the title company?

17   A.    Those were the ones I provided to them, correct.

18   Q.    So you didn't identify Isaac's Foundation, did you?

19   A.    I did not.

20   Q.    Even though in 2020 you told the SBA it was your business.

21   A.    Correct.

22   Q.    And you didn't identify any consulting business in 2020,

23   right?

24   A.    Correct.

25   Q.    Even though you told the IRS it was your business.
```

1    A.    Correct.

2    Q.    And you didn't identify any consulting business in 2019,

3    right?

4    A.    Right.

5    Q.    Even though you told the IRS you had a business that was

6    consulting?

7    A.    Right.

8    Q.    And you also didn't tell them about your employment as an

9    actor in 2020, right?

10    A.    I don't recall this form.  I filled it out in 2021, so it's

11    2023.  So I don't recall every information that I put in this

12    form.

13    Q.    But we didn't see it.  That was the form, right?

14    A.    Correct.

15    Q.    And in 2020 you told the SBA that you were an actor, right?

16            MR. BUNCH:  Your Honor, I object.  May we approach,

17    sidebar?

18            THE COURT:  All right.

19            (Bench conference outside the hearing of the jury.)

20            MR. BUNCH:  They are getting into the PPP stuff that

21    the Court previously ruled was not relevant and objected to by me

22    on relevance.

23            MS. WALTERS:  So we did not provide 404(b) notice of

24    the PPP fraud, because we did not intend to bring it up in our

25    case in chief, however, the Defendant has taken the stand, has

 1    asserted she has not committed any fraud and that she would never

 2    commit any fraud, and now we are aware of a PPP loan that she

 3    took out and lied on to obtain $20,000 from the Government, which

 4    she then wired out.

 5                So it seems having taken the stand and claimed that she

 6    never committed any fraud and never conspired with anyone to

 7    commit wire fraud or money laundering, she's opened the door for

 8    us to show -- to cross-examine her and this is a fair area for

 9    cross-examination.  It's also been provided in the discovery

10    months ago.  There's no surprise on this.

11                MR. BUNCH:  I acknowledge there's no surprise.  I have

12    known about it.  But this is a remote --

13                MS. WALTERS:  But if the defense is that Animashaun

14    made her do the fraud, the response is this is post David

15    Animashaun and she's still engaging in fraud.

16                MR. BUNCH:  I don't know that they've established that

17    this is fraud or that --

18                MS. WALTERS:  Well, we have to ask questions to be able

19    to establish that.

20                THE COURT:  I think we're getting too far afield, so

21    I'll sustain the objection on that one.

22                MS. WALTERS:  Even though she has videos on her own

23    cell phone establishing that she committed the PPP fraud?

24                THE COURT:  (Nods head.)

25                MS. WALTERS:  So -- and continuing lies, so the -- she

1   has applied for a PPP, an EIDL loan, all of these that she lied

2   on, and all of them postdate David Animashaun.  So if the defense

3   is very well established as David Animashaun got me into this,

4   there's no way but by bringing in information other than

5   Animashaun that she continued to establish that she had the

6   intent to commit fraud.

7          MR. BUNCH:  I think the Government has done that with

8   their 2019 $140,000 transaction.  But this is -- this is 2021

9   stuff.  It's four years later.

10          MS. WALTERS:  It also does include the fact that she

11  applied for the -- for forgiveness for the PPP loan post

12  indictment in this case after having -- so she applies for the

13  loan, she obtains it, she gets indicted, and then she applies for

14  forgiveness having failed to meet the requirements of that.

15          THE COURT:  Yeah, I think it's too attenuated.  Okay?

16          (End of bench conference.)

17          THE COURT:  The objection is sustained.

18  Q.  (BY MS. WALTERS)  So you have testified on direct that you

19  worked for KPMG, correct?

20  A.   Correct.

21  Q.   And you began working for KPMG in November of 2019

22  approximately, right?

23  A.   Correct.

24  Q.   You submitted an application online initially to apply for

25  your job at KPMG, correct?

1  A.    Correct.

2         MS. WALTERS:  Move to admit Government's Exhibit 120

3  based on the 902 certificate and the stipulation between the

4  parties.

5         MR. BUNCH:  No objection.

6         THE COURT:  It's admitted.

7         MS. WALTERS:  Let's bring up Government's Exhibit 120

8  at page 226, please.  226, please.  And if we could zoom in, yes,

9  to the middle.

10 Q.    (BY MS. WALTERS)  Do you recognize this as a portion of the

11 application you submitted to KPMG for your job?

12 A.    Yes.

13 Q.    Okay.  It provides your name and your e-mail address,

14 correct?

15 A.    Correct.

16 Q.    Your phone number and your then current address on

17 Vista Glen, right?

18 A.    Right.

19        MS. WALTERS:  Let's zoom back out.  Now, let's then go

20 to page 229, please.

21 Q.    (BY MS. WALTERS)  At the top of page 229 it asks you where

22 you have been employed, correct?

23 A.    Correct.

24 Q.    And at the top line you identify a prior employer as

25 NTT Data, right?

1  A.    Right.

2  Q.    And you, in fact, worked for NTT, didn't you?

3  A.    I did.

4  Q.    Now, on this application for KPMG you identified your start

5  date as the 21st of November 2012, correct?

6  A.    I don't recall the whole information that I put in, but if

7  that's what it says.

8  Q.    Yeah, so it does say that.

9  A.    Okay.

10 Q.    So it's the 21st of November 2012, right?

11 A.    That's what it says.

12 Q.    And it ends on the 11th of January 2014, right?

13 A.    That's what it says.

14 Q.    And the contract -- and the reason for leaving was the

15 contract ended, correct?

16 A.    That's what it says, correct.

17 Q.    Okay.

18         MS. WALTERS:  Let's move to Government's Exhibit 138,

19 which the Government moves to admit based on its 902.11 and the

20 stipulation between the parties.

21         MR. BUNCH:  Did you say 108?

22         MS. WALTERS:  138.

23         MR. BUNCH:  138.  No objection.

24         THE COURT:  It's admitted.

25         MS. WALTERS:  Let's bring up page 1 of Government's

1    Exhibit 138, please.  And in the -- and let's bring up the top

2    half basically of that document.

3    Q.    (BY MS. WALTERS)  Do you see where it -- this record from

4    NTT identifies your hire date in the middle of the page?

5    A.    I do.

6    Q.    And you'd agree that you were hired at NTT March 26th, 2019?

7    A.    That is incorrect.

8    Q.    And NTT recorded your service separation date as May 21st,

9    2019, didn't they?

10   A.    That would be backwards, so that's incorrect.

11   Q.    So you think NTT has totally -- has inaccurate records of

12   when you were hired and how long you worked for them?

13   A.    I mean, the start date is backwards from the separation

14   date, so that doesn't seem like it's accurate.

15   Q.    The start/hire date was March 26th, right?  So you worked

16   for NTT for two months, correct?

17   A.    The separation date says 2019.

18   Q.    So you worked for NTT for about two months?

19   A.    That is minus five days.

20   Q.    Two months minus five days.  I'll give you that.

21            MS. WALTERS:  Let's go back to Government's Exhibit

22   120, please, page 238.  Now, let's go to the top half.  Yes,

23   please.

24   Q.    (BY MS. WALTERS)  You also told KPMG when you applied for a

25   job that you worked for Texas Oncology, right?

1  A.    Yes.

2  Q.    And that was here on Merit Drive in Dallas, the second line?

3  A.    I don't recall all the aspects of the application, it's been

4  so long.  It's 2019.

5  Q.    Do you doubt that this is yours?  Because we can get to a

6  signature page where it's -- where it shows your signature.

7  A.    I don't doubt if it's mine, I'm just saying I do not recall

8  the aspects of the application that was filled.

9  Q.    Okay.  Let's go four lines down where it shows a start date

10  at Texas Oncology.  Do you see that in the middle of the page?

11  A.    I do.

12  Q.    And the start date on the additional employment information

13  is March -- is April 14th, 2014, correct?

14  A.    Correct.

15  Q.    And then the end date is October 28th, 2019, correct?

16  A.    Correct.

17  Q.    So that's five -- more than five years?

18  A.    Four and a half, I believe.

19  Q.    2014 to 2019.

20  A.    Oh, yeah.

21        MS. WALTERS:  Let's go -- let's turn to Government's

22  Exhibit 139, which the Government moves to admit based on its 902

23  notice and the stipulation between the parties.

24        MR. BUNCH:  No objection.

25        THE COURT:  It's admitted.

1    Q.   (BY MS. WALTERS)  Let's go to page 1, please.  And could you

2    review this record where it identifies what day you initiated

3    employment?

4    A.   It says 4-9-2019.

5            MS. WALTERS:  And let's zoom back out.  Let's go to the

6    next page, please.  Okay.  Thank you.  The second page.

7    Q.   (BY MS. WALTERS)  And does it show when the contract ended

8    on the second page?

9    A.   Yes.

10   Q.   And does it appear that the contract ended on -- on or about

11   August 14th, 2019?

12   A.   It says effective date on there.

13   Q.   Okay.  And the heading says "contract ended," correct?

14   A.   Correct.

15   Q.   Okay.  So that's approximately four months, right?

16   A.   Approximately.

17   Q.   Not the four and a half years you told KPMG, right?

18   A.   Like I said, I don't recall all the aspects of the

19   application that I put in for KPMG.

20           MS. WALTERS:  May I have just a moment, Your Honor?

21           (Discussion out of the hearing of the reporter.)

22           MS. WALTERS:  I pass the witness, Your Honor.

23                        REDIRECT EXAMINATION

24   BY MR. BUNCH:

25   Q.   Ms. Okoro, do you remember the Government asked you about

1  some meetings that you had in their office?

2  A.    Correct.

3  Q.    Was I your attorney at that time?

4  A.    No, you weren't.

5  Q.    Okay.  So you did not say anything to the prosecutors at

6  that time, correct?

7  A.    I couldn't.  It was a reverse proffer.  I was just supposed

8  to listen.

9  Q.    Okay.  So were you under indictment at that time?

10  A.    I was.

11  Q.    And on the advice of counsel did you remain silent?

12  A.    Correct.

13  Q.    Okay.  So you also discussed with the Government the report

14  you filed.  We discussed it as well.  Do you know what I'm

15  talking about, the FBI anonymous report that you made?

16  A.    Correct.

17  Q.    Okay.  And you indicated at that time when the Government

18  was asking you that you didn't have a copy of the report, but you

19  were not able to give a complete answer as to why.  Would you

20  like to tell us why?

21  A.    I have been incarcerated and even if I wanted to login to my

22  e-mail to check it I don't have access to that.

23  Q.    Did -- further on the Government was asking you about

24  David's employment and that he played in a church.

25  A.    Correct.

1    Q.    And did some gigs on the side?

2    A.    Correct.

3    Q.    Did you ever in your previous testimony when we were

4    talking -- did you ever claim that Mr. Animashaun made this kind

5    of money doing church gigs?

6    A.    No, I did not.

7    Q.    The Government asked you if you wanted to be an

8    entrepreneur.

9    A.    Yes.

10    Q.    And you replied yes, correct?

11    A.    Correct.

12    Q.    Okay.  Let's -- let's take immigrant from Nigeria out of it.

13    Is there anything odd in the United States about a person wanting

14    to be an entrepreneur?

15    A.    That's the American dream.  No.

16    Q.    Do you remember the Government went through your -- some

17    bank accounts with you?

18    A.    I did.

19    Q.    And they showed that you started with zero, some -- some

20    money -- a large amount of money went in and then that account

21    ended in zero?

22    A.    Correct.

23    Q.    Okay.  Do you remember Defense Exhibit 17?

24    A.    I do.

25    Q.    And this is Monica Khullar's statement, correct?

1   A.   Correct.

2   Q.   For her Bank of America account?

3   A.   Correct.

4   Q.   What's the beginning balance on this exhibit?

5   A.   Zero dollars.

6   Q.   Did a lot of money come in?

7   A.   It did.

8   Q.   Did a lot of money go out?

9   A.   It did.

10  Q.   And what's the ending balance?

11  A.   Zero dollars.

12  Q.   Why -- why were you comfortable giving David Animashaun your

13  login information?

14  A.   I trusted him.

15  Q.   Were these -- were these passwords that you use, were

16  they -- were they significant names and dates or anything like

17  that or were they random passwords?

18  A.   Significant date.

19  Q.   Okay.  And what generally was -- was your password format in

20  these accounts?

21  A.   Usually my son's name with some number behind and an

22  asterisk behind it as well.

23  Q.   And a what behind it?

24  A.   Like an asterisk, a period or something.

25  Q.   So the -- you spoke with the Government about several of

1  your accounts were -- were closed, right?

2  A.   Correct.

3  Q.   And when you got a check from the bank for those accounts,

4  did you keep that money?

5  A.   I did not.

6  Q.   Who got that money?

7  A.   David instructed me.  So whatever account that is not closed

8  he would instruct me to deposit that money in there and then I

9  give it to him.

10  Q.   Who was your cell phone provider in 2017?

11  A.   Sprint.

12  Q.   Okay.  And we saw that on a bill, right?

13  A.   Correct.

14  Q.   Was it at one time before that signed up through Virgin?

15  A.   I'm sorry, say that again?

16  Q.   Signed up through Virgin Mobile?

17  A.   So what was the question?

18  Q.   Did you sign up originally through Virgin Mobile?

19  A.   No, it was through Sprint and then I got Virgin Mobile in

20  2019, I believe.  2018.

21  Q.   The Poshmark items we see on here, what -- what kind of

22  store is that?

23  A.   Poshmark is an online resale store.  So you can actually

24  post items that you actually want to resell on Poshmark and you

25  can purchase items there as well.

1  Q.   Okay.  When you were selling clothes, is that something you

2  did locally or is that something that you shipped a lot of

3  clothes?

4  A.   Locally.  And I posted a couple of items on Poshmark too,

5  but locally.

6  Q.   And so when -- the entire time you knew David, did he have a

7  roommate?

8  A.   No, he did not.

9  Q.   Okay.  Could you anticipate in 2017, when in your experience

10 he did not have a roommate, that in 2023 he would come into court

11 and talk about roommates outside the time you knew him?

12 A.   I did not anticipate that.

13 Q.   If money is being moved into a savings account and you

14 didn't do it yourself, why would you keep an eye on the

15 statements of that account if you're not doing the activity in

16 it?

17 A.   There was no reason for me to do it.  I trusted David.  The

18 account that the Government was talking about, the transfer when

19 he was in Nigeria, right below that it also says online wire

20 transfer on the Chase account.  On both transfers.

21 Q.   Remind me again when you broke up with David?

22 A.   Before I turned 28 in 2018.  My birthday is in June, so May,

23 I believe.

24 Q.   Okay.  So I'm showing you Government's Exhibit 89.  Do you

25 remember this account?

1    A.    Yes.

2    Q.    Okay.  And the Government made a point to point out that

3    there was a lot of activity in here over the course of 2017 and

4    then into 2018.  Is that when you and Mr. Animashaun started to

5    grow apart?

6    A.    Correct.

7    Q.    Okay.  And then subsequent to that in May and for a long

8    time there's not all this activity that we see before when you

9    were with Mr. Animashaun in this account, correct?

10    A.    Correct.

11    Q.    So at any time when these accounts were being closed, did

12    you have suspicions or question David at that time?

13    A.    I did.  It didn't make any sense why the accounts were being

14    closed, but he assured me that it was his money and the bank was

15    probably closing it because of the withdrawals, and that was the

16    excuse he gave me.  But the fact that he assured me it was his

17    own funds, I -- I just let it go and I just -- I believed him.

18    Q.    And this money coming into the account, did you feel -- I

19    mean, you didn't do anything to earn that money, right?

20    A.    I did not.

21    Q.    Okay.  So you didn't feel any obligation to report that to

22    the IRS, right?

23    A.    Because it wasn't my money.

24    Q.    Right.  That's David's problem.  If he's got income, he

25    needs to figure out how to report it.

1    A.    Correct.

2    Q.    These -- let me ask you about your NTT.  I mean, you saw

3    that in Exhibit 138, hire date March 26th, 2019; separation date,

4    May 21st, 2019.  And the Government asked this in reference to a

5    question about your KPMG application.

6    A.    Right.

7    Q.    Is it -- did you work for NTT more than -- on more than one

8    occasion or on more than one contract?

9    A.    As a contractor, whatever position they have available, yes,

10   I did work with them on another contract.

11   Q.    Okay.  So did you -- did you also work for them on the dates

12   provided in your -- as a contractor on the dates provided in your

13   employment application, if you remember?

14   A.    I don't recall all the aspects of my application with KPMG.

15   It's been so long.

16   Q.    The Government asked you about the W-2 for -- which listed

17   exotic entertainer.

18   A.    Correct.

19   Q.    Tell the jury what that was about.

20   A.    It was going to parties and dancing pretty much.

21   Q.    And you made a little money doing that?

22   A.    Yes.  It's African.  We have what is called like a cultural

23   dance.  It's just when you go to an African party and were just

24   dancing the cultural dance of whatever occasion that it is.  And

25   the way we dance can be exotic.

1    Q.    Now, contained in your KPMG records, Government's Exhibit

2    120, are there performance reviews?

3    A.    It doesn't appear to be so.

4    Q.    Okay.  So I'm showing you page 28 of your -- the employment

5    records of KPMG.  Does this appear to be -- you may not be able

6    to tell with just this.  Does this appear to be a performance

7    review?

8    A.    Yes.  Because it actually talks about my proficiency related

9    to my job, so, yes, it is.

10   Q.    Okay.  And it's got several areas in it, critical thinking,

11   problem solving, progressing towards level; data analysis and

12   generating insights, progressing towards level; work structure

13   activity and management, progressing towards level;

14   communications, progressing towards level.  Some things were not

15   observed.  Developing trusted relationships, demonstrating at

16   level; vision and influence, demonstrating at level.  Some of

17   these are not observed.  Financial optimization, demonstrating at

18   level; KPMG service and solution expertise, progressing towards

19   level.  Which competency is this person's greatest strength?

20   Which competency is this person's greatest development need?  And

21   it appears by this that you're doing a good job at KPMG.

22   A.    That is correct.

23   Q.    Early on was it a little -- were your performance reviews a

24   little more critical because you were learning the job?

25   A.    Yes.

1    Q.    This is Government's 148.  Do you recall this?

2    A.    I do.

3    Q.    Okay.  And like you told the jury earlier, you paid about

4    15,000 down for this house, right?

5    A.    Correct.

6    Q.    And you still owed -- out of 310,334 that was the sale

7    price, you still owed 304,712, correct?

8    A.    Correct.

9    Q.    Now, the -- the Government showed you several wire

10    transfers, transactions in your banking statements.  Do you

11    remember that?

12    A.    Yes, I do.

13    Q.    And then they asked you if you asked David what those

14    transactions were about.  And you can't say what he said, but did

15    you ask him what some of those transactions were about?

16    A.    I did.

17    Q.    And, again, they'll object if you say what he said, but he

18    was giving you reasonable explanations.  Is that fair?

19    A.    That is fair.  That's correct.

20    Q.    You believed him?

21    A.    I believed him.  There's no -- he didn't give me any reason

22    to doubt him.

23    Q.    Based on all this information that you were getting from

24    him, at any time based on the things he was telling you

25    generally; don't say what they are -- but based on the things he

1  was telling you, the answers he had for pretty much every

2  question you asked, did you -- did you think anything strange was

3  going on at any point when he was running this money through your

4  accounts?

5  A.    No, I did not.  I met him in church, so no.

6  Q.    And because you met him in church did you feel like he was a

7  righteous person?

8  A.    He appeared to be so, yes.

9  Q.    Is there anything else you feel the need to clarify?

10  A.    I realized the TWC Workforce did not list KPMG as an

11  employee there, even although clearly the Government proved that

12  I worked at KPMG.  Bradford and B&G, that is also not listed on

13  TWC amongst my employees (sic).  Looking at this statement right

14  here, a direct deposit clearly says Bradford & Galt payroll.

15        So I don't know how the reporting works.  I don't know

16  why all of the companies that I worked is not on the TWC or the

17  IDRC IRS website.  But the TWC does not show KPMG, but the

18  Government has shown that I did actually, in fact, work for KPMG.

19  Q.    So we know that those Texas Workforce Commission reports can

20  sometimes be inaccurate.

21  A.    That is correct, yes.

22  Q.    What is Isaac's Foundation?

23  A.    So I opened that foundation.  The statement of that is I

24  love kids.  I love kids so much that I donated my eggs to a

25  family member so she could have children.

1          The kids in Nigeria are -- they're really suffering.

2    So what I really wanted to do was help like the orphanages and we

3    just donate money to orphans in Nigeria to help the underserved

4    kids who are walking on the streets and the majority of them end

5    up being killed by drivers, because, I mean, they're crossing the

6    road.  And I wanted to be able to create a foundation where I can

7    create a safe space for them to stay and go to school and have a

8    better life.

9          MS. WALTERS:  Your Honor, the Government would like to

10   object and then move -- if we could approach at a sidebar,

11   please.

12          (Bench conference outside the hearing of the jury.)

13          MS. WALTERS:  So Isaac's Foundation was not created

14   until 2020 and Isaac's Foundation that she's testifying about

15   forms the basis of one of the EIDL loans she applied for.  She

16   worked there.  She claims she made income.  And the Government

17   believes that the defense has just opened the door to introduce

18   the evidence.  If they're trying to provide evidence of good

19   character, the problem is we've got significant evidence that she

20   used this entity as a -- as a basis to apply for a loan that was

21   denied.

22          MS. RUDOFF:  And to that point, Your Honor, the

23   documents used to apply contradict prior documents that have been

24   admitted and the SBA issued a declination letter under Isaac's

25   Foundation because of fraud.

```
 1          THE COURT:  I'm still of the opinion that it is too

 2   attenuated.  And to elaborate on that, I mean, it's different and

 3   rough in character and remote in time.  From where I sit it looks

 4   like more propensity evidence than negating intent.

 5          MS. WALTERS:  We would disagree as far as negating an

 6   intent, because this is -- I do understand the concern about

 7   propensity, but -- but the -- when we're in a situation where

 8   intent is merely observable by one's actions and one's actions

 9   involve creating a foundation that is then used as the basis to

10   apply for a fraudulent loan from the Government, that does go to

11   intent and the Government right now is -- is being limited to

12   intent that was only in 2019 rather than additional --

13          THE COURT:  It looks like propensity to me, so --

14          MS. WALTERS:  But --

15          THE COURT:  -- you don't have to agree with me.  That's

16   the ruling.  How much more do you have?

17          MR. BUNCH:  I'm finished.

18          (End of bench conference.)

19          THE COURT:  Defendant may proceed.

20          MR. BUNCH:  Thank you.  Your Honor, I withdraw my prior

21   question about the foundation and would pass the witness.

22                       RECROSS-EXAMINATION

23   BY MS. WALTERS:

24   Q.   Now, the -- your Chase 7577 account you opened when you were

25   in California, correct?
```

1  A.    I believe so.  I don't recall where I opened it, but I

2  believe so, yes.

3          MS. WALTERS:  Okay.  Let's -- let's go to Government's

4  Exhibit 94, page 1, please.

5  Q.    (BY MS. WALTERS)  Does this refresh your recollection about

6  when you opened your 7577 account?

7  A.    Yes, that's --

8  Q.    It does?

9  A.    Yes.

10  Q.    It's 2013, well before you knew Mr. Animashaun.

11  A.    Correct.

12  Q.    And it stayed open well after you knew Mr. Animashaun.

13  A.    Correct.

14          MS. WALTERS:  Could we go to page 387, please?

15  Q.    (BY MS. WALTERS)  Now, the top half shows that this is a

16  statement for August of -- I believe July through August of 2020.

17  Do you see that?

18  A.    I do.

19  Q.    Okay.  Let's go to page 389, please.  And I'd like to focus

20  on transactions that occur on July 27th, please.  Now, do you see

21  multiple transactions that are cash deposits on July 27th?

22  A.    I do.

23  Q.    Multiple ATM deposits, in fact?

24  A.    I do.

25  Q.    At 4175 East Renner Road in Richardson, correct?

1  A.   Correct.

2  Q.   Each one -- the smallest one is $50 at the bottom.  Do you

3  see that?

4  A.   I do.

5  Q.   The next one closest in size is $600.  Do you see that?

6  A.   I do.

7  Q.   But some of them are as much as $3,000 on one day.  Do you

8  see that --

9  A.   I do.

10  Q.   -- at the top?  So, in fact, there are 20 ATM deposits made

11  on your 7577 account at an ATM machine on July 27th, correct?

12  A.   Correct.

13  Q.   That totals more than $40,000 in deposits at an ATM machine,

14  correct?

15  A.   I'm not sure what the total is.  Oh, yes, yes.

16  Q.   Okay.  Then do you see at the bottom on July 27th a wire, an

17  outgoing wire transfer?

18  A.   Correct.

19  Q.   And that's a $21,000 wire to Nigeria?

20  A.   Correct.

21  Q.   You're not dating Mr. Animashaun at this point, are you?

22  A.   I'm not.

23  Q.   Let's go to page 390.  Do you see an additional wire --

24  outgoing wire on July 28th at the top of the document?

25  A.   I do.

1  Q.    And that's for $20,000?

2  A.    Correct.

3  Q.    After that are there then a series of more cash deposits?

4  Do you see several cash deposits on July 29th?

5  A.    I do.

6  Q.    For $3,000 at 4175 East Renner Road?

7  A.    I do.

8  Q.    Do you, in fact, see 11 separate cash deposits on July 29th

9  at 4175 East Renner Road?

10  A.    Yes.

11  Q.    Via an ATM card, via an ATM machine?

12  A.    I do.

13  Q.    Okay.  And then we go down to July 30th, and do you see

14  starting July 30th you've got at least 20 deposits on July 30th

15  of cash at an ATM, correct?

16  A.    Correct.

17  Q.    So the first three are at 206 West Farm to Market in Murphy

18  Texas, right?

19  A.    Correct.

20  Q.    And then the next dozen, I believe, are all at 4175 East

21  Renner Road in Richardson, correct?

22  A.    Correct.

23  Q.    Those are all for the same amounts, even amounts, $600.

24  A.    Correct.

25  Q.    Then we go down to July 30th.  There's -- at the bottom you

1  change locations and there are deposits still being made in cash

2  at an ATM at 206 West Farm to Market, correct?

3  A.   Correct.

4  Q.   And let's go to the next page, 391.  And we see, again, cash

5  deposits continue at an ATM in the amount of $600 at 206 West

6  Farm to Market 544, Murphy, Texas, correct?

7  A.   Correct.

8  Q.   And we see one, two, three, four, five, six, seven, eight --

9  eight transactions that are cash deposits at an ATM in Murphy,

10 Texas, right?

11 A.   Right.

12 Q.   And then later that day, July 30th, you wire 20,000 --

13 $25,000 to Nigeria, correct?

14 A.   Correct.

15 Q.   At this point you were working for KPMG, right?

16 A.   Right.

17 Q.   KPMG doesn't pay you in cash, do they?

18 A.   No.

19 Q.   And you said earlier KPMG was a job that you really

20 appreciated, right?

21 A.   Right.

22 Q.   You were making good money, right?

23 A.   Right.

24 Q.   You were making about $90,000 a year?

25 A.   Give or take.

```
 1    Q.    Give or take.  You weren't struggling, but yet in July in a

 2    three-day period you keep making cash deposits at the same ATM,

 3    right?

 4    A.    Right.

 5    Q.    4175 East Renner Road.

 6    A.    Right.

 7    Q.    Wouldn't it have been easier to just walk into the bank and

 8    do one transaction rather than more than 30 at an ATM?

 9    A.    I honestly don't recall the aspects of that day.  I probably

10    went out during my lunch break and the line was probably long and

11    I was just trying to just go back to work, but I honestly don't

12    really recall.

13    Q.    You don't remember?

14    A.    I don't recall the --

15    Q.    So 30 and you drove to two different ATMs that day, correct?

16    Two totally different locations.

17    A.    It appears so, yes.

18    Q.    On a lunch break when you've got to get back to work.

19    A.    Correct.

20    Q.    Isn't it because you didn't want to be asked by the bank

21    where the money came from when you deposit that much?

22    A.    No.

23    Q.    And so you were doing well financially with KPMG.  You

24    weren't struggling.

25    A.    No, I wasn't.
```

```
 1   Q.   And even when Covid hit you were still doing okay, weren't
 2   you?  Because this is 2020, right?
 3   A.   Right.
 4   Q.   And you were doing well enough to buy a house in March of
 5   2021.
 6   A.   That is correct, yes.
 7             MS. WALTERS:  No further questions for this witness.
 8             THE COURT:  Thank you, ma'am.  You may step down.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1        I, Jeff L. Foster, United States Court Reporter for the

2    United States District Court in and for the Northern District of

3    Texas, Dallas Division, hereby certify that the above and

4    foregoing contains a true and correct transcription of the

5    proceedings in the above entitled and numbered cause.

6        WITNESS MY HAND on this 28th day of February, 2024

7

8

9

10                          /s/ Jeff L. Foster_____
                            JEFF L. FOSTER, RMR, CRR
11                          United States Court Reporter
                            1100 Commerce St., Room 1504
12                          Dallas, Texas 75242
                            (214) 753-2349
13

14

15

16

17

18

19

20

21

22

23

24

25