1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF TEXAS

3                    DALLAS DIVISION


4     UNITED STATES OF AMERICA,        )  3:21-cr-435-N
5                  PLAINTIFF,          )
                                       )
6     vs.                              )  DALLAS, TEXAS
                                       )
7     IJEOMA OKORO,                    )
                   DEFENDANT.          )  November 30, 2023
8

9

10       **TRANSCRIPT OF GLENDA SPURLOCK TRIAL TESTIMONY**

11        **BEFORE THE HONORABLE DAVID C. GODBEY**

12             **UNITED STATES DISTRICT JUDGE**

13    A P P E A R A N C E S:

14

15    FOR THE PLAINTIFF:      **MS. MARY F. WALTERS**
16                            **MS. ELYSE J. LYONS**
                              **MS. JENNA DANELLE RUDOFF**
17                            UNITED STATES ATTORNEY'S OFFICE
                              NORTHERN DISTRICT OF TEXAS
18                            1100 Commerce Street
                              Third Floor
19                            Dallas, Texas 75242
                              mary.walters@usdoj.gov
20                            elyse.lyons@usdoj.gov
                              jenna.rudoff@usdoj.gov
21                            (214) 659-8664

22

23

24

25

```
 1   FOR THE DEFENDANT:              MR. DOYLE RAYMOND BUNCH, III
                                     BURLESON, PATE & GIBSON, LLP
 2                                   900 Jackson Street, Suite 330
                                     Dallas, Texas 75202
 3                                   tbunch@bp-g.com
                                     (214) 871-7543
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19   COURT REPORTER:                MR. JEFF L. FOSTER, RMR, CRR
                                     United States Court Reporter
20                                   1100 Commerce St., Room 1504
                                     Dallas, Texas 75242
21                                   jeff_foster@txnd.uscourts.gov
                                     (214) 753-2349
22

23

24           Proceedings reported by mechanical stenography and

25   transcript produced by computer.
```

```
 1              GLENDA SPURLOCK TESTIMONY -- NOVEMBER 30, 2023

 2                         P R O C E E D I N G S

 3              MS. LYONS:  Your Honor, the Government calls Glenda

 4    Spurlock.

 5              THE COURT:  And how long are you going to be with

 6    this --

 7              MS. LYONS:  About an hour, Your Honor.

 8              THE COURT:  Let's go until about 20 'til and take a

 9    break right around then.

10              Come on up, please, ma'am.  If you'd come right up here

11    and have a seat, please.  Could you raise your right hand,

12    please?

13              (The witness was duly sworn.)

14              THE COURT:  The Government may proceed.

15         GLENDA SPURLOCK, GOVERNMENT'S WITNESS, SWORN

16                         DIRECT-EXAMINATION

17    BY MS. LYONS:

18    Q.   Good morning, ma'am.

19    A.   Yes.

20    Q.   Can you please state your name and spell your last name for

21    the record?

22    A.   Glenda Spurlock, S-P-U-R-L-O-C-K.

23    Q.   And without giving us your address, what city and state do

24    you live in?

25    A.   Minden, Louisiana.
```

1  Q.   And are you currently employed?

2  A.   Yes.

3  Q.   Where do you work?

4  A.   I'm working at an Al-N-Way Cleaners part-time.

5  Q.   What is -- what is that?

6  A.   It's a cleaners and laundry where people drop dry cleaning

7  off, laundry and wash and fold.

8  Q.   And in the last ten years have you had any other jobs

9  besides working at the Al-N Cleaners?

10  A.   Yes.

11  Q.   What are some of those other jobs?

12  A.   The last ten years I worked in banking.  I worked at

13  Brookshire's, I worked at Rite Aid, Walgreen's and Ace Hardware.

14  Q.   And, Ms. Spurlock, have you ever been a victim of an online

15  romance scam?

16  A.   This is the first time with this -- with this here.

17  Q.   Okay.  And in connection with that did you send money to

18  accounts that you were provided by the person that you

19  believed scammed you?

20  A.   I did.

21  Q.   So let's back up and talk about how that relationship came

22  about.  Were you -- have you ever used an online dating website?

23  A.   I did.  It was PlentyofFish.

24  Q.   And did you create a profile for that account?

25  A.   I just signed up, you know, like as a temporary and stuff.

1    I don't really even know much about like doing that stuff.

2    You're just kind of getting on there.  When it showed it will

3    pop up to see different -- different people and stuff.  And I had

4    lost my husband and alone and just lonely, I guess, and it just

5    put it out there, I reckon, dear.

6    Q.    I'm sorry about your husband.  You lost him.  When was that?

7    A.    '07.

8    Q.    And how long had you been married?

9    A.    For about 14 years.  We were together like two years before

10   we married.

11   Q.    When did you first sign up for an online dating website?

12   A.    I don't remember what year.  Maybe '13 or '14, I'm thinking,

13   but I'm not -- I really can't remember.

14   Q.    Did you ever meet anyone in person on a date as a result of

15   that dating website?

16   A.    Like a couple of locals.  I met up like and like had like a

17   Coke or a cup of coffee somewhere, but nothing -- it just didn't

18   pan out.  I didn't feel like we was compatible.

19   Q.    What was the most serious relationship that you developed

20   from an online website?

21   A.    The one that I just have been back and forth with for

22   several years, but actually never met.  I mean, we had like

23   talked on the phone and for years text.  But as far as ever

24   meeting, no.

25   Q.    And was this a gentleman that you were corresponding with?

```
 1  A.    Yes.

 2  Q.    What was his name?

 3  A.    Timothy Gehrig is what he said.

 4  Q.    Do you remember how to spell his last name?

 5  A.    G-E-H-R-I-G, I believe.

 6  Q.    And what did you see about Timothy Gehrig on the website?

 7  A.    Well, I had lost my husband to cancer and he supposedly had

 8  lost his wife to cancer too.  And it just -- it was kind of like,

 9  I guess, a bond that we both suffered a loss.

10  Q.    What did you learn about Mr. Gehrig's profession?  Do you

11  know if he had a job?

12  A.    He was supposed to be a -- like he went overseas and did a

13  lot of -- some type of pipelining job, like engineering maybe,

14  something to that effect.

15  Q.    And you said that he told you that he had lost his spouse as

16  well.

17  A.    Yes.

18  Q.    Did he have any kids?

19  A.    He said he had one son.

20  Q.    Do you know how old the son was?

21  A.    No, ma'am.

22  Q.    Did you share with him about your husband?

23  A.    Yes.

24  Q.    And you said that was something that you connected about?

25  A.    (Witness nods head.)
```

1    Q.   Did you talk about any of your hobbies with Mr. Gehrig?

2    A.   I really don't remember.  I know I've always liked animals

3    and had my horses and stuff, but as far as really -- I don't know

4    that we ever really talked about that.  Mostly grandkids.

5    Q.   Do you have grandkids?

6    A.   Yes, ma'am.

7    Q.   How many?

8    A.   I have two.

9    Q.   And did Mr. Gehrig have grandkids as well?

10   A.   Not that I'm aware of.

11   Q.   So you shared with him about your grandkids?

12   A.   (Witness nods head.)

13   Q.   What was his response to that?

14   A.   Well, he was planning on finishing the job over in Malaysia

15   where he had gone to and he was going to come back and we were

16   supposed to get together and that way he would get to meet the

17   whole family and stuff.  But that never happened.

18   Q.   What was Mr. Gehrig's approximate age, if you know?

19   A.   He was younger than me.  So I'm thinking he would be -- I'm

20   73.  I'm thinking he was going to be around 62 or 63.  I think it

21   was like about an eight to ten-year difference in our age.

22   Q.   And where was he living when you first connected with him

23   online?

24   A.   I can't remember the name of the town, but it's out of

25   New Orleans, it's a little bitty spot, but I can't remember the

1  name of the little town.

2  Q.   Were you living in Louisiana at the time that you met him?

3  A.   Yes, ma'am.

4  Q.   And so that was the same state?

5  A.   Yes, ma'am.

6  Q.   How did you communicate with Mr. Gehrig?

7  A.   When we -- when we first started before he went overseas to

8  Malaysia for the job we would talk every day on the phone several

9  times and then text message.  But, like I say, we never met in

10  person.

11  Q.   When you would talk on the phone, did you notice if

12  Mr. Gehrig had an accent of any kind?

13  A.   Yes, ma'am.

14  Q.   And did that surprise you?

15  A.   No, he told me he was born in Nantes, France, and so I knew

16  he was of French -- that's what he said, French descent.  I can't

17  distinguish between different -- because I've never been hardly

18  out of the state of Louisiana, because I don't know different

19  accents.  And I did have a friend of mine that passed away and

20  she was German and stuff, so I could maybe pick up a little bit

21  on that, because we did a lot of things together.

22  Q.   But the accent that you heard from Mr. Gehrig on the phone

23  didn't make you suspicious that he wasn't from France?

24  A.   Huh-uh.

25  Q.   It seemed consistent --

1   A.   No, ma'am.

2   Q.   -- with what you had known about him.

3   A.   Yeah.  No, ma'am.

4   Q.   Did you exchange any photographs with Mr. Gehrig?

5   A.   Yes, he had pictures and I had pictures of him and stuff.

6   Q.   And what did he look like?

7   A.   He was about a little over six foot, grayish blonde like

8   hair, dark eyes.  Appeared to be maybe -- he wasn't super slim,

9   but he wasn't a heavy person.

10  Q.   And you sent him photographs of yourself as well?

11  A.   Yes, ma'am.

12  Q.   You said that at some point after you met him he needed to

13  go to Malaysia.  Can you explain that a little bit more?

14  A.   Well, we were talking on the phone and he was working on a

15  proposal for a contract to go over there to work on a pipeline

16  I'm assuming, some type of engineering like deal.

17          So a lot of times he would call and then he got a call

18  and said he'd won the contract, because it must have been between

19  him and some other companies, but his bid went through and so he

20  got the contract and so he went to Malaysia.

21  Q.   Did he tell you how long he was going to be in Malaysia?

22  A.   He didn't know how long exactly the job would take, but when

23  he got there it was one thing right after the other that like

24  happened and stuff, so it prolonged it and caused him to use all

25  the funds that he had carried over there, so then he needed help.

```
 1  Q.    When he was over there in Malaysia, did he talk to you about
 2  the work that he was doing on the pipeline?
 3  A.    He just told -- he carried -- he recruited someone to go
 4  over there with him.  I don't know who they were or anything.
 5  But he hired some locals there that was working on it.
 6  Supposedly the pipeline blew out or something or another and a
 7  couple of their workers that he had hired from Malaysia were
 8  killed in that accident.
 9  Q.    And he shared all of that information with you?
10  A.    Yes, ma'am.
11  Q.    While he was in Malaysia, were you-all still able to talk on
12  the phone?
13  A.    Not very often.  Could sometimes, but I don't get good
14  service at my house and a lot of times the calls would be dropped
15  and stuff and it's still the same way now.  There's very little
16  service out there where I live and it's only six miles from town.
17  Q.    So while he was in Malaysia, what was the primary way you
18  communicated with Mr. Gehrig?
19  A.    Just text.
20  Q.    Did you exchange e-mails as well?
21  A.    I'm thinking that we did have e-mail at one time too.
22  Q.    Did you ever video chat with Mr. Gehrig?
23  A.    No, ma'am.
24  Q.    Did you ask if you could?
25  A.    I don't -- I don't really know how to operate the video chat
```

1    and stuff on my phone.  I'm just not text savvy at all.

2    Q.   And at some point while he was in Malaysia -- well, I guess

3    about how many months had you been corresponding or years before

4    he went to Malaysia?

5    A.   It was probably I'm thinking maybe five to six months before

6    he went over there.  I really can't -- that time frame I really

7    don't remember exactly.

8    Q.   But when he went to Malaysia, did you think of yourselves in

9    an exclusive relationship?

10   A.   I did.

11   Q.   Is that something that you talked about with him?

12   A.   Yes, ma'am.

13   Q.   What did you --

14   A.   He said we were going to get married whenever he got back to

15   the States.

16   Q.   So it's a serious relationship at that point?

17   A.   Uh-huh.

18   Q.   Did he express, you know, affection and compliments to you

19   in your relationship?

20   A.   Yes, ma'am.

21   Q.   Did he tell you he loved you?

22   A.   Yes, ma'am.

23   Q.   So you mentioned that he was in Malaysia and there was an

24   issue with the pipeline.  I want to turn your attention to kind

25   of the financial aspect of your relationship with Mr. Gehrig.  At

```
 1  any point did he ask you for money?
 2  A.   Yes, he said he -- because with the expenses he had got over
 3  there and the -- the problems he was having over there and the
 4  family of the two guys that got -- that were killed on the --
 5  supposedly got killed, I don't really know all that deal, but he
 6  needed money to keep from going to jail.
 7  Q.   So he told you that if he didn't have money for the families
 8  of the victims he was going to jail?
 9  A.   Right.
10  Q.   Did he tell you how much money he needed?
11  A.   I think it was 15,000 for each -- the two families, so it
12  would have been like 30,000.
13  Q.   And did he ask you if you could give him that money?
14  A.   He did.
15  Q.   Did he -- did he have his own money that he could access in
16  Malaysia, if you know?
17  A.   They had -- he told me -- now, whether he did or not -- he
18  carried 300,000 over there with him, but he had already expended
19  that out or whatever.  It was gone.
20  Q.   And so he didn't have -- as far as you know, he didn't have
21  a bank account in Malaysia?
22  A.   No, ma'am.
23  Q.   Did he have any other resources available in the States that
24  he told you about, bank accounts or anything?
25  A.   No, ma'am.
```

1  Q.   Did you understand that the pipeline was going to be a paid

2  job for him?

3  A.   Yes, ma'am, I had like -- I've got a document out there in

4  the deal that supposedly like a notary and everything filled out

5  of what he was supposed to receive.  It was supposed to be

6  $2.7 million for this job that he was doing over there.

7  Q.   Is that a document that he sent you showing how much money

8  he was going to make?

9  A.   It was -- to my knowledge, it came from the -- the one that

10 did -- that typed -- with the letterhead and stuff.  I have it in

11 that envelope back there if you would like to have that for I.D.

12 or to present.

13 Q.   But that said he was going to make $2.7 million from the

14 pipeline?

15 A.   Uh-huh.

16 Q.   Okay.  And so when he was asking you for money, did you

17 expect to get any of that money back?

18 A.   Yes.

19 Q.   Did you --

20 A.   He said he would take care of me.  Whenever he got the funds

21 and stuff he would get me paid back.

22 Q.   When he asked you for that $30,000; you said it was for the

23 victims, how did that make you feel that he was asking you for

24 money?

25 A.   It kind of took my breath away.  But like he said what he

1    was supposed to get and a promise to pay back.  And I'm thinking

2    within six months he was going to be home and it would be --

3    everything would be taken of.  But that never happened.  It went

4    from one thing -- he was in a car wreck in a taxi where he said

5    the taxi driver was killed.  He was in the hospital and he had to

6    have surgery.  They had to get -- a nurse or doctor called me

7    from the hospital in Malaysia and said that they didn't know

8    whether he would make it or not.  He had a bad injury to the

9    brain and they wasn't sure he would make it.

10   Q.   So that's a lot that happened in that period of time he was

11   in Malaysia?

12   A.   Yes, ma'am.

13   Q.   I want to go through each of those things to get a little

14   more detail from you.  But let's back up to the victims of the

15   pipeline accident and the $30,000.  Did you -- were you able to

16   send him that money?

17   A.   I sent him some, but I wasn't able to send the whole amount.

18   You know, it took -- it took me a time to get the money gathered

19   to get it to him.

20   Q.   And where did you pull the money from?

21   A.   I cashed in my 401(k) and then I was still working, plus I

22   was drawing some Social Security from my husband too.

23   Q.   So you sent him money that you earned from a job?

24   A.   (Witness nods head.)

25   Q.   And you also sent him some of your 401(k).  Do you remember

1  about how much that was out of your 401(k)?

2  A.    I think it was 27,000, what I had in my 401(k).

3  Q.    And you said that you were drawing Social Security as well?

4  A.    (Witness nods head.)

5  Q.    Did you send him -- did you have savings from Social

6  Security or did you forward your Social Security money as it came

7  in to him?

8  A.    I sent it to him by Western Union wires and stuff, that way,

9  MoneyGram.

10  Q.    So you gathered money from these different sources and you

11  sent him -- did you send him one transaction via Western Union?

12  A.    No, it was several as he needed it.

13  Q.    As he needed it.

14  A.    And as I could get it.

15  Q.    And were you communicating with him daily?

16  A.    There was a while there whenever he was in the hospital

17  supposedly that I wasn't able to talk to him, because he -- they

18  kept him like in an unconscious state.  So I don't know where

19  this doctor and everything was that was involved in all this or

20  not, if it was really true.  I don't know.

21  Q.    So for the -- again, just the money for the victims of the

22  pipeline accident, do you remember about when that was?

23  A.    No, ma'am, I don't remember the dates.

24  Q.    Was it shortly after he went to Malaysia?

25  A.    It was probably within three to four months after he had

1  been over there probably.  Maybe not even that long.

2  Q.   But were you in communication with him throughout that time

3  leading up to the pipeline incident?

4  A.   Yes, ma'am.

5  Q.   Okay.  What was his response to you sending this money to

6  help him?

7  A.   He promised he would get it back as soon as he could get

8  back, because he couldn't get the funds for the job until it was

9  finished and he couldn't get it until he got back to the United

10 States.  It was like in an offshore account and stuff.  I don't

11 understand that as well.

12 Q.   So there were two obstacles to him paying you back, one, he

13 had to finish the job it sounds like; and, two, he had to come

14 back to the States?

15 A.   Yes.

16 Q.   And was he able to finish the job, to your knowledge?

17 A.   He finally did get the job finished.

18 Q.   But you said there were some other things that happened

19 while he was in Malaysia.  You mentioned a taxi incident?

20 A.   Yeah, he was in -- coming from one place to the other -- I

21 don't know whether he had gone to eat, I don't know the

22 circumstance, but he was on the way back to the hotel where he

23 was staying and there was a traffic accident with a cab or taxi

24 that he was in.  And he told me that whenever he was able to talk

25 that the driver had been killed and, I think, he had lost a lot

1  of his I.D. that was on him, that was in -- you know, that he had

2  on his possession.  Somewhere, I guess, in the ambulance.  I

3  really don't know that part, how he lost some of his I.D. stuff.

4          MS. LYONS:  I think we're going to take our morning

5  break, Your Honor, and, Ms. Spurlock, we'll talk about that more

6  after our break.

7          THE COURT:  All right.  Let's take our break now and

8  see you-all back at 11:00.

9          COURTROOM SECURITY OFFICER:  All rise for the jury.

10          (Recess taken.)

11          THE COURT:  Be seated.  The Government may proceed.

12          MS. LYONS:  Thank you, Your Honor.

13                  DIRECT EXAMINATION (CONT'D)

14  BY MS. LYONS:

15  Q.   Ms. Spurlock, we were discussing another incident that

16  Mr. Gehrig told you happened when he was in Malaysia and that was

17  the taxicab incident.  You said that there was an accident of

18  some kind?

19  A.   Yes, that the taxi driver was -- I don't know whose fault it

20  was, whether it was the taxi driver or the other party hit them.

21  Q.   And do you recall -- I know we talked about you signing up

22  for the website in 2014.  Do you recall what period of time

23  Mr. Gehrig was in Malaysia?

24  A.   I really -- I don't remember the month or anything about

25  when it actually happened.  It just -- I guess you just kind of

1  block it out from the pain and stuff that I've gone through.  I

2  don't know.  I can remember, you know, the things that he told me

3  that happened over there, but I can't remember the dates at all.

4  Q.    Do you remember a year?  Was he there for more than a year?

5  A.    Yes, ma'am, I'm pretty sure it's been more than a year he

6  was there.

7  Q.    And do you remember if it was in 2015 or later?

8  A.    I'm thinking it was between 2014 and maybe 2016, something.

9  I'm thinking about that time frame.

10  Q.    Would some documents reflect your -- refresh your

11  recollection?

12  A.    Some of those that I gave her may do that.

13  Q.    Okay.  We will talk about later.

14  A.    I thought it was just involving the wires and stuff that

15  they had messed me up with, so I thought those would go to a

16  different case somewhere, so that's why I told her that I had

17  those with me.

18  Q.    Okay.  Like I said, we might look at some of those to

19  refresh your recollection in a little bit, but back to the

20  incident with the taxicab driver.  Was Mr. Gehrig injured in that

21  accident?

22  A.    Yes, he had a brain injury.

23  Q.    And is that something that he himself told you he had a

24  brain injury?

25  A.    The doctor or nurse from the hospital, they had called me,

1  but the call dropped a couple of times because I have such poor

2  service.  And when they talked to me they told me that he had

3  been in a bad accident and they didn't know whether he would make

4  it.  And he had a really severe brain injury; that they didn't

5  know whether he would survive it.

6  Q.    So you first -- did you first learn of the taxi incident

7  from the hospital?

8  A.    Yes, ma'am.

9  Q.    And was it a hospital in Malaysia that was calling you?

10 A.    Yes, ma'am.

11 Q.    Did you -- did it come up on your phone from a foreign

12 number?

13 A.    Yes.

14 Q.    And you said you spoke with a medical professional there.

15 Was it a doctor or nurse?

16 A.    A doctor had talked to me at one point and then a nurse at

17 another point.  They had made, I think, two different calls to

18 me.

19 Q.    And what was the purpose of their call to you?

20 A.    To let me know how his condition had progressed, and one

21 that he was going to have to have a specialist come in from

22 another country to do the surgery.  They didn't have anybody

23 there that was -- that did that particular surgery, to my

24 knowledge.

25 Q.    Were they asking you for funds to pay for that surgery?

```
 1  A.   No, ma'am.  They did say it was going to be $5,000 though.

 2  Q.   The doctor told you that?

 3  A.   (Witness nods head.)

 4  Q.   Do you know if Mr. Gehrig -- did he tell you that he had

 5  that surgery?

 6  A.   To my knowledge, he did.  He survived.

 7  Q.   I'm sorry, say that again?

 8  A.   I said, to my knowledge, he did.  He recovered from that.

 9  But I don't remember his recovery time before he was able to do

10  anything.

11  Q.   Okay.  Did he get a bill from the hospital for that surgery?

12  A.   I have no idea.

13  Q.   Did he ever ask you for money in connection with that

14  surgery?

15  A.   (Witness shakes head.)

16  Q.   You mentioned that there were other obstacles to this

17  pipeline getting completed.  Do you remember any other things he

18  told you about the pipeline?

19  A.   There was a power surge over there that caused -- the

20  computers that they had carried over there to work the job, it

21  had burned up the computers and he needed computers.

22  Q.   Did he ask you to help with that computer problem?

23  A.   Yes, I got computers.  He gave me the specifications that he

24  needed for the computers to work the pipeline deal.  And there's

25  an envelope with those specs on it that was in the envelope.
```

1    But, like I said, I thought it was just going to be about the

2    wires and not that, but I did bring those with me just in case we

3    needed it.

4    Q.    Okay.  And did he -- so he asked you to send -- buy some

5    laptops in the United States and send them to him in Malaysia?

6    A.    Yes.

7    Q.    Did you do that?

8    A.    I did.  I sent them from FedEx with insurance and stuff.

9    Q.    Where did you buy the laptops?

10   A.    Best Buy in Shreveport.

11   Q.    And is that -- are the receipts of those laptop purchases

12   one of the documents that you brought here today?

13   A.    Yes.

14   Q.    Okay.  I think we will have that shortly.  And how did you

15   send the laptops?

16   A.    FedEx.

17   Q.    Did you put anything else in the package with the laptop?

18   A.    At times I did.

19   Q.    So did he ask you --

20   A.    Cash.

21   Q.    -- to do this on multiple instances?

22   A.    Yes.

23   Q.    Do you remember about how many laptops you purchased?

24   A.    I'm thinking it was five, but I'm not positive.

25   Q.    On how many occasions?

```
 1   A.    Five different occasions.

 2   Q.    So you would send one laptop at a time?

 3   A.    Yes, ma'am.

 4   Q.    And sometimes you said you put cash in the envelope as well?

 5   A.    (Witness nods head.)

 6   Q.    Do you remember if you sent it to him personally?

 7   A.    Yes.

 8   Q.    In Malaysia?

 9   A.    The receipts from FedEx should be with them too, with the

10   address in Malaysia that it was sent to.

11   Q.    Okay.  In addition to the laptops, did you ever send

12   anything else through the mail to Mr. Gehrig in Malaysia?

13   A.    Just the computers and stuff with some of them with the

14   money inside.

15   Q.    Do you remember about how much cash you sent over there?

16   A.    It was probably in the neighborhood of probably 15 to

17   $20,000.  I sold a piece of property and stuff so I could have

18   the money.

19   Q.    And which property did you sell?

20   A.    Part of my property that I had owned since '78.

21   Q.    So you sold some land?

22   A.    Uh-huh.

23   Q.    And that gave you the 15 or $20,000 that you sent --

24   A.    (Witness nods head.)

25   Q.    -- over there.  Okay.  What was his reaction when you sent
```

1   the laptops and all that cash?

2   A.   He just thanked me for helping him and he promised that he

3   would get me paid back as soon as he could get the job finished

4   and get back to the States.

5   Q.   So did you understand that to be sort of a gift to

6   Mr. Gehrig or a loan or advance on money that he was going to pay

7   you back?

8   A.   A loan for --

9   Q.   And what was the tone of his communications when he's asking

10  you for things?  Were these urgent problems or stressful

11  problems?

12  A.   Most ones were the urgent -- you know, he had to have the

13  laptops to finish the job, number one.  And then whenever the

14  workers got killed and stuff and that they had to have that to

15  keep from going to jail over there in a foreign country.  I've

16  never been out of the United States and very seldom ever been out

17  of -- like Louisiana, Texas and Arkansas is about the most.

18  Q.   And so you're not very familiar with how business is

19  conducted in Malaysia?

20  A.   None.

21  Q.   Did you tell him that, that you've never been there?

22  A.   He knew I had never been anywhere.

23  Q.   And at some point did the job on the pipeline get finished?

24  A.   Yes, ma'am.

25  Q.   And did Mr. Gehrig receive payment for that?

1  A.    To my knowledge, he has never received it, but I don't know.

2  He got to leave there.  He flew in to -- I think it was in

3  Maryland.  He was detained there according to him whenever he

4  called me.  And then whenever they got all the paperwork

5  straightened out he was supposed to fly into Shreveport and I was

6  to pick him up.

7       I took off work one day, and I don't remember the date,

8  and went over there and sat in the Shreveport airport for hours.

9  And I didn't get any word from him or anything on text or the

10 telephone.  So I had no idea what -- what had transpired.

11 Q.   Did he send you documents about that $2.7 million that he

12 earned from the pipeline?

13 A.   I don't know whether he physically sent them to me or it's

14 the one that drawed up the documents and they sent it to me.

15 Q.   And when you said that you received a document about

16 Mr. Gehrig from someone else, how did you receive that document?

17 A.    I think it come through e-mail and I think I went to the --

18 because I don't have a printer I think I printed it out at the

19 library in Minden.  I'm not positive.  I can't remember.

20 Q.   And is that one of the documents that you've just brought

21 here today?

22 A.    Yes, ma'am.

23       MS. LYONS:  Your Honor, may I approach the witness?

24       THE COURT:  Yes.

25 Q.   (BY MS. LYONS)  Ms. Spurlock, I'm showing you what's been

1    marked for identification purposes as Government 157.  Can you

2    take just a minute to look through all the pages here of

3    Government's Exhibit 157 and then tell me what they are?  Not

4    each document, but just are these the documents you brought in

5    court today?

6    A.   Yes, ma'am, these are the documents I brought in today.

7    Q.   And where did you find these documents?

8    A.   I had them put back -- I put them in a box or I'll put them

9    in a drawer.  And I've been going through them this week from the

10   talks with some of the FBI agents and trying to find as much I

11   could.  I had mice in my house and they destroyed a lot of papers

12   that had been in their nest, but what I could find so far.

13          And I know I may still have some in a storage building

14   outside that doesn't have any power to it that I maybe can kind

15   some more things between now and the next time or I can get them

16   and get them to y'all.

17   Q.   And are these documents that you brought related to your

18   relationship with Mr. Gehrig?

19   A.   Yes.

20   Q.   And are they related to the financial transactions that you

21   sent to him?

22   A.   Yes.

23          MS. LYONS:  At this time, Your Honor, the Government

24   offers Exhibit 157.

25          MR. BUNCH:  Your Honor, if these documents are needed

1  to refresh recollection I don't have an issue with that, but

2  these were just handed to me at 11:07, Your Honor.  I don't --

3  it's not enumerated on their exhibit list, it is -- and so as

4  such I would say it's not a timely exhibit.

5          THE COURT:  I'll sustain the objection.  You can use it

6  to refresh the witness's recollection.

7          MS. LYONS:  Thank you, Your Honor.

8  Q.   (BY MS. LYONS)  Ms. Spurlock, if you could look at the

9  second page of this exhibit and just take a minute to read it and

10  see if it refreshes your recollection about Mr. Gehrig's time in

11  Malaysia?

12  A.   I don't remember how long after he had been over there that

13  he got this document here for me.  I see this is dated, you know,

14  in 2017.

15  Q.   Do you recall that in 2017 he sent you information that he

16  had earned the $2.7 million?

17  A.   Yes.

18  Q.   And did he send you documents that appeared to be coming

19  from a third party like a bank?

20  A.   I didn't realize -- I don't know that I knew it was from a

21  bank.  I thought it was from this law firm where they had got the

22  stuff put together.  And I told him, I said, I would like to have

23  some type verification and stuff for my inner self to be able to

24  do what I was doing for him.

25  Q.   And you said that you received something from a law firm.

1    Do you remember what it was that the law firm was telling you?

2    A.    This came together, the best I can remember.

3    Q.    And did the law firm convey anything to you about your

4    ability to access the $2.7 million?

5    A.    I never talked with anybody.  This paper that they had sent

6    in, like I said, I'm thinking it come to my e-mail and I went to

7    the -- I believe that I went to the library to pull a copy, to

8    have a copy for myself.

9    Q.    And did you ever understand at one point that he was deeding

10    money to you?

11    A.    He told me that anything that he had -- he said he had

12    property and if anything happened to him it would all come to me

13    is all that -- but I never knew any addresses.  I know the towns

14    and stuff he told me.  And -- and after he got back into the

15    States where he had went and things that he said happened -- I

16    don't know that they personally happened, because I have no way

17    of verifying it.

18            After they released him from -- I think it was in

19    Maryland he went to his hometown, which is south of Louisiana.

20    And I cannot for the life of me -- the name of that town won't

21    come to my brain.  Anyway, he said he broke into his house and

22    the police picked him up and he -- I guess they found enough

23    documentation that he did own it, according to him.  Then he left

24    there and went to --

25    Q.    I'm going to stop you right there, because I think there's a

1  lot of different things here that I want to explore, but talking

2  back about this $2.7 million that he earned from the pipeline,

3  were you ever appointed as his next of kin to receive that money?

4  A.   He was supposed to take care of that over there as far as

5  anything that -- I'm assuming this -- whatever that paperwork is,

6  that was supposed to be what it was for, like -- like I would be

7  the beneficiary or something or another, but I'm not positive.

8  Q.   And when you talk about that paperwork, are you referring to

9  paperwork that you received from a law firm?

10 A.   Yes.

11 Q.   And that is what you think contained the information that

12 you were the beneficiary?

13 A.   Yes, ma'am.

14 Q.   Is that a yes?  Okay.  So after he had left Malaysia you

15 said he went to Maryland?

16 A.   I think it was Maryland where he flew into first from

17 whenever he left Malaysia.  And he was detained there for some

18 type paperwork that wasn't in order or something or another from

19 coming over there.  I'm not -- I don't know anything about

20 international documents or anything like that, what's needed.

21 Q.   And was it in 2017 that he arrived in Maryland?

22 A.   I really don't know when -- I can't remember when he got

23 there.  It could have been.  I'm not sure.

24 Q.   Would looking at a document about when you -- would looking

25 at a document about the legal paperwork that you received prior

1  to him going to Maryland refresh your recollection about the time

2  of that?

3  A.   I can't -- I really don't remember.  I don't remember how --

4  how long I had -- that he had sent this to me.

5  Q.   If you would look at page 2 of the document that you're

6  looking at.  Do you see a date on that?

7  A.   This too says 10-2017.

8  Q.   Does that refresh your recollection about when these events

9  transpired?

10  A.   I just -- all I can remember is when I got the paperwork and

11  it come in.  And I had actually a friend of mine that has passed

12  now and she was more savvy with a computer and stuff and we went

13  up to the -- and she pulled the documents up for me at the post

14  office -- I mean, not the post office, the library.

15  Q.   And when you -- when you looked at the documents, do you

16  think that they were dated about the same time that you would

17  have received them?

18  A.   I'm assuming so.

19  Q.   And that would have been in 2017?

20  A.   (Witness nods head.)

21  Q.   So after he got to Maryland, what happened?

22  A.   Well, I guess I'm assuming after he got the paperwork that

23  he needed and they released him he was supposed to come to

24  Shreveport, but he didn't come to Shreveport.  The next place he

25  said he was at was his home there in Louisiana -- in south

1    Louisiana.  And that he had to break into his house and it was in

2    total disarray he said in the house.

3             And the police came and he was in the police station

4    there.  And he said he got it straightened out.  And then he

5    went -- and he said he had property in, I think, Phoenix,

6    Arizona.  He went up there to -- it was like a -- I had some

7    addresses.  I don't know whether I can find them or not.  But

8    some addresses with an apartment, but then he was -- the

9    apartment caught fire before he could get it sold.  It was always

10   something.

11            And then we wound up in what -- what, '20 when all of

12   the Covid hit or '19?  He was sick there and needed money for a

13   ventilator.  And he said it was a massive containment area where

14   there was many people in there that were suffering from the Covid

15   and stuff.

16   Q.   So that's indicating to me that your relationship continued

17   into 2020?

18   A.   Whenever Covid hit.  And after the -- whenever the Covid --

19   and he got it I'm thinking two or three times and a nurse called

20   and said that he needed another -- the ventilator, that they

21   didn't know if he was going to survive.  And I said I can't -- I

22   can't send you anything for a ventilator.  I had her name and

23   stuff and I contacted -- she was like a travel nurse.  And I'm

24   not sure.  I would jot a name down and I don't know whether one

25   of those names that's on there is hers in some of that paperwork.

1   Because she said, "You're just going to let him die?"  And I

2   said, "There's nothing else I can do for him.  If he dies he

3   dies."

4          But after that point I haven't -- I haven't heard from

5   them anymore.  I don't -- I don't have that phone anymore, that

6   number or anything else and stuff since -- since that time.

7   Q.   Okay.  Taking you back to that incident in connection with

8   him breaking into his own home, did he ever ask you for any

9   assistance with that legal situation?

10  A.   Not there.  He knew I didn't have anything else left.

11  Q.   And how did he know that?

12  A.   I told him.  I said there's -- there's nothing else.

13  I can't borrow any more.  I can't sell anything else.  I'm going

14  to keep my place and stuff.  But I said I can't send you anything

15  else.

16  Q.   And when you said I can't borrow any more, had you -- at the

17  time that he was in -- back in Louisiana had you already borrowed

18  money from friends to send to him?

19  A.   Yes.

20  Q.   About how much?

21  A.   About 17,000.

22  Q.   Was that some of the cash that you sent with the laptops to

23  Malaysia?

24  A.   Probably so, yes.

25  Q.   And what was his reaction when you said I can't send you any

1    more money?

2    A.    He said, "Well, you can get your money when I get home."

3    But I said, "I mean, we've gone through all these steps and you

4    haven't been able to get here."

5              And then whenever the Covid hit I thought --

6    whenever the -- when the nurse said that he was in really bad

7    shape and then I told them there's nothing that I can do, she

8    said, "Well, you're just going to let him die?"  And I said, "I

9    don't have a choice in that.  God has got that choice.  If He

10   takes him He takes him."  But I said, "There's nothing else that

11   I can personally do for him.  I've done everything that I could

12   do to get you to safe ground and home and it hasn't worked.  So I

13   don't -- I don't know what else I can do and I can't tell you

14   anything else."

15   Q.    And did you ever met Mr. Gehrig in person?

16   A.    No.

17   Q.    Why not?

18   A.    Because he went straight from his hometown there in south

19   Louisiana to the flight to Malaysia and I never got -- he was

20   supposed to come into the Shreveport airport and I'd pick him up,

21   which he never showed up.

22   Q.    Do you remember why he told you that he ultimately didn't

23   come to Shreveport on that day?

24   A.    That's when he was -- that's when he was detained in

25   Maryland and stuff.  The flight -- I guess, you know, you're

```
 1   supposed to go from different states and change planes or
 2   something or another.  But I didn't have the -- what do you call
 3   it -- itinerary and stuff with the different planes and stuff.
 4   But he got detained there for some paperwork that wasn't in order
 5   or he didn't have, to my -- what he had told me.
 6   Q.   And that is why he wasn't able to meet you there?
 7   A.   Yes, ma'am.
 8   Q.   Did he -- Mr. Gehrig ever ask you to use your bank account
 9   to receive money on his behalf?
10   A.   Yes.
11   Q.   Can you tell the jury a little history about that?
12   A.   He said it was for a job he had completed already before he
13   went to Malaysia that people owed him and they were paying him
14   back is what he told me.
15   Q.   And why did he need to use your bank account?
16   A.   Because he didn't have a bank account over there in Malaysia
17   that he could use and do wires out.  And then after he sent the
18   wire in they -- he had a partner -- and I think his name is on
19   some of that document in there too -- that -- the one that was
20   going to Texas, I believe, was his -- some family member that he
21   owed.  I guess they had helped him get to Malaysia.  I don't
22   really know the prior things that he need -- that he was getting
23   the money for.  But as far as keeping any money for myself, I
24   just took that in and sent it to who they told me that needed it
25   and stuff.
```

1  Q.   And when you said who they told me needed it, was it

2  Mr. Gehrig who told you who to send money to?

3  A.   Yes.

4  Q.   Do you remember --

5  A.   I'm assuming that he's the one that sent the address and the

6  names too.  It could have been the other gentleman.  I don't

7  know, because they had access to his phone.

8  Q.   So he would text you the name of the person -- the

9  beneficiary for the wire money?

10  A.   Yes, ma'am.

11  Q.   Did he tell you who to expect the money coming in from?

12  A.   He just said it was a company that owed him money from a

13  past job, but I don't -- I don't remember him telling me the name

14  of the company.

15  Q.   Where do you bank?  What's your bank?

16  A.   Right now I'm with B1Bank and then I have another one with

17  Gibsland Bank.

18  Q.   Did you ever bank at Regions Bank?

19  A.   Yes, and I worked there for 19 years.

20  Q.   Okay.  What did you do for them?

21  A.   I was a bank teller.

22  Q.   Okay.  If I could have you flip in the binder in front of

23  you to Tab 140, please.

24  A.   You said where?

25  Q.   I'm sorry, in the binder.

1  A.    In the binder.  140?

2  Q.    Yes.

3  A.    Yes.

4  Q.    Do you recognize Exhibit 140?

5  A.    Yes.

6  Q.    What is it?

7  A.    That's my bank account.

8  Q.    From which bank?

9  A.    From Regions.

10  Q.    At this -- is it your name on the account there?

11  A.    Yes.

12        MS. LYONS:  At this time, Your Honor, pursuant to our

13  902.11 notice and agreement of the parties as well as

14  authentication by this witness we offer Government's Exhibit 140.

15        MR. BUNCH:  No objection, Your Honor.

16        THE COURT:  It's admitted.

17        MS. LYONS:  If we could publish Exhibit 140 on the

18  screen, please.  And specifically if we could go to page 11 of

19  Exhibit 140.

20  Q.    (BY MS. LYONS)  Ms. Spurlock, do you recognize this as being

21  a statement from August 16th, 2017 through September 13th, 2017?

22  A.    You said page 11 of this one?

23  Q.    Oh, yeah, page 11 or it's on the screen right down to

24  your --

25  A.    Oh, yes.

```
 1   Q.   And this is from your Regions bank account?

 2   A.   Yes, ma'am.

 3   Q.   And if you'll look with me under the summary it looks like

 4   for that month your beginning balance was about $10, right?

 5   A.   Yes.

 6   Q.   And the deposits -- so the money that your account received

 7   that month -- was $133,000 -- $133,586.

 8   A.   Yes.

 9   Q.   That's a lot of money.  And that was a lot of money to your

10   account, right?

11   A.   (Witness nods head.)

12   Q.   Is this the time you received the money on behalf of

13   Mr. Gehrig?

14   A.   Yes.

15        MS. LYONS:  If we could zoom out --

16   A.   I'm thinking it was two different wires.  I don't think it

17   was one.  I can't remember for sure.

18   Q.   (BY MS. LYONS)  Let's look on -- let's see -- the deposits

19   there.  Yeah, on 8-30 it says, "Wire transfer Gemini Fund."  Does

20   that name mean anything to you?

21   A.   No, ma'am.

22   Q.   So you didn't -- you've never worked with the Gemini Fund?

23   A.   No.

24   Q.   Do you think this is the fund that -- or the business that

25   Mr. Gehrig worked for that he told you to expect the money from?
```

1    A.    Possibly.

2    Q.    And it looks like two transactions there for -- one for

3    $92,000 and the other for $39,000?

4    A.    Correct.

5    Q.    Were you involved in any business yourself with the

6    Gemini Fund?

7    A.    No, ma'am.

8    Q.    Do you know any reason why they would pay you that much

9    money?

10    A.    No.

11    Q.    And so had you consented to Mr. Gehrig that he could use

12    your account information to receive this money?

13    A.    Yes.

14    Q.    Okay.

15          MS. LYONS:  And if we can zoom out now, please, and

16    look at the withdrawals.

17    Q.    (BY MS. LYONS)  On 8-31 do you see with me wire transfer to

18    Syed M. Raza?

19    A.    Yes.

20    Q.    Who is Syed Raza?

21    A.    I have no idea.

22    Q.    Why did you transfer $62,000 to that person?

23    A.    That was the money that -- that Timothy had told me he

24    needed to get to these people and the funds that had supposedly

25    been received for a job.  And I don't know if he was paying

1    somebody else.  I don't -- I don't have any idea.  Like I said,

2    I don't know any of the ones that I sent to or sent -- or that it

3    came from.  I was doing it for -- to help him, because he said he

4    couldn't get it done over there in Malaysia.

5    Q.    So who gave you the name Syed Raza?

6    A.    Timothy did.

7    Q.    And did he give you the account information as well?

8    A.    He gave me everything.

9    Q.    Was that via text message?

10   A.    Probably so.

11   Q.    You mentioned that there was a second person, like an

12   associate of Timothy Gehrig that you spoke with.

13   A.    Yes.

14   Q.    Who was that?

15   A.    Kenneth something, but I can't remember -- I can't remember

16   the last name.  I had -- he had sent a copy of his driver's

17   license, which I believe was Oklahoma and I had written all the

18   information down.  I also had gave it to the FBI agent, Mike

19   Stimpe (phonetic), all that with him too.

20   Q.    So Timothy himself -- Timothy sent the picture of Kenneth's

21   I.D. or did Kenneth correspond with you separately?

22   A.    It come from -- as far as I know it came from Timothy.  It

23   could have come from him, because I think they used the same

24   phone.

25   Q.    Okay.  And what did you know about Kenneth?

```
1   A.    Nothing.

2   Q.    Just that he was an associate with --

3   A.    Right, --

4   Q.    -- Timothy?

5   A.    -- that went over there.  Like a co-partner, I think, is

6   what they were.

7   Q.    Okay.  And were you working at the time that you were --

8          MS. LYONS:  I guess let's look back at the deposits, if

9   we could zoom in on that.

10  Q.    (BY MS LYONS)  It looks like there are a couple of sources

11  of money coming into this account, so the top one I see is "SSA

12  Treasury."  What's that?

13  A.    Social Security for my widow's benefit.

14  Q.    And then underneath I see "RAR" --

15  A.    Rite Aid Corporation, a pharmacy that I worked at.

16  Q.    And it says "payroll," so that's your check coming in --

17  A.    Yes.

18  Q.    -- or your paycheck.

19  A.    Yes.

20  Q.    Okay.  And then the other money, "LA Carp Pension"?

21  A.    My husband that passed away he had a pension fund and stuff,

22  so when he died I get that 108 a month.

23  Q.    And then we have another paycheck deposited and then the two

24  wires for that month; is that right?

25  A.    Yes, ma'am.
```

1 Q. Okay.  So when Mr. Gehrig, Timothy, sent you this money, did

2 he ever talk to you about paying you for helping him do this?

3 A. He said whenever he got home to me that it would all be

4 taken care of.

5 Q. Did he tell you that you could keep any portion of the wire

6 transfers that had come in?

7 A. He said if I needed to use a little bit that I could, but I

8 used my own money and stuff.  I didn't -- I just sent what he

9 wanted me to send out to whom he wanted it sent.

10 Q. Do you remember taking him up on that offer and using just a

11 little bit of the money that he had sent?

12 A. I don't -- I don't think that I used hardly any of that

13 money unless it was just necessary to pay a bill or something.

14 It wasn't -- I'm not an extravagant person and to go and just

15 spend money.

16 Q. And overall -- between the money that you had sent him and

17 any of the money that you might have used that he had sent you,

18 overall did you profit from this or not?

19 A. No, ma'am.

20    MS. LYONS:  Okay.  If we could look at page 12, please.

21 And on 9-5, if we could highlight that there, wire transfer

22 emblem.

23 Q. (BY MS. LYONS)  It looks like, Ms. Spurlock, on September

24 5th you transferred $27,000 -- sorry, backward.  You had it.

25 $27,000 to an account in the name of Imbrum.  Does that mean

1   anything to you?

2   A.    That's is one that Timothy had gave me too.

3   Q.    So that was just a couple of days after the other transfer

4   that you made out of the account, right?

5   A.    Yes.

6   Q.    Did you know what the wire was for?

7   A.    No.

8   Q.    Do you think he might have told you the reason at the time

9   and you just don't remember or did he not really discuss that

10  with you?

11  A.    I don't remember him telling me what it was for.

12  Q.    On -- if we could zoom out and go down a little bit on

13  September 8th, there's a wire transfer to it looks like Alireza

14  Saleka of $38,000.  Do you know who that is?

15  A.    No.

16  Q.    Is that another name that Mr. Gehrig gave you?

17  A.    Yes.

18  Q.    And then if we look -- if we stay where we are there zoomed

19  in and we see on 9-8, September 8th, there's an ATM withdrawal in

20  it looks like Minden, Louisiana.  Is that the town that you live

21  in?

22  A.    Yes.

23  Q.    Do you think that might have been a time that you did need

24  some of the money out of the account and you withdrew it?

25  A.    It's possible.

1 Q.   Did you ever take cash out of your account from the money

2 that Mr. Gehrig had sent you and do anything with it besides

3 these wires that we've discussed?

4 A.   No, ma'am.

5 Q.   Okay.  I want to circle back, because I've got the documents

6 in front of me now for the -- or I've got information about the

7 laptops.  Did you send these -- the laptops via FedEx?

8 A.   Yes.

9 Q.   And you said that you sent one laptop at a time?

10 A.   Yes, ma'am.

11 Q.   And did you keep receipts for when you mailed it via FedEx?

12 A.   I thought I kept them.  That may have been some of the

13 paperwork that I haven't come across yet when I was going through

14 the boxes or it could have been something that the mice had got

15 into and tore up.  I can't truly say that I -- I can't find them

16 somewhere, but I just haven't got to that part.  I don't keep

17 real good records that way.

18 Q.   If you were to go through the records that you did find,

19 though, and count up the receipts of the FedEx packages that you

20 did, would that remind you of how many different laptops you

21 sent?

22 A.   Probably, but, like I say, I'm thinking it was like five.

23         MS. LYONS:  Your Honor, may I approach the witness?

24         THE COURT:  Yes.

25 Q.   (BY MS. LYONS)  Ms. Spurlock, if you can look at that

1  document in front of you and not read anything from it, but just

2  count through the receipts and see if that reflects -- refreshes

3  your recollection about how many packages you sent.  And you can

4  tell me when you're done.

5  A.    Two, three, four -- it looks to be about seven, I guess, or

6  eight that I sent.

7  Q.    And you remember sending about that many laptops?

8  A.    I guess I did, but I just didn't remember how many.

9  Q.    Okay.  When was the last time that you had contact with

10  Mr. Gehrig or one of his associates?

11  A.    In 2020 whenever the -- Covid and that's the last contact.

12  Q.    Did you talk to him while he was in the hospital with Covid

13  or someone else?

14  A.    I talked with him at one point and stuff, but then the last

15  talk was with the nurse or a travel nurse that said he was so bad

16  that he hadn't recovered from it, that he needed another -- the

17  breathing machine that they needed and stuff.  And I told her

18  there's nothing -- there's nothing else I can do to help.

19  Q.    And do you know if he survived Covid?

20  A.    I have no idea.

21  Q.    You've never heard from him since?

22  A.    No, ma'am.

23  Q.    Okay.  Sitting here today do you have an idea of how much of

24  your own money that you sent to Mr. Gehrig over the years?

25  A.    With what I borrowed and stuff from loan companies and stuff

1    it's got to be in excess of probably 50 or $60,000.

2    Q.    So we had talked about that you had borrowed money from a

3    friend, but did you obtain loans from banks as well?

4    A.    I refinanced some things to get money and stuff.

5    Q.    Okay.  And so you mentioned that you had also sold some

6    property at one point to get additional money?

7    A.    Yes.

8    Q.    And you sent your Social Security money too?

9    A.    (Witness nods head.)

10   Q.    And some of your 401(k)?

11   A.    Huh?

12   Q.    Some of your 401(k)?

13   A.    (Witness nods head.)

14   Q.    Did you have penalties for taking money out your 401(k)?

15   A.    Yes, and I had taxes I had to pay on that too.

16   Q.    When you said that you refinanced some things, did you

17   refinance your home?

18   A.    No, because it was in both my husband and my name.

19   Q.    Okay.

20   A.    It's just I would borrow and I'd pay back and stuff and get

21   enough that I could borrow a little bit more.

22   Q.    Did any friends help you other than the one friend with the

23   17,000?

24   A.    Yes.

25   Q.    How so?

```
 1   A.    I asked if I could borrow to help someone, --

 2   Q.    Okay.

 3   A.    -- that I was in need.

 4   Q.    How many other friends --

 5   A.    I didn't tell them -- I didn't tell them who it was for.

 6   Q.    How many different friends did you borrow from?

 7   A.    Three.

 8   Q.    And did you ever sell --

 9   A.    I've been -- I've been paying some of them back a little

10   along too.  So some of that money that I taken out like at the

11   ATM and stuff I would -- when I would get ahead I would give it

12   to them to get them kind of paid back, so I'm trying to do

13   what -- the best I can.  I told them -- I told a couple of them,

14   they knew the situation, what I had been put under.

15   Q.    What was their reaction when you told them about your

16   situation?

17   A.    They were kind of horrified that somebody would do that and

18   I was too.

19   Q.    Uh-huh.  Are you still living in your -- in the same home

20   that you were?

21   A.    Yes.

22   Q.    Okay.  And have you had to refinance or obtain any reverse

23   mortgages or anything against your home?

24   A.    I didn't.  It went up for a sheriff's sale and a friend of

25   mine had paid it and stuff so it wouldn't -- it wouldn't go --
```

1    where I'd have a place to live.

2    Q.   And was it going to be sold because you weren't able to make

3    the payment?

4    A.   Yes.

5    Q.   Is that because you had sent the money to Mr. Gehrig?

6    A.   Yeah, because I was sending it to him rather than taking

7    care of all my business that I needed to take care of.

8    Q.   And we've talked now about the financial impact of this on

9    you.  How did the relationship affect you emotionally?

10   A.   Well, I wound up losing a job and I spent about two weeks in

11   a mental facility.  They thought I was going to have a breakdown

12   or do an overdose or something, I guess.  But the experience in

13   that facility hurt me worse than just about anything.

14   Q.   And did you go to the facility because of the relationship

15   with Mr. Gehrig?

16   A.   Well, some friends, they were afraid that I would do

17   something to myself, because I had gotten so depressed and stuff.

18   And they -- I didn't even know that's where I was going.  And

19   they went and signed me in there and I was there for about two

20   weeks, I think.

21   Q.   Do you remember what year that was?  Sometime in the last

22   five years?

23   A.   It was after -- I really don't know the -- I don't know the

24   year it was.  It was probably after all this -- these here went

25   out and he didn't fulfill the promises that he made.

```
 1              MS. LYONS:  Thank you.  Pass the witness.

 2

 3

 4                      CROSS-EXAMINATION

 5   BY MR. BUNCH:

 6   Q.   Good morning.

 7   A.   Good morning.

 8   Q.   I want to ask you a little bit about the Regions Bank

 9   account that the Government was just talking with you about.

10   Okay?

11   A.   Yes.

12   Q.   Into that account you received some pretty substantial

13   wires, correct?

14   A.   Yes.

15   Q.   And those were at the direction of Mr. Gehrig, correct?

16   A.   Correct.

17   Q.   And when those went into your account you were directed by

18   him to forward some portion of that to someone else, correct?

19   A.   Yes.

20   Q.   Okay.  And you said that some of the money you used to pay

21   some bills or -- or --

22   A.   He told me I could use up to a thousand dollars of it, but I

23   don't think I ever used a full thousand.  It was only to pay on

24   some of the bills and stuff that I had.

25   Q.   Okay.  But you did use some of that money?
```

```
 1  A.    Yeah.
 2  Q.    And the rest you sent on as directed to --
 3  A.    Yes.
 4  Q.    -- whatever recipient he told you to send it to?
 5  A.    Yes, sir.
 6            MR. BUNCH:  I'll pass the witness.
 7                    REDIRECT EXAMINATION
 8  BY MS. LYONS:
 9  Q.    Just one quick question, Ms. Spurlock.  When you said that
10  your home was a share sale -- is what you said?
11  A.    It was going to a sheriff's sale.
12            MR. BUNCH:  Object that it goes beyond the scope.
13            THE COURT:  Sustained.
14  Q.    (BY MS. LYONS)  Ms. Spurlock, when Mr. Bunch asked you about
15  the transactions that you did on behalf of Mr. Gehrig, was it
16  always Mr. Gehrig that was providing you the information or do
17  you think it was coming from his associate as well?
18  A.    It could have been coming from his associate too.  I really
19  don't know.
20  Q.    Are those the only two people that you know of that had
21  access to that phone from Mr. Gehrig?
22  A.    Yes, ma'am.  That's the only one that I knew of.
23  Q.    And is that -- so his phone or the number that you
24  associated with him was the only source of that information about
25  people?
```

```
 1   A.    Yes, ma'am.
 2             MS. LYONS:  No further questions.
 3             MR. BUNCH:  Nothing further, Your Honor.
 4             THE COURT:  Thank you ma'am.  You may step down.
 5             THE WITNESS:  Do I need --
 6             THE COURT:  You can just leave those there.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1      I, Jeff L. Foster, United States Court Reporter for the

2  United States District Court in and for the Northern District of

3  Texas, Dallas Division, hereby certify that the above and

4  foregoing contains a true and correct transcription of the

5  proceedings in the above entitled and numbered cause.

6      WITNESS MY HAND on this 12th day of April, 2024

7

8

9

10                         /s/ Jeff L. Foster_____
                           JEFF L. FOSTER, RMR, CRR
11                         United States Court Reporter
                           1100 Commerce St., Room 1504
12                         Dallas, Texas 75242
                           (214) 753-2349
13

14

15

16

17

18

19

20

21

22

23

24

25