IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 3:21-cr-435-N |
|       PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | DALLAS, TEXAS |
| | ) | |
| IJEOMA OKORO, | ) | |
|       DEFENDANT. | ) | March 18, 2024 |

**TRANSCRIPT OF SENTENCING HEARING**

**BEFORE THE HONORABLE DAVID C. GODBEY**

**UNITED STATES DISTRICT JUDGE**

A P P E A R A N C E S:

FOR THE PLAINTIFF:　　　　**MS. MARY F. WALTERS**
　　　　　　　　　　　　　**MS. JENNA DANELLE RUDOFF**
　　　　　　　　　　　　　UNITED STATES ATTORNEY'S OFFICE
　　　　　　　　　　　　　NORTHERN DISTRICT OF TEXAS
　　　　　　　　　　　　　1100 Commerce Street
　　　　　　　　　　　　　Third Floor
　　　　　　　　　　　　　Dallas, Texas 75242
　　　　　　　　　　　　　mary.walters@usdoj.gov
　　　　　　　　　　　　　jenna.rudoff@usdoj.gov
　　　　　　　　　　　　　(214) 659-8664

```
 1   FOR THE DEFENDANT:          MR. DOYLE RAYMOND BUNCH, III
                                 BURLESON, PATE & GIBSON, LLP
 2                               900 Jackson Street, Suite 330
                                  Dallas, Texas 75202
 3                               tbunch@bp-g.com
                                 (214) 871-7543
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19   COURT REPORTER:            MR. JEFF L. FOSTER, RMR, CRR
                                 United States Court Reporter
20                               1100 Commerce St., Room 1504
                                 Dallas, Texas 75242
21                               jeff_foster@txnd.uscourts.gov
                                 (214) 753-2349
22

23

24        Proceedings reported by mechanical stenography and

25   transcript produced by computer.
```

```
 1              SENTENCING HEARING -- MARCH 18, 2024

 2                   P R O C E E D I N G S

 3          THE COURT:  And are we ready to proceed now

 4   sentencing of Defendant Okoro?

 5          (Pause.)

 6          MR. BUNCH:  Defense is ready, Your Honor.

 7          THE COURT:  All right.  Mr. Bunch, if I could ask you,

 8   please, to confirm for me that you've had an opportunity to

 9   review the presentence report and the addendum and have gone over

10   those with your client?

11          MR. BUNCH:  I have, Your Honor.

12          THE COURT:  And there were also some filings I want to

13   say Friday by the Government.  Have you had a chance to see those

14   as well?

15          MR. BUNCH:  I have, Your Honor.

16          THE COURT:  All right.  Then I should tell you I'm

17   inclined to sustain the Government's objection about obstruction

18   based on what I've read, though certainly I'll wait until I hear

19   from you.

20          MR. BUNCH:  Yes, Your Honor.

21          THE COURT:  That said, I'm ready to listen to whatever

22   the defense would care to present.

23          MR. BUNCH:  Yes, Your Honor, and having observed the

24   previous sentencing, would the Court like for me to address both

25   the objections and the reasons for variance at the same time?
```

```
 1              THE COURT:  Yes.
 2              MR. BUNCH:  Thank you, Your Honor.  Starting --
 3   beginning with the objections, as to the overall relevant conduct
 4   pertaining to several Government objections, including objection
 5   one where the addendum states relevant conduct extended until
 6   February 2019, and it also pertains to defense objection one, I
 7   would point the Court to U.S. vs. Ortiz.  In that case the
 8   evidence revealed a significant marijuana trafficking operation
 9   for which Ortiz had central responsibility.
10              It also revealed a separately packaged, separately
11   delivered quantity of cocaine in a suitcase, which the direct
12   evidence connected to someone else.  Only speculation based on
13   primarily the proximity of the cocaine's container connected the
14   cocaine to Ortiz.  This is not evidence that cocaine and
15   marijuana were joined in an episode spree or ongoing series of
16   offenses.  Similarly -- and that's U.S. vs. Ortiz, 613 F.3rd 550
17   at 558 and 559, Fifth Circuit 2010.
18              Your Honor, I wanted to point that case out to the
19   Court and suggest -- submit to the Court that it is analogous to
20   some of the relevant conduct that the Government has proposed in
21   this case, but we'll rest primarily on the written materials
22   without going any further on that.
23              As to objections 12, objections 13, some of the other
24   objections, the Government objected under objection 12 -- their
25   objection 12 that -- and by the way, this is an objection to
```

1   paragraph 63, which is the third of three paragraphs contained in

2   part C of the presentence report entitled "Offender

3   Characteristics."  This is not entitled "Offender Travel," it's

4   not entitled "Offender Vacations."  This is an objection about

5   the statement in paragraph 63 from the Government where the

6   Government -- where the PSR states that Ms. Okoro last entered

7   the country on September 4th, 2013.

8           That is true in that that is the last time she entered

9   as not a resident of the United States.  She was no longer a

10  visitor and so, therefore, she was not -- when she went on trips

11  abroad she was not reentering the United States for immigration

12  purposes, she was returning home.  She was -- when she went --

13  for instance, the Government submitted a log -- a travel log of

14  where she went.  When she flew into Frankfurt, Germany she was

15  entering Germany, but when she flew home she was returning to her

16  residence.

17          So I don't -- I don't see a need and I don't know why

18  this is significant to the Court's sentencing.  I don't know why

19  it's worth an objection.  But, yes, she did take 12 trips, but I

20  mean, this is not -- this is under offender characteristics.

21  This about her general movements when she -- when she entered and

22  became a resident.

23          Further, objection 13, it's talking about -- it's an

24  objection the Government made about unemployment benefits and

25  PPP.  And as to the unemployment benefits there -- apparently the

1    probation officer in the presentence report recorded that

2    Ms. Okoro denied ever receiving unemployment benefits.

3            I was present in that interview.  I do not -- I do not

4    recall that.  If it was said I -- maybe I missed it.  I don't --

5    I don't know.  But I didn't hear it and I did not record it in my

6    notes that Ms. Okoro responded in her presentence interview that

7    she never received unemployment.  I'm speculating, but I believe

8    that Ms. Okoro might have thought she was answering if she was

9    currently receiving any federal benefits or state benefits.  I

10   don't know.

11           But I do know I would never allow her to state nor do I

12   believe that she would state affirmatively that she's never

13   received unemployment benefits, because of the evidence presented

14   at trial.  I mean, she was unemployed legitimately for a time and

15   received some benefits.  So to that degree, you know, we agree.

16           As to the defense objections, we'd stand on the written

17   materials for objection number one.  As to objection number

18   two -- and this somewhat applies to the -- tied into the variance

19   argument, but in objection number two I'm going to submit to the

20   Court that David Animashaun in this case was a ringleader.

21   That's what the evidence at trial showed.

22           He said he started scamming at trial in late 2016,

23   early 2017.  But the memorandum of interview that was submitted

24   with sentencing materials states that Animashaun had

25   previously -- Moses stated in that interview that Animashaun had

1    previously been arrested for scamming in Malaysia.  Now, this

2    didn't come into trial, the Government objected and the Court

3    sustained that objection, which maybe it wasn't appropriate at

4    trial, but here at sentencing that's the truth.  That's what

5    their materials say, that -- that Moses had knowledge that

6    Animashaun had been arrested previously in Malaysia.  And then

7    that Animashaun convinced Moses to come to North Texas and begin

8    scamming people.

9         And Mr. Moses came in here too and he said -- he said,

10   you know, I started in late 2016, early 2017, just like

11   Animashaun.  But then there's all these checks and Government

12   exhibits.  There are checks and plane receipts and things of

13   that -- flight -- flight plans, things of that nature that he had

14   used earlier in 20 -- as early as March 2016 to scam other

15   people.  He came in here and told you that Okoro and Animashaun

16   introduced him to scamming and that's just not true.

17        The Government is aware of this arrest in Malaysia.

18   They're aware of this report by Moses.  And I would submit to the

19   Court that if David Animashaun was the party who took this case

20   to trial, that memorandum of interview would be absolute gospel

21   in this court.  It would be the best evidence ever presented.

22   But that's not what they're arguing.  They're trying to gloss

23   over it.

24        Furthermore as to David, David had a roommate prior to

25   meeting Ms. Okoro and prior to Mr. Moses being here by the name

1     of Deji, who later we found out was involved in a scam with an

2     Antranette Gibbons involving TIAA.  This is a roommate of David

3     prior to Moses and prior to Okoro being there that was

4     established in trial.

5            Another MOI that's referenced in the Government's

6     objections -- contrary facts are referenced in the Government's

7     objections.  This other MOI, Animashaun states -- and it was

8     taken by Luke Ingert, special agent.  The report was written on

9     September 27, 2023, but the interview was conducted on June 29th,

10    2023 with David Animashaun at the U.S. Attorney's Office here in

11    this building where he stated he did not use his personal bank

12    account to move romance money through.

13           So in their objections the Government states Animashaun

14    had -- or Okoro had knowledge that Animashaun had a bank account.

15    Well, he's -- he's telling the Government that he didn't use his

16    own bank account.  Is it that improbable that he told Ms. Okoro

17    he didn't have a bank account and she needed to open a bank

18    account?  And then later she discovered that some of the -- that

19    this money was fishy?

20           That's consistent with the jury's view of the case.  In

21    a jury note the jury said -- the jury asked if the Defendant

22    didn't know the source of the funds, didn't know about the scam,

23    but suspected or assumed the funds were the result of illegal

24    activity, is this still part of the scam?

25           They gave credibility to the fact that Mr. Animashaun

1  was likely the leader of this conspiracy.  Mr. Animashaun, if the

2  Court recalls, had a bank account at Fifth Third Bank.  The only

3  other time we heard about that bank in this trial was from Jill

4  Sobol-Kerst, the first victim who testified.

5       Your Honor, as to a mitigating role in this case, I

6  think the trial of this case established that Ms. Okoro was a

7  lesser party to this conspiracy.  She had no criminal record when

8  she came -- when she met David Animashaun.  She had never been

9  arrested for anything.  I don't think she had ever received a

10  ticket.  She was -- she had -- and before I get into the variance

11  factors, I do want to point the Court's attention to the family

12  members that are in the courtroom.

13       We have a cousin Acuna Ihemere, Marian Ihemere,

14  Gabrielle Ihemere, Ekeoma Cooper, an aunt, and Glory Okoro, her

15  mother.  All the first three that I named -- people that I named

16  were cousins.

17       As mentioned moments ago prior to this matter pending

18  before this honorable court Ms. Okoro had never before been

19  charged with a crime or any violation of the laws.  Ms. Okoro

20  grew up in Lagos, Nigeria.  She was raised by both parents until

21  the age of 12 when her parents separated.

22       Sometime after that Ms. -- shortly after that

23  Ms. Okoro's mother immigrated to the United States with her

24  brother, and soon after that Ms. Okoro came over unaccompanied as

25  an immigrant to live here in the United States at the age of 15.

1        As a new immigrant to the United States Ms. Okoro

2   describes her experience -- her initial experience as a cultural

3   shock.  Her mother, Glory Okoro, had to work multiple jobs to

4   support her newly immigrated family, and Ms. Okoro set out to use

5   the new opportunities that her newly adopted nation could provide

6   and immersed herself in educational pursuits, first graduating

7   high school and then enrolling in L.A. Southwest College.

8   Ms. Okoro then continued her education by transferring to the

9   University of California Bakersfield where she earned a degree in

10  public administration.

11       Now, in Ms. Okoro's letter that she provided to the

12  Court she describes the ordeal she had to endure to get through

13  college and the obstacles that she faced.

14       The presentence report lists Ms. Okoro's Bachelor's

15  degree as unverified, but Government's Trial Exhibit 121 contains

16  an official transcript of Ms. Okoro's undergraduate studies at

17  UC Bakersfield.  Ms. Okoro graduated after an ordeal that's

18  described in her letter where financial aid, in-state tuition

19  status, things of that nature interfered greatly, caused her

20  great difficulty, and she had to take several classes -- a year

21  of classes over again, but she persisted and she finished her

22  degree.

23       In Ms. -- let's see.  The presentence report lists --

24  I'm sorry.  During her working career Ms. Okoro largely remained

25  employed at multiple jobs and that ended in employment at KPMG,

1  which was terminated by the indictment of this case.  But from an

2  unaccompanied immigrant at 15 coming to this country, graduating

3  high school, assimilating to the culture, getting a job, working

4  productively, she did this for many years.  She had no -- no

5  issues with the law.  She had no issues with any of that.

6       Letters of support have been filed in this case.  The

7  letters describe a kind, hard working and cherished family

8  member.  In her letter of support her mother, Glory Okoro, states

9  that Ijeoma Okoro is a first time offender who veered off the

10  path of righteousness.

11       Further the letters paint a picture of a person who

12  came to the United States with very little and through hard work

13  and dedication and community support was able to achieve

14  educational success and wind up working at a national accounting

15  firm.

16       According to Glory Okoro, Ijeoma has exemplified the

17  qualities of a responsible daughter, a university graduate, who

18  worked tirelessly to attain her academic goals, a diligent

19  employee who has contributed to her community.

20       Further, Glory Okoro in her letters describes the pride

21  she feels in witnessing Ms. Okoro's transformation into a

22  compassionate and hard working individual, always guided by

23  integrity and a sense of duty to her family.

24       Ms. Okoro, Glory Okoro, goes on to state that she

25  strongly believes that Ijeoma is remorseful for her mistake and

1    is determined to make amends not only for herself, but for her

2    young son, who relies on her love and guidance.

3           In addition to the qualities described previously

4    Ms. Okoro is diligent and hard working and has goals for herself

5    that she is pursuing.

6           According to the presentence report and according to

7    her statements to me Ms. Okoro would like to continue her

8    education and complete the nursing program she started several

9    years ago until the educational institution she was attending

10   closed as a result of the Covid pandemic.

11          When examining all these sentencing materials and the

12   trial testimony, sentencing letters, presentence report, it's

13   evident that Ms. Okoro has primarily lived a productive and

14   meaningful life aside from her activities that have led to her

15   conviction in this case.  In fact, there was no indication during

16   trial or otherwise that Ms. Okoro was in any way involved in

17   criminal activity prior to becoming associated with Co-defendant

18   David Animashaun.

19          According to trial testimony and the presentence report

20   Okoro and Animashaun met at a church they were attending at the

21   time.  Ms. Okoro -- Glory Okoro recalls when David Animashaun

22   came to her and expressed his intention to marry Ijeoma.  Glory

23   stated that she felt the relationship was abnormal because David

24   Animashaun was from the Yoruba tribe of Nigeria and Ijeoma is

25   from the Igbo tribe of Nigeria and generally, culturally,

1   according to Glory Okoro and common knowledge, the two tribes

2   generally do not intermarry.

3          The trial testimony established that as previously

4   mentioned Animashaun traveled through Malaysia prior to entering

5   the United States.  Further trial evidence suggested that

6   Animashaun was instrumental in setting up fraud operations in

7   North Texas and recruiting others to commit fraud and launder

8   money.

9          According to the memorandum of interview by Mr. Moses,

10  which took place on July 20th, 2023 and has been filed in the

11  sentencing materials of this case, Moses first came to the U.S.

12  in 2014 from Malaysia, he came back in 2015 and stayed.  Moses

13  met Animashaun through Moses' brother.  Moses moved to Dallas

14  because he knew Animashaun.

15         Animashaun introduced Moses to scams and taught him how

16  to look online, communicate and induce victims to send money.

17  Animashaun was arrested for a scam once before when he lived in

18  Malaysia.

19         The Government doesn't want these negative facts I

20  would submit about Mr. Animashaun and Mr. Moses to be true.  But

21  those people, Moses and Animashaun, are both more culpable --

22  significantly more culpable than Ms. Okoro.

23         Mr. Animashaun, though he received a short sentence in

24  this case, was a ringleader.  The victims deserve to know that.

25  The victims deserve the truth of who set this up, who recruited

1    Moses and Okoro here.  The victims deserve the truth about that.

2    But the Government wants to punish the person who made them work

3    the hardest, not the person most culpable.  And, Your Honor, I

4    urge you to grant a mitigating role in this case based on that.

5            Ms. Okoro was not involved in any fraud, anything

6    illegal before she met David Animashaun.  There's no evidence of

7    that.

8            As to -- I would like to briefly address before I turn

9    it over to Ms. Okoro herself and if the Court would accommodate

10   one -- one audience speaker?

11           THE COURT:  One.

12           MR. BUNCH:  Before I do that I do want to briefly

13   address the Court's stated intention of applying the obstruction

14   of justice enhancement.

15           The examples -- many of the examples are based on

16   things that I would argue to the Court are liberties that the

17   Government is taking with their view of the evidence.

18           For example, there's a line of questioning mentioned on

19   page 7 in the Government's supplemental objection to the

20   presentence report, paragraph 39, which is the paragraph

21   addressing obstruction of justice where the -- they are stating

22   Ms. Okoro was asked about a payment to Mr. Animashaun.  And it

23   talks about later on in 2018 she had sent him a Zelle payment of

24   $20 and $500.  And they say this contradicts that David

25   Animashaun had a bank account and she should have known all

1    along.  Okay?  But he told the Government that he uses other bank

2    accounts.

3         And just because in 2018 she's sending money to a bank

4    account, that doesn't mean that in 2016, 2017 David Animashaun

5    didn't tell Ms. Okoro, "Hey, I don't have a bank account, I need

6    you to open a bank account for me, because I'm an immigrant."

7    Those two things don't mean that that's a lie.  This was in 2018,

8    she sent a Zelle to a bank account.  She learned at some point

9    that he had a bank account.

10        The next page, page 8.  The Government says that the

11   Defendant claimed that she had not knowingly engaged in fraud.

12   But she acknowledged her bank account was closed due to

13   fraudulent activity.  Well, we heard during trial that Ms. Okoro

14   had testified and the victims had testified that the money had

15   gone through Ms. Okoro's account.  But that doesn't mean she

16   knowingly participated in fraudulent activity at that time.

17   Those two things aren't the same.

18        In addition, under -- on objection two in the

19   Government's -- under the Government's objections there's

20   multiple times where the Government makes factual assertions that

21   just are not true, not supported by the evidence, not supported

22   by what we heard.

23        So when they claim deposits into her accounts

24   significantly exceeded those of Animashaun and Moses, it was

25   greater based on what they presented, but it was not

1   significantly greater.  They all had large amounts of money

2   moving through their accounts.

3            Further, there's an assertion that says unlike other

4   co-conspirators who received funds from only a few victims, Okoro

5   received funds from 16 victims and then they cite presentence

6   report paragraphs 27, 30 and 103.  Well, if you take a look at

7   that, that's not what it says.  That's not what the presentence

8   report says.  The presentence report does say there were 16

9   victims, but it references Okoro and co-defendants.  There are

10  not 16 victims whose money went into Ms. Okoro's account.  And

11  that's -- there's an exhibit on this.  I believe it's Exhibit

12  131.  113.  It's 113, Your Honor.

13           So based on these things I would submit to the Court

14  that the -- the obstruction enhancement should not apply and that

15  a mitigating role should be applied, that, you know -- and as

16  this Court is aware 18 USC 3553 requires this Court to consider

17  the nature and circumstances of the offense, characteristics of

18  the Defendant, need for sentencing imposed to reflect the

19  seriousness of the offense, to promote respect for the law and to

20  provide just punishment for the offense, to afford adequate

21  deterrence to criminal conduct, to protect the public from

22  further crimes of the Defendant, to provide the Defendant with

23  needed educational, vocational, medical care or other

24  correctional treatment in the most effective manner, and need to

25  avoid unwarranted sentence disparities among defendants with

1  similar records -- and I don't know what Animashaun and Moses'

2  records are, but Ms. Okoro has got none -- who have been found

3  guilty of similar conduct.

4          On March 11th, David Animashaun was sentenced to

5  24 months in this case.  Though presumably Mr. Animashaun

6  received a reduction pursuant to 5K of the sentencing guidelines

7  for substantial assistance, his culpability and conduct was much

8  greater than Ms. Okoro's.

9          According to the Government's own witness, Mr. Moses,

10 Animashaun recruited him to act as the fraudulent character

11 George Mike.  Similarly Mr. Moses indicated that Animashaun was

12 the resource for fraud methodology and would recruit other

13 individuals to conduct fraud or launder money.

14          The trial testimony was unmistakable that

15 Mr. Animashaun was a leader and an organizer with respect to the

16 group contained in the incident indictment.  Further, though I do

17 not have exact knowledge of Mr. Animashaun's criminal history,

18 Ms. Okoro has none.

19          Though Ms. Okoro did exercise her right to a jury

20 trial, sentencing Ms. Okoro to a sentence greater than

21 Mr. Animashaun would be a miscarriage of justice and an offense

22 to the -- against the victims in this case.  And would violate

23 the need to avoid unwarranted sentence disparities among

24 defendants with similar records who have been found guilty of

25 similar conduct as stated by 18 USC 3553.6.

 1          Upon her return to society Ms. Okoro will enter a
 2  loving family environment.  Ms. Okoro is highly motivated to
 3  ensure she will never again find herself facing prison time.  In
 4  her letter of support Ms. Ikoh stated that Ms. Okoro will never
 5  put herself, her mother or her child through this again and that
 6  Ms. Okoro has learned a lot from this situation.
 7          Your Honor, we ask that you consider all these things
 8  as well as the statements from Dr. Cooper and Ms. Okoro and
 9  sentence Ms. Okoro to a sentence below the sentencing guidelines.
10  Now, I would ask Ms. Cooper to come up.
11          DR. COOPER:  Good morning, Your Honor.  Thank you so
12  much for allowing me the opportunity to speak on behalf of my
13  niece.
14          When Ms. Okoro moved to Dallas she moved in to stay
15  with me.  I remember the first time I heard about Moses.  The
16  first time I heard about David Animashaun I had told her to
17  invite her -- invite him to the house, because we have a lot of
18  nieces and nephews and cousins that attend school here that I
19  sort of oversee.
20          Part of Ijeoma's issue is the fact that she wants to be
21  married.  When Moses came to the house, what Moses communicated
22  to me was he wanted to marry her.  He was loving to Isaac,
23  Ms. Okoro's son.  She was in nursing school and I.T., the
24  Government includes that school.  So during that period of time I
25  honestly can't tell you what happened.  That's when he entered

1    her life and was able to convince her to move out of the house.

2            My family is in shock and we're sorry for everything

3    that's happened.  But I'm asking you, Your Honor, to please have

4    mercy.  Her biggest issue is wanting to be married.  That was her

5    problem.  She wanted to be a pediatrician.  From wanting to go to

6    a pediatrician who went to something -- she had a year to finish

7    the nursing program and that school closed and this man walked

8    into her life and everything changed.

9            I have been in court.  I don't know if you recognize my

10   face.  I have missed a few of the trial.  But just sitting and

11   just coming to let her know that she's not alone.  She's sorry.

12   I'm just asking you to temper justice with mercy and kindness.

13           We're sorry for all the victims.  I'm telling you when

14   David walked into my house I believed him.  When he said he

15   wanted to marry her, I believed him, but I didn't know he

16   was -- we didn't know it was more.

17           To give my niece another opportunity, she will go back

18   to school.  I believe she'll do better.  I believe she'll do

19   better.  We're asking the Court to please temper justice with

20   mercy.  Thank you so much for allowing me to speak.  I'm

21   grateful.

22           THE COURT:  Thank you, ma'am.

23           THE DEFENDANT:  I would like to start by apologizing to

24   the Court and the Government and the victims that were involved

25   in this case.  I am truly sorry for what my actions have caused

1  to everyone involved.

2          I would also like to apologize to my family, because

3  this whole situation was a shock and a burden to everyone

4  involved in this case.

5          And I just want to quote a few Bible verses.  John 1

6  verse 46, Philip went to his friend Nathanael telling him that

7  they have found Jesus of Nazareth, and Nathanael responded by can

8  anything come out from Nazareth?

9          In my situation can anything come out from me being in

10  Johnson County in jail?  Yes, a lot of good things came out of

11  this process.  Though it was painful, I -- I learned a lot.  I

12  grew closer in my relationship with God.  Not only did I do that,

13  I drew the females around me in my pod to draw closer to God to

14  have this personal relationship with Him.  Because at the end of

15  the day we are just temporary aliens here on earth and we're

16  accountable to God.

17          I'm not the same person that walked in here 24 months

18  ago.  I'm a different person.  And this is not no jailhouse

19  religion, because I did grow up in church and I do love God and I

20  do fear God, but I'm asking for a second chance to be a voice in

21  my community.

22          There's a stigma with Africans and fraud and I truly

23  want to go home and be a voice in my community to let them know

24  that whatever it is you're doing it's not worth it.  It's not

25  worth it.  Not only are you going to bring shame to your family,

```
 1   you're going to lose everything.  Whatever it is, whatever money
 2   that you think you can get real quick, you're going to lose
 3   everything.
 4           And whoever it is that money is stolen from, if that
 5   person fears God and that person prays to God against you, it's
 6   God -- God is going to fight for that person and no can stand
 7   against when God fights.
 8           Above all I want to quote another Bible verse, John 5
 9   verse 14, when Jesus healed a man who had been sick for years he
10   came and said now that you have been made whole, see that you do
11   not go and sin no more.
12           I would not go back to being -- to being with the wrong
13   crowd, because I am accountable to God at the end of the day.
14   And I don't want to sin no more, because the worst thing that
15   will happen from this situation and me going back to sin is
16   eternal separation from God and I don't want that.
17           Being in jail is hell on earth, because I have never
18   been in jail in my whole life and it was a shock.  And then being
19   in Johnson County jail it was horrible.  And I don't want to ever
20   be in that situation where I'm eternally separated from God and
21   burning in hell forever.
22           A known author quoted that no one should be -- no one
23   should be defined based off of a bad decision they have made if
24   they are willing to learn and change from this.  I made a bad
25   decision.  Not only am I willing to learn and change from this, I
```

1    have changed and I do want to be a voice in my community to let

2    them know that it is not -- it is not worth it.  It is not worth

3    it.

4            Even if you think you got away with it from the U.S.

5    Government, you're not going to get away with it from God,

6    because he says that he hates fraud.  And whatever money you get

7    from whatever fraudulent activity is not going to last, because

8    God is going to fight against you.

9            I'm just asking that you temper justice with mercy.

10   James 2 verse 13 says that mercy rejoices against judgment, and

11   I'm just asking today, Your Honor, that you show me mercy, that I

12   can go home and make a change and go home back to my son and go

13   home and be a voice to my community to let them know that it is

14   not worth it, you're going to lose everything.  If you're

15   unfortunate, you might lose a loved one and you cannot go out and

16   be a part of that funeral and it hurts.

17           I'm just asking for a second chance today.  I have

18   learned from my mistake.  I'm asking that you show me mercy, that

19   I can go home and make a difference and I promise you will never

20   see me here.  I'm going to go back to school and finish that

21   nursing degree.  I'm going to integrate I.T. with nursing.  I do

22   want to make a difference not only in my community here in

23   America, I also want to make a difference in my country in

24   Nigeria.  Make a difference in my country.  I'm just asking for

25   mercy today and thank you so much for the opportunity to speak to

1   you.

2          THE COURT:  Thank you, ma'am.

3          MR. BUNCH:  Your Honor, in closing I would just like to

4   remind the Court that the jury in this case deliberated for two

5   days; that this was not -- this was not as close as the

6   Government would like the Court to believe.  And I'm just asking

7   the Court to -- I mean, based on the Government's objections it

8   seems that the Government is arguing that Ms. Okoro has never

9   done an honest thing in her life, that she's been scheming her

10  whole life and that's simply not true, Your Honor.  You heard

11  from the letters, you heard from the family, you heard from

12  Ms. Okoro.  You can read the presentence report and hear the

13  evidence at trial.  That's simply not true.

14         She lived a good life prior to meeting David Animashaun

15  and we just ask for a sentence to reflect her actual role in this

16  case.

17         THE COURT:  What says the Government?

18         MS. WALTERS:  Your Honor, I won't address everything.

19  I will address high points that I think will matter for the

20  record and for clarification of the evidence.

21         With respect to the Government's objections the real

22  reasons that we objected to paragraph 63 in the PSR and 74, 63

23  was with travel, 74 was whether she had ever received any

24  benefits from the Government for unemployment, and she did

25  receive unemployment insurance and she received a PPP loan for

1    which she was forgiven and while on bond in this case.

2          So those are inaccuracies and they don't affect the

3    guideline level, but they do further represent her character.

4    Because she testified at trial, she testified falsely, and then

5    when speaking with probation she still continued to minimize

6    conduct.

7          She owns property in Nigeria.  She has a bank account

8    in Nigeria.  All of that, in addition to saying she's never

9    received any benefits from the Government, go into her ability to

10   pay a fine, also her ability to provide restitution to victims,

11   but furthermore just honesty.  On things that don't even affect

12   the guidelines she can't be honest.  And that is quite

13   problematic and it does not portend well for what she says she

14   will do in the future.

15         When I look at how she got involved in this fraud in

16   January of 2017, we thought that she was involved for a short

17   period of time.  And as the investigation continued, by her own

18   actions she extended the time period of the fraud from July 2017

19   through September of 2019 -- September of 2017 and that was just

20   the romance fraud aspect of it.  And it wasn't someone else, it

21   wasn't David Animashaun, it wasn't Moses, there are victims whose

22   funds continued to go into her account later in 2017.

23         So she wasn't someone who started and stopped.  She was

24   someone who not only continued through the whole conspiracy, she

25   extended it.  But beyond that this was really a springboard to

1    her fraudulent activities, because she continued to receive money

2    in 2018 from two victims who were in Canada, D.Z. and K.Z.  She

3    received $4,400 with another online impostor scam.

4            Then in February of 2019 she really hit the big time by

5    receiving a wire for $140,000 from victim TIAA, who testified at

6    trial.

7            So although her schemes initially and the wires she

8    initially received might be as low as $2,904 received September

9    19th, 2017 from victim A.H., which is noted in Government's

10   Exhibit 113, by February of 2019, as shown in Government's

11   Exhibit 134, she was receiving a $140,000 wire.  That was well

12   after she was no longer connected to David Animashaun.  She was

13   no longer connected to Oluwalobamise Moses.  She was connected to

14   other co-conspirators.

15           And it's also important to recognize -- oh, for record

16   purposes Government's Exhibit 113 does not attempt to show that's

17   all the money Ijeoma Okoro received.  Government's Exhibit 113

18   shows wires that were received into her accounts that were

19   received by indicted co-conspirators.  So that's a subset of the

20   money that went into her accounts.

21           And specifically it does not include wires and

22   cashier's checks she received from two individuals who were the

23   intermediaries between testifying victims Glenda Spurlock, Janet

24   Herald and Linda James.  So what we know from the trial testimony

25   of Special Agent Keeton as well as the victims, three victims

1  sent money to intermediaries D.J. and another unindicted

2  co-conspirator.  That money ended up in Okoro's account in

3  September of 2017.

4          Why this is very significant is because if Ijeoma Okoro

5  says she was only connected to this via David Animashaun or

6  really brought in via Moses, she's actually involving other

7  people in a romance scam that she doesn't tell David Animashaun

8  about or Oluwalobamise Moses about.

9          So the reason it's important, she has a group of people

10  she was indicted with, but she expands beyond that and involves

11  two other people in 2017.

12          Then there are two more unindicted co-conspirators that

13  she acknowledged on direct testimony and cross-examination

14  involved in the TIAA scheme in February of 2019 where she got

15  another $140,000.

16          So Ijeoma Okoro is involved in the scheme online the

17  longest.  She actually knows at least six co-conspirators.

18  That's far more than what we know about other charged

19  individuals.  She also receives money from the most victims.

20  Sometimes the money comes in directly with a wire, sometimes it

21  comes in indirectly via a co-conspirator.  But she received the

22  most money from the most victims over the longest period of time.

23  And that matters significantly in how culpable she is and how she

24  should be held accountable for her actions today.

25          She -- we do want to note Animashaun was not the

1    leader/organizer.  He wasn't found to be a leader/organizer.

2    Probation didn't propose that nor did the Government.  He

3    testified -- he had the opportunity to be cross-examined and he

4    wasn't questioned on assertions that the defense is making here

5    about an arrest in Malaysia.  No one knows if that's true.  No

6    one knows.  Moses said Animashaun was arrested in a foreign

7    country several years ago.  We don't know if that's true or not.

8    And that is one of the reasons that I believe the Court sustained

9    the objection.

10          But beyond that even -- setting aside Animashaun and

11   what his testimony was, Mr. Bunch focused on Moses' memorandum of

12   interview that was attached to Docket No. 450.  Well, if he's

13   going to rely on some statements that Mr. Moses made to the

14   Government in an interview, he must also rely on other statements

15   that Mr. Moses made in that interview.

16          First, he said that Ms. Okoro knew how a romance fraud

17   worked because he had done it -- she had done it before, she

18   talked to victims directly, and she bragged about $30,000 she had

19   scammed and she wanted to buy a house.

20          And what we know from the trial is that she, in fact,

21   bought a house while he was underemployed except for all of these

22   scams.  She managed to achieve the dream that she had by stealing

23   it from her victims.  She bought a house, she had a Mercedes, she

24   had a great life.  But it wasn't her money.

25          And meanwhile the victims' lives have been completely

1    destroyed.  Glenda Spurlock's house went into foreclosure.  Janet

2    Herald lost a significant amount of money.  Jill Sobol-Kerst,

3    also a testifying victim, has had to downsize, has sold property,

4    has liquidated retirement funds.

5            In fact, we only presented five victims at trial.  Five

6    additional victims were interviewed and we know that there are

7    six more victims whose funds went into Ms. Okoro's accounts.

8    That means that the Government has actually spoken to ten of the

9    16 victims, which is far more than necessary to establish

10   Ms. Okoro's culpability.  She had more bank accounts than Moses

11   and Animashaun and she received more money.

12           We also know that any statement about her not believing

13   Animashaun had a bank account is false, because in May of 2017

14   she wired money to Animashaun in Nigeria.

15           We also know she had a cashier's check in August of

16   2017 made out to B&G Global Link that could only be cashed by

17   Animashaun, meaning she knew he had a bank account in the name of

18   his own fake business.  That was Government's Exhibit -- that --

19   evidence of that could be found at Government's Exhibit 106,

20   page 6.

21           So the Court has had the opportunity to evaluate

22   Mr. Animashaun's testimony at Ms. Okoro's trial, Mr. Moses'

23   testimony at Ms. Okoro's trial and, finally, Ms. Okoro's

24   testimony.

25           Based on what has been presented to the Court after a

1    nine-day trial we do believe that Ms. Okoro should be held

2    accountable for all of the funds that went into her account, all

3    of the funds that went into the co-conspirators' accounts and

4    that is consistent with the requirements of the Sentencing

5    Guideline Section 1(b)1.3(a) as well as 2(b)1.1 comment note 3A.

6    Loss has to be the greater of the actual or intended loss.

7    Therefore, while other co-defendants were held accountable for

8    lower loss numbers, that's because that's what the Government

9    knew at the time that they pled guilty and knew that they should

10   be held accountable for.

11           Based on the additional investigation and detail

12   necessary to go to a trial, to a -- for a fraud trial for almost

13   two weeks, the Government identified 16 total victims and the

14   loss number should be that entire amount of $3,300,034.61.

15           So based on the fact that she received money from

16   16 victims, she extended the length of the conspiracy, she

17   involved other unindicted co-conspirators and her fraud increased

18   over time.  She ends up with a PPP loan in 2021 for a fake

19   business.  And, finally, the -- if the Court applies the

20   obstruction of justice enhancement she should be at level 31 and

21   looking at 108 to 135 months.

22           A sentence within that guideline range would be

23   appropriate given how the Court has sentenced every other

24   defendant in both this case as well as the related cases of

25   3:21-cr-434, 436, I believe 4 -- and 430 -- 437 and 438.  It's

1  Afeez Alao, Victor Idowu, Ezezobor, and Frederick Orji, Emanuel

2  Orji, David Animashaun and Moses and Ambrose Ohide.

3       All of the defendants so far in these cases have

4  received a guideline sentence and sometimes adjustments to the

5  guideline sentence based on motions, but all of them have been

6  sentenced based on the losses that identifiable victims suffered

7  and within their guideline ranges.

8       Ms. Okoro, if anything, is more culpable than some of

9  her co-defendants based on how long she was involved in these

10  online impostor scams.  She put the -- she put the Government to

11  its burden of proof and the Government succeeded.  It doesn't

12  matter how long the jury was out, it doesn't matter what

13  questions the jury asked.  Rather than undermining the evidence

14  or undermining the verdict it shows the jury was actively

15  considering the evidence and actively asking questions.

16       We disagreed with her -- with the objection or the

17  suggestion that she was a minor participant.  A minor participant

18  doesn't receive money from 16 victims or continue in the fraud

19  the longest of all the co-conspirators.  She also had the highest

20  number of bank accounts.

21       Finally, on acceptance of responsibility she didn't

22  tell probation she accepted responsibility, she minimized her

23  ability to pay.  And overall we believe that the guideline

24  sentence of 108 to 135 months within the range would promote

25  respect for the law, deter others from committing the same

1    crimes, protect the public and justly punish the Defendant.

2    We're not asking for an upward variance or an upward departure,

3    but we do believe that all of the enhancements are properly

4    applied.

5              If the Court would like to hear more with respect to

6    sophisticated means or the obstruction enhancement we could go

7    on, but I think that that suffices to justify the sentence.

8              MR. BUNCH:  Your Honor, if I may briefly, very briefly.

9              THE COURT:  Oh, so briefly because you were talking for

10   almost an hour.

11             MR. BUNCH:  Yes, Your Honor.  As a basis that Ms. Okoro

12   is more culpable than her co-defendants Animashaun and Moses, the

13   Government just claimed that -- as a fact that is aggravating to

14   that that Ms. Okoro received money from two other people not

15   related, but they are related and this is what the Government

16   didn't tell you.  One of those people is Deji, Animashaun's

17   previous roommate before he met Okoro, before Moses came here.

18   So that's -- that's David's roommate.

19             Secondly, Moses lied that he started scamming in

20   2016 -- late 2016.  This -- the Government's own exhibit showed

21   that this is objectively false.  The Court can look at them.

22   There's -- there's -- in Exhibit 53 there's travel documents

23   where he's showing a victim that he's coming to visit her in

24   March of 2016 before Okoro ever met Animashaun or became involved

25   in anything.  So that's a lie and the Government continues to

1  push that lie on the Court.

2          And, lastly, proof that Ms. Okoro sent money to David

3  while he was in Nigeria is not proof that she has knowledge that

4  he had a bank account in America.  It's just not.  And so I felt

5  the need to correct those misstatements I would submit to the

6  Court for the Court's consideration.  Thank you.

7          THE COURT:  All right.  I'm adopting the factual

8  contents of the presentence report and the addendum as my factual

9  determination in connection with sentencing.  I'm overruling all

10  the objections for the reasons stated in the addendum with the

11  exception of the obstruction objection, which I'm sustaining.

12          The defense in my estimation tries to paint a picture

13  of Ms. Okoro as being otherwise law abiding with this one

14  aberration, which you blame on Defendant Animashaun.  And I just

15  don't think the evidence at the trial supports that caricature.

16          There was evidence that she filed false and fraudulent

17  federal income tax returns, there is evidence that she filed a

18  false and fraudulent PPP loan application.  There was, of course,

19  evidence of the scheme at issue before me and there was evidence

20  that after that she defrauded or participated in defrauding TIAA

21  of a substantial sum of money.  So to say that this is an

22  aberration caused by a boyfriend just is not supported by the

23  record.

24          The guideline calculation here with the objection I'm

25  sustaining yields offense level 31, criminal history category

1  one, for a sentencing range of 108 to 135 months.  I find under

2  the circumstances that the guidelines here adequately reflect the

3  seriousness of the offense conduct as well as the other statutory

4  sentencing factors of Section 3553(a).  Accordingly, I don't see

5  any reason to vary from the guidelines in imposing sentence.

6       I think you can quibble about specific details, but

7  when you look at the big picture Ms. Okoro sat on the witness

8  stand there, told the jury she didn't do it and they rejected

9  that unanimously.  And I'm very comfortable that she committed

10 perjury in the course of the trial and merits the enhancement.

11      I think a sentence in the middle of the range is

12 appropriate, therefore, I'm going to sentence the Defendant to

13 120 months in the custody of the Bureau of Prisons on each of

14 counts one and two to run concurrently for a total aggregate

15 sentence of 87 months.

16      I'm going to order restitution in the amount set forth

17 in the presentence report, which is $2,256,861.11.  This is joint

18 and several with Co-defendants Animashaun, Moses, E. Orji and

19 F. Orji to be the disbursed as set forth in the judgment.

20      MS. WALTERS:  Your Honor, I'm so sorry.  I heard 120

21 months on each of the two counts to run concurrently, and then I

22 believe I might have misheard 87 months and I wanted to clarify

23 that.

24      THE COURT:  If I said 87 I misspoke.  That was before

25 the obstruction enhancement.

1          MS. WALTERS:  Thank you for clarifying.

2          THE COURT:  It's a total sentence of 120.

3          MS. WALTERS:  Thank you.

4          THE COURT:  The restitution to be disbursed as set

5  forth in the written judgment.  If upon commencement of the term

6  of supervised release any part of the restitution remains unpaid

7  the Defendant shall make payments on the unpaid balance in

8  monthly installments of not less than ten percent of the

9  Defendant's gross monthly income or a rate not less than $50 per

10 month, whichever is greater, beginning 60 days after release.

11          In addition, at least 50 percent of the receipts

12 received from gifts, tax returns, inheritances, bonuses, lawsuit

13 awards and any other receipt of money shall be paid toward the

14 unpaid balance within 15 days of receipt.

15          I will also order the special assessment in the amount

16 of $100 per count for a total assessment of $200.  I'm not going

17 to impose any fine due to inability to pay in view of the

18 restitution amount.

19          I'm also going to place the Defendant on supervised

20 release for a term of three years on each of counts one and two

21 to run concurrently for a total period of three years to serve as

22 an extra deterrent to prevent possible future reentries.

23          The terms of supervised release are set forth in

24 Miscellaneous Order 64 and Part G of the presentence report,

25 including particularly that if ordered deported or removed the

1    Defendant shall remain outside the United States.

2          I'm required to advise the Defendant regarding her

3    rights to appeal.  You can appeal your conviction if you believe

4    there was error in the course of the trial that affected your

5    substantial rights.

6          You also have a right to appeal your sentence

7    particularly if you think the sentence is contrary to law.  You

8    have the right to request to appeal at no cost if you do not have

9    sufficient funds for the appeal and you may request the clerk of

10   court to prepare and file a notice of appeal on your behalf.

11   With very few exceptions any notice of appeal must be filed

12   within 14 days of entry of formal written judgment.

13         Having advised the Defendant regarding her rights to

14   appeal is there anything else from the defense?

15         MR. BUNCH:  Your Honor, we would request placement in

16   the North Texas region.

17         THE COURT:  I will recommend local placement.  As you

18   know, my recommendation is not binding on the Bureau of Prisons,

19   but for whatever help it is, yes, I will recommend that.

20         MR. BUNCH:  Yes, Your Honor.

21         THE COURT:  Anything else from the Government?

22         MS. WALTERS:  The Government moves to dismiss the

23   indictment with respect to this Defendant only.

24         THE COURT:  It is dismissed as to this Defendant only.

25         Then the Defendant is remanded into custody and counsel

1    may be excused if you have nothing further with us today.

2              (Court adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                                    INDEX

2    Court's ruling............................................ 32

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, Jeff L. Foster, United States Court Reporter for the

2    United States District Court in and for the Northern District

3    of Texas, Dallas Division, hereby certify that the above and

4    foregoing contains a true and correct transcription of the

5    proceedings in the above entitled and numbered cause.

6          WITNESS MY HAND on this 19th day of June, 2024

7

8

9

10                         /s/ Jeff L. Foster_____
                           JEFF L. FOSTER, RMR, CRR
11                         United States Court Reporter
                           1100 Commerce St., Room 1504
12                         Dallas, Texas 75242
                           (214) 753-2349
13

14

15

16

17

18

19

20

21

22

23

24

25